UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KHAN FUNDS MANAGEMENT AMERICA, INC. *and* XUEFENG DAI, <br><br> Plaintiffs, <br><br> – *against* – <br><br> NATIONS TECHNOLOGIES INC., NATIONS TECHNOLOGIES (USA) INC., SHENZHEN QIANHAI NATIONS INVESTMENT MANAGEMENT CO. LTD., ZHAOXUE LUO, YINGTONG SUN, BAOXIN HUANG, JUNEE YU, YAPING CHEN, HUAXIA GENERAL PROCESSOR TECHNOLOGIES INC., OPTIMUM SEMICONDUCTOR TECHNOLOGIES INC. *d/b/a* GENERAL PROCESSOR TECHNOLOGIES, KEYI LI, *and* DOES 1–20, <br><br> Defendants. | **OPINION & ORDER** <br><br> 22-cv-5055 (ER) |

RAMOS, D.J.:

Khan Funds Management America, Inc. ("Khan Funds") and its chief executive officer, Xuefeng "Eric" Dai (together, "Plaintiffs"), bring this action for civil racketeering, conspiracy, and fraud in connection with an alleged enterprise to coerce Plaintiffs into stealing American technology for the Chinese military.  Doc. 35 (Am. Compl.). Defendants are Nations Technologies Inc. ("Nations") and its subsidiaries Nations Technologies (USA) Inc. ("Nations USA") [1] and Shenzen Qianhai Nations Investment Management Co. Ltd. ("Nations Investment"); Nations directors and officers Zhaoxue Luo, Yingtong Sun, and Junee Yu (a/k/a Junjie Yu); Baoxin Huang; Yaping Chen; HuaXia General Processor Technologies ("HuaXia GPT") and its subsidiary Optimum

---

[1] Nations and Nations USA are referred to herein as "the Nations Defendants."

Semiconductor Technologies ("OST") (d/b/a General Processor Technologies ("GPT")[2]); and OST Chairman of the Board Keyli "Kerry" Li (collectively, "Defendants").  *Id.* ¶¶ 21–30.

Before the Court are the Nations Defendants' and OST's motions to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5), and 12(b)(6). Docs. 46 and 53.  For the following reasons, the Nations Defendants' motion is DENIED without prejudice, and OST's motion is GRANTED.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  *Plaintiffs*

Dai was born in Chongqing, China and worked as a dentist until 2006 when he switched to a career in finance and founded Khan Funds, then based in Shenzhen, China. Doc. 35 ¶ 58.  Khan Funds is a hedge fund focused on investments in biomedical and pharmaceutical companies.  *Id.* ¶¶ 2, 58.  Khan Funds became an "industry giant" and, at its height, ran fourteen hedge funds with assets totaling over one billion dollars.  *Id.* ¶ 58.

In 2014, Dai sought to expand into the American market and focus on merging U.S. healthcare, pharmaceutical, and biotechnology companies with Chinese publicly traded companies.  *Id.* ¶¶ 2, 59.  As part of this effort, in October 2014, he founded plaintiff Khan Funds Management America, Inc. to serve as the global headquarters for his business and the umbrella parent company to the wholly owned affiliated entities in China, Singapore, and elsewhere.  *Id.* ¶ 59.

In January 2014, he obtained a U.S. visa and moved to New York in October 2015 to run Khan Funds.  *Id*.  In 2017, he received an EB1-A (Alien of Extraordinary Ability) visa and became a U.S. lawful permanent resident.  *Id.* ¶¶ 2, 64.  One of Khan Funds'

---

[2] Plaintiffs state that it is not clear whether GPT is a separate legal entity from OST or merely a d/b/a name and asks the Court to consider allegations about OST to be made about GPT to the extent it is a separate entity.  *Id.* ¶¶ 29, 51 n.8.  Accordingly, the Court treats references to GPT to also encompass OST, both in the amended complaint and instant Opinion.

wholly owned subsidiaries, Beijing Qilong Medical and Pharmaceutical Holding Co.,
Ltd. ("Khan Funds Beijing") serves as Khan Funds' base in China.  *Id.* ¶ 59.

    *2.  Defendants*

    Nations is a publicly traded company, incorporated in China in 2000, and is a
leader in China's information security and integrated circuit design industry.  *Id.* ¶¶ 3, 43.
It is closely affiliated with the Chinese government, which is also one of its major clients
and an indirect controlling shareholder.  *Id.* ¶ 43.  Plaintiffs allege Nations' mission is to
convert civilian technology to military use as part of China's effort to win the arms race
for next-generation weapons (which require semiconductor chips) "by any means
necessary," including by stealing designs and expertise.  *Id.* ¶¶ 40–43.  Nations USA is
Nations' wholly owned subsidiary with a principal place of business in California.  *Id.*
¶ 22.  Nations Investment is also a wholly owned subsidiary of Nations.  *Id.* ¶ 3.  Luo was
Nations' independent director from 2009 to 2012 and its president from 2014 to 2018,
allegedly appointed to the position by top Chinese government officials because of his
work in and with the Chinese military.  *Id.* ¶¶ 23, 44–45.  Sun is Nations' general
manager and current president and a former delegate on the Shenzhen City National
People's Congress with close ties to the Chinese government.  *Id.* ¶¶ 24, 46.  And Yu was
Nations' chief financial officer and vice general manager from approximately 2014 to
2018.  *Id.* ¶ 25.

    Huang is a former Chinese cabinet-level official, who served in various roles in
China's national security apparatus, and Luo's longtime friend.  *Id.* ¶ 26, 61.

    Chen is a semiconductor expert and founded semiconductor company Chengdu
RML Technology Co. (90% of whose sales are to the Chinese military).  *Id.* ¶¶ 27, 47.

    HuaXia GPT is a Chinese company focused on semiconductor research in New
York and China, and OST (d/b/a GPT) is its wholly owned subsidiary with a principal
place of business in New York.  *Id.* ¶¶ 28–29.  Plaintiffs also allege OST is partially and
indirectly owned by Nations.  *Id.* ¶ 54.  Li, OST's Chairman of the Board, is associated

with several other semiconductor companies and is also linked to the Chinese government and the Chinese Communist Party.  *Id.* ¶¶ 30, 51–52.

Plaintiffs allege Defendants are members of an enterprise to steal semiconductor research and expertise in service of the Chinese military ("the Enterprise").  Luo and Sun were responsible for recruiting and managing members of the Enterprise, including Chen and Li.  *Id.* ¶¶ 47, 53.  Plaintiffs specifically describe Luo as the "mastermind" of the Enterprise with final authority over all its decisions, policies, and practices.  *Id.* ¶ 121(i).  Sun also serves as "a leader" of the Enterprise, contributing to its decisions, policies, and practices.  *Id.* ¶ 121(ii).  Nations, including through its subsidiaries Nations USA and Nations Investment, manages the Enterprise and orchestrates its schemes to illicitly procure protected technologies and commodities for China's use.  *Id.* ¶¶ 121(iii)–(v).  Yu was responsible for the day-to-day affairs of the Enterprise.  *Id.* ¶ 121(vi).  Huang tried to recruit Plaintiffs to the Enterprise and induce Plaintiffs to commit crimes for it.  *Id.* ¶ 121(vii).  Chen managed and compensated members, and he also coordinated with Nations, Luo, and Sun about retaliation and intimidation campaigns against Plaintiffs.  *Id.* ¶¶ 47, 121(viii).  OST serves as the Enterprise's strategic base, including management of its technical experts.  *Id.* ¶ 53.  Li, through OST, managed the Enterprise's New York activities.  *Id.* ¶¶ 7, 121(x).  HuaXia GPT serves as OST's Chinese base.  *Id.* ¶ 121(xi).

### 3. *The Partnership*

In May 2014, before Dai relocated to the United States, Huang introduced Dai to Luo and Sun to discuss a potential partnership between Khan Funds and Nations.  *Id.* ¶ 61.  Although Huang, Luo, and Sun purported that the partnership was for Nations to serve as Khan Funds' exclusive partner for biomedical investments, Plaintiffs allege Defendants always intended to use the Partnership to lure Dai and Khan Funds into the Enterprise.  *Id.* ¶ 66.

On November 23, 2015, Khan Funds Beijing and Nations Investment entered into a partnership agreement whereby Khan Funds Beijing would serve as the general and

executive partner, and Nations Investment would be only a limited partner ("the Partnership"). *Id.* ¶ 63. Khan Funds Beijing had the sole and exclusive right to make independent investment and management decisions for the Partnership, and Nations Investment was expressly forbidden from participating in or interfering with the decisions. *Id.* Nations invested approximately $42 million in the Partnership with Khan Funds.[3] *Id.* ¶ 3.

From January to September 2016, Dai worked to identify suitable biomedical investment targets for the Partnership, and, in May 2016, Khan Funds identified a San Diego company conducting clinical research on diabetes and other endocrine diseases. *Id.* ¶ 65.

Meanwhile, Luo insisted that Dai create a hedge fund called Zhongxinanxin to serve as a semiconductor-focused fund, which Dai created on February 2, 2016. *Id.* ¶ 67. But, because Dai did not want to expand to semiconductors, he never procured a license from the Chinese securities regulatory commission, nor registered any capital for the fund, and continued to refuse to do so even when Luo and Yu insisted. *Id.*

In March 2016, Luo asked Dai to meet during Luo's business trip to New York on May 7, 2016, to set up an account at the China Merchants Bank's New York branch for a British Virgin Islands company. *Id.* ¶ 68. Plaintiffs allege, unbeknownst to Dai, that Luo intended to use the account to launder the Enterprise's proceeds and finance its activities. *Id.* Luo also told Dai that, during his May trip to New York, Luo met with his "old friend" Li and reiterated that he hoped Dai would acquire semiconductor companies through the Partnership. *Id.* ¶ 69. Dai disregarded the suggestion and continued with his plans for the San Diego-based biomedical transaction. *Id.* Around this same time, Dai also met with Huang and two executives of the San Diego biomedical company. *Id.* ¶ 70.

---

[3] Both here and generally in allegations regarding the Partnership, Plaintiffs say "Khan Funds" and "Nations" without clarifying whether they actually mean Khan Funds Beijing and Nations Investment (the actual parties to the Partnership).

In June 2016, Dai called Yu about his concerns that Luo did not seriously intend to invest in the biomedical industry as the Partnership had envisioned, but Yu reassured Dai that his fears were unfounded and told him to proceed as planned.  *Id.* ¶ 71.  Based on these reassurances, Dai approved an additional $29 million capital contribution from Nations in July 2016.  *Id.*  With the leverage of the additional capital contribution, Yu called Dai in August 2016 to express Luo's anger that Dai refused to move forward with the semiconductor effort and threatened to terminate the Partnership if Dai did not acquiesce.  *Id.* ¶ 72.  Dai continued to refuse.  *Id.*

In September 2016, Yu asked a Khan Funds executive to visit Beijing so he could introduce her to business contacts, but when she arrived, Yu informed her that they would instead be meeting representatives of HuaXia GPT in furtherance of Luo's hope that Khan Funds would invest in OST.  *Id.* ¶ 73.  Li helped coordinate the meeting, but it did not lead to an investment or other transaction.  *Id.*

Also in September 2016, Luo traveled to New York to again try to convince Dai to expand into semiconductors, and he also visited OST's office to coordinate with Li and other Enterprise members regarding its activities.  *Id.* ¶ 74.  And on September 26, 2016 Yu met with Dai in Beijing and threatened to dissolve the Partnership immediately if Plaintiffs did not acquire a semiconductor company.  *Id.* ¶ 75.  Dai proposed to terminate the Partnership in stages in 2018 and 2020 if no acquisition was consummated by that time, and Yu agreed.  *Id.*

In November 2016, Dai met with Luo in Beijing, and Luo again told Dai that he hoped Khan Funds would invest in OST through the Partnership.  *Id.*  Yu also pushed Dai to acquire OST.  *Id.*  Dai again refused.  *Id.*

On December 7, 2016, Plaintiffs allege that Defendants caused the Chinese Ministry of State Security to send two officials to Khan Funds' office in Shenzhen, purportedly to investigate an American employee of Khan Funds, but really to "demonstrate Defendants' reach and to back up their demands with coercive force."  *Id.*

¶ 76.  When the officials were refused entry, they said they would return in a few days but never did.  *Id.*

From December 2016 to May 2017, Yu repeatedly requested to meet with Khan Funds employees, including at least once in China, to inquire about Plaintiffs' efforts to acquire a semiconductor company.  *Id.* ¶ 77.  He grew angry at Plaintiffs' lack of progress on the acquisition.  *Id.*

Ultimately, in meetings with Dai from September 10 to 14, 2017 in New York (which Dai secretly recorded), Luo admitted that Nations never intended to use the Partnership to invest in biomedical companies, but the Partnership was in fact a "special mission from the state" to orchestrate the Enterprise's aims of acquiring technology for the Chinese military.  *Id.* ¶¶ 78–81.  Specifically, Luo wanted Dai to provide $42 million to finance the Enterprise, fully license and provide capital for Zhongxinanxin, and launder money for the Enterprise.  *Id.* ¶ 83.  Luo threatened Dai, his family, and his associates if Dai did not comply, and promised Dai profit, access, and influence if he did. *Id.* ¶¶ 78, 84–87.

In response to Luo's threats, on September 12, 2017, Dai arranged for his mother and older sister to flee China, and they reached South Korea the next day.  *Id.* ¶ 86.

After the September meetings, Dai also reported the Enterprise's activities to the New York Field Office of the Federal  Bureau of Investigation ("FBI"), which initiated an investigation with the United States Attorney's Office for the Southern District of New York.  *Id.* ¶ 88.  He met with the FBI four times between April and June 2018 about Nations, Chen, Yu, and other members of the Enterprise.  *Id.*  He ultimately met with federal investigators sixteen times over the next two-and-a-half years.  *Id.*

Knowing that he would be blacklisted in China when his cooperation with law enforcement became known, Dai dissolved Khan Funds' Chinese affiliates, liquidated the private equity funds, and returned the capital to his investors, incurring $1.5 million in penalties and other damages arising from the dissolutions.  *Id.* ¶ 89.

Shortly after Dai first reported the Enterprise, Luo called Dai to request Dai fund the Enterprise via a British Virgin Islands company, but Dai equivocated to buy time. *Id.* And, in November 2017, Yu also called Dai to implore Dai to finance a $1.5 billion semiconductor fabrication project Nations was trying to establish in China, but Dai again equivocated to buy time. *Id.* ¶ 90.

In late November 2017, a Khan Funds executive informed Yu that Plaintiffs would not be joining the Enterprise. *Id.* In response, Plaintiffs allege Defendants made good on Luo's prior threats and initiated a "Fox Hunt" on November 30, 2017, a tactic by which the Chinese government threatens the family and friends of dissidents, conducts extensive surveillance, and otherwise harasses the dissident and his family to try to force him to repatriate to China to stand trial for his "crimes against the state." *Id.* ¶¶ 92–93. Nations first falsely announced Dai and his colleagues had absconded from China, and it engaged in a years-long press campaign accusing Dai and his associates of embezzling funds and otherwise ruining his reputation in the Chinese business community. *Id.* ¶ 93. In December 2017, the Funds Association of China, a government agency, suspended the financial license of Khan Funds China[4] without notice, preventing Plaintiffs from doing business in China.[5] *Id.* ¶ 94.

A few weeks after the suspension, U.S. federal authorities arrested two Enterprise members for violations of the International Emergency Economic Powers Act ("IEEPA") and conspiracy for attempts to transfer semiconductor technology back to China. *Id.* ¶ 95. Defendants assumed the arrests meant that Dai had reported the Enterprise to the authorities and, the same day as the arrest, burglarized Khan Funds' office in Singapore

---

[4] Plaintiffs do not clarify if this is the same or a different entity from Khan Funds Beijing.

[5] Plaintiffs do not specify whether this occurred before Dai's dissolution of Khan Funds' Chinese affiliates (for which they provide no dates). Nor do they specify, if the suspension occurred after the dissolution, what business Plaintiffs still conducted in China that the suspension prevented them from doing.

and changed its locks.  *Id.*  Dai spent $50,000 to retain a law firm to investigate the burglary.  *Id.*

In February 2018, Dai's younger sister traveled to New York and told him she wanted to move to the United States permanently because she feared retaliation from the Chinese government.  *Id.* ¶ 96.  When Dai revealed, in response to her questions, that he had reported Luo to the authorities, she suddenly announced she was returning to China. *Id.*  Plaintiffs allege Huang had in fact arranged for her to travel to New York to collect intelligence on Dai.  *Id.*

In May 2018, the Enterprise brought a lawsuit in China to remove Khan Funds Beijing as general partner of the Partnership and alleged that Nations could not contact Dai, resulting in a default judgment against Khan Funds Beijing in February 2019.  *Id.* ¶ 97.  Through the litigation, Nations Investment also formally removed Dai from his position as director of the Partnership on October 16, 2019.  *Id.* ¶ 106.  Dai did not learn of the default until June 2021.  *Id.* ¶ 97.

Although the United States Attorney's Office declined to bring a case against the Enterprise,[6] the Department of Justice indicted Chen and others on October 18, 2018 in the U.S. District Court for the Southern District of California for conspiracy to violate IEEPA, Export Administration Regulations, and other forms of economic espionage.  *Id.* ¶ 98.

On December 6, 2018, Defendants ordered a cyberattack against Khan Funds' computers and networks in New York to steal confidential documents and correspondence with legal counsel.  *Id.* ¶ 100.  Nations Investment filed the stolen documents on October 27, 2020 in litigation in Singapore against Dai and other Khan Funds associates for embezzlement.  *Id.*  Between November 2020 and September 2021, as part of the Singaporean litigation, Nations Investment also hired three alleged process serving

---

[6] Plaintiffs do not state when this occurred.

entities (who Plaintiffs allege were actually investigators employed as part of the Fox Hunt) to surveil Dai's property in New York, purportedly to serve Dai a subpoena for the litigation.  *Id.* ¶ 107–09.  Dai was eventually served by email (*i.e.*, not based on the surveillance).  *Id.* ¶ 107.

On December 25, 2018, Nations announced that the Shenzhen People's Procuratorate had approved the arrest of Dai and his colleagues as fugitives suspected of embezzlement, as a result of which Dai cannot travel to any country honoring China's extradition requests, and his assets in China are frozen.  *Id.* ¶ 101.

Between January and March 2019, Dai received a series of "threatening and degrading" Twitter messages and comments by a user Plaintiffs allege to be a family member of the former Chinese vice premier acting on behalf of the Enterprise.  *Id.* ¶ 103–04.

In August 2019, the FBI interviewed Dai about the director of Nations USA.  *Id.* ¶ 105.  And in October and November 2019, they sought Dai's assistance with an investigation into the Fox Hunt, which Plaintiffs allege was meant to target Sun.  *Id.*

## B.  Procedural History

Plaintiffs brought suit against the Nations Defendants, Sun, Luo, Huang, and Yu on April 6, 2022 in New York state court for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), RICO conspiracy, fraud, defamation, prima facie tort, and civil conspiracy.  Doc. 1-1.  The case was removed to this Court on June 16, 2022.  Doc. 1.

Plaintiffs amended their complaint on December 19, 2022, adding Chen, HuaXia GPT, Li, OST, and Nations Investment as defendants.  Doc. 35.  The amended complaint asserts four claims:  (1) RICO violations against all Defendants, (2) conspiracy to violate RICO against all Defendants, (3) common law fraud against the Nations Defendants, Nations Investment, Luo, Yu, and Huang; and (4) violation of the Computer Fraud and

Abuse Act against the Nations Defendants, Luo, and Sun.  *Id.*  As to the RICO claims,

Plaintiffs allege predicate acts of:

- wire fraud (based on Defendants' international communications misrepresenting the purpose of the Partnership and induce Plaintiffs to invest in OST);

- witness tampering, retaliation, and obstruction of justice (based on the Fox Hunt, including the negative press campaign, revocation of Khan Funds' financial license, inducing Dai's younger sister to investigate him, burglary of Khan Funds' Singapore office, the cyberattack, the fraudulent lawsuits in China and Singapore, inducing the Chinese arrest warrant against Dai, pervasive surveillance, attempted kidnapping, and the Twitter threats);

- extortion (based on threats to dissolve the Partnership and against Dai and his family if he did not invest in Zhongxinanxin);

- kidnapping (based on the Fox Hunt's ultimate goal of seeking to repatriate Dai to China); and

- money laundering (based on the Enterprise's attempts to transfer its funds into the Partnership in support of its plans for economic espionage).

*Id.* ¶¶ 129–37.

The Nations Defendants moved to dismiss the amended complaint on February 17, 2023 for lack of personal jurisdiction, insufficient process, and failure to state a claim as to all four counts.  Doc. 46.  OST also moved to dismiss the two RICO claims (the only claims brought against it) on February 24, 2023.  Doc. 53.

## II.   LEGAL STANDARDS

### A.  Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Plaintiffs "opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction ha[ve] the burden of establishing that the court has jurisdiction over the defendant."  *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02-cv-4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  Plaintiffs "must establish the court's jurisdiction with respect to each claim asserted."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To meet this burden, Plaintiffs must plead facts sufficient for a prima facie showing of jurisdiction. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The Court construes all of Plaintiffs' allegations as true and resolves all doubts in Plaintiffs' favor. *Casville Invs., Ltd. v. Kates*, No. 12-cv-6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012)). "However, [Plaintiffs] may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14-cv-3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citation omitted). The Court may rely on additional materials outside the pleading when ruling on 12(b)(2) motions. *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91-cv-3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *Darby Trading Inc. v. Shell Intern. Trading and Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008) (citations omitted).

### B. Rule 12(b)(5) Motion to Dismiss for Insufficient Service of Process

To evaluate a 12(b)(5) motion, courts look to Federal Rule of Civil Procedure 4, which governs service of process. In considering a motion to dismiss pursuant to Rule 12(b)(5) for insufficient service of process, a court may also look to materials outside the complaint to determine whether it has jurisdiction. *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003). "Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process." *Id.* (citation omitted). When a defendant challenges the sufficiency of service pursuant to Rule 12(b)(5), "the plaintiff bears the burden of proving its adequacy." *Id.* (citation omitted).

The Second Circuit has held that Federal Rule of Civil Procedure 4 is to be construed liberally "to further the purpose of finding personal jurisdiction in cases in

which the party has received actual notice." *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986) (citation omitted).  Thus, upon a finding that service has not been completed or is otherwise insufficient, courts have discretion to dismiss the case or simply quash the faulty service.  *Ting Qiu Qiu v. Shanghai Cuisine, Inc.*, No. 18-cv-5448 (ER), 2021 U.S. Dist. LEXIS 9633, at *7 (S.D.N.Y. Jan. 19, 2021) (citing *Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781, 796 (S.D.N.Y. 2008)).  Accordingly, quashal of the improper service, rather than dismissal of the action, is generally appropriate where proper service may still be obtained.  *See Grant v. State*, No. 88-cv-8703 (RJW), 1989 U.S. Dist. LEXIS 5716, at *8–9 (S.D.N.Y. May 23, 1989).  Quashal is particularly appropriate where, notwithstanding the insufficient service of process, the defendant nonetheless has actual notice of the action.  *See Aries Ventures, Ltd. v. Axa Fin. S.A.*, 729 F. Supp. 289, 303 (S.D.N.Y. 1990).  But a court may dismiss an action when it appears that "there is simply no reasonably conceivable means of acquiring jurisdiction over the person of the defendant."  *Romandette*, 807 F.2d at 311 (citation omitted).

### C.  Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

13

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.   DISCUSSION

### A.   The Nations Defendants' Motion to Dismiss is Denied Without Prejudice as Premature

The Nations Defendants move to dismiss the action, in its entirety, for (1) lack of personal jurisdiction, under both New York's long-arm statute and the Due Process Clause, pursuant to Rule 12(b)(2); (2) insufficient service of process pursuant to Rule 12(b)(5); and (3) failure to state a claim as to all counts pursuant to Rule 12(b)(6). *See* Doc. 50 (Nations Defs.' Mem. of L.). When the Court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether the complaint states a claim. *Mende*, 269 F. Supp. 2d at 251 ("Before addressing Defendants' Rule 12(b)(6) motion to dismiss, the Court must first address the preliminary questions of service and personal jurisdiction."); *see also Darby*

*Trading*, 568 F. Supp. 2d at 335.  Federal courts may exercise personal jurisdiction over a party only if (1) it was properly served, (2) there exists a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction would comport with constitutional due process.  *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012).  Accordingly, the Court cannot decide the Nations Defendants' 12(b)(6) arguments unless it has personal jurisdiction over them, which in turn requires that Plaintiffs have properly served them.

 *1. Nations*

 Generally, Chinese companies, like Nations, must be served pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("the Hague Convention").  *See* Fed. R. Civ. P. 4(f), (4)(h)(2); *Peifa Xu v. Gridsum Holding Inc.*, No. 18-cv-3655 (ER), 2020 U.S. Dist. LEXIS 55452, at *37–39 (S.D.N.Y. Mar. 30, 2020) ("There is no strict requirement that a plaintiff pursue service through [the Hague Convention] before asking a court's assistance in ordering alternative service, and the decision of whether to allow that service is committed to the sound discretion of the district court. . . . [But w]hen courts have allowed for alternative service, they have done so when plaintiffs have been unable, despite diligent efforts, to serve the defendant in the foreign country according to the Hague Convention procedures.  The plaintiffs here have not been diligent in their efforts[, and the court therefore requires them to pursue service through the Hague Convention.]" (internal citations and quotation marks omitted)).  The parties agree that, as of the date of their papers, Nations has not been served under the Hague Convention.[7]  Doc. 50 at 35–36; Doc. 64 (Pls.' Opp. to Nations' Defs.' Mot.) at 35–36.  Rather, Plaintiffs allege their attempts to serve Nations are ongoing:  they began the process by retaining a Hague Convention service specialist on July 19, 2022 and

---

[7] The Court previously held at a July 20, 2022 hearing that it would not allow Plaintiffs to move to serve by alternate means until they first attempted to serve Nations pursuant to the Hague Convention.  Doc. 30 at 11:9–15).

engaged investigators to research defendants' addresses; obtained the results of that research in February 2023 and the final summons and translations on March 28, 2023; and anticipated completing the final steps to submitting the Hague Service Convention Requests to the International Legal Cooperation Center in April 2023.  Doc. 64 at 36.

Because "Plaintiffs failed to serve [Nations] in compliance with the Hague Convention" as of the date it filed its memorandum of law in February 2023,[8] Nations therefore argues that the case against it must be dismissed.  Doc. 50 at 36.  But it is premature for Nations to move to dismiss the complaint for failure to serve in compliance with the Hague Convention when Plaintiffs are currently in the process of doing exactly that.  *See Mashud Parves Rana v. Islam*, 305 F.R.D. 53, 65–66 (S.D.N.Y. 2015) (denying motion to dismiss for insufficient service of process where proper service under the Hague Convention could still be obtained and noting that the Federal Rules of Civil Procedure impose no time limit for service in a foreign country); *Daly v. Llanes*, 30 F. Supp. 2d 407, 416 (S.D.N.Y. 1998) ("the district court should not have dismissed the action for invalid service of process under the Hague Convention until the plaintiffs were given a reasonable opportunity to attempt to effect valid service of process on the defendant in a manner complying with the convention" (citation omitted)).

---

[8] In its principal brief, Nations does not appear to argue that Plaintiffs have been insufficiently diligent in pursuing service under the Hague Convention, resting instead solely on the argument that the case must be dismissed because service is not yet complete.  Doc. 50 at 36.  On reply, Nations alleges that "Plaintiffs have no legitimate defense to the fact that they failed to commence service on [Nations] within 90 days of filing the complaint, requiring dismissal."  Doc. 69 (Nations Defs.' Reply) at 14.  They further cite *Yellowave Corp. v. Mana*, No. 00-cv-2267 (SA), 2000 WL 1508249, at *2 (S.D.N.Y. Oct. 11, 2000) for the proposition that a motion to dismiss for insufficient process should be granted where plaintiff made no effort to serve within 170 days after filing of the complaint.  Doc. 69 at 14.  But the *Yellowave* plaintiff had taken no steps whatsoever to begin serving the defendant and, in fact, had not even attempted to oppose the motion to dismiss.  2000 WL 1508249, at *2.  Comparatively, here, Plaintiffs had retained a Hague Convention service specialist and begun research on Defendants' addresses to begin the process of service within approximately three months of filing their complaint in state court, and they oppose dismissal.  Doc. 64 at 36.  The Court is therefore not persuaded that "proper service may [not] still be obtained," and "there is [thus] simply no reasonably conceivable means of acquiring jurisdiction over the person of the defendant."  *Romandette*, 807 F.2d at 311 (citation omitted).  Dismissal is therefore premature.  Accordingly, the Court will not grant Nations' motion to dismiss pursuant to Rule 12(b)(5).

Moreover, because service of process is necessary for the Court to obtain personal jurisdiction over Nations (and therefore to decide its 12(b)(6) arguments), *see Licci*, 673 F.3d at 59–60, the remainder of Nations' arguments to dismiss the complaint are also premature.  Accordingly, Nations' motion to dismiss is denied without prejudice.

    *2.  Nations USA*

Nations USA also argues that it was improperly served.  Doc. 50 at 36–39. Plaintiffs contend that Nations USA was properly served before removal under CPLR § 311(a)(1)[9] when Plaintiffs served Jie "Jay" Liang, Director of Nations USA, at Nations USA's principal place of business on May 5, 2022.  Doc. 64 at 37.  The process server's affidavit lists Liang as "John Doe" simply because he refused to identify himself by name to impede service, but the process server subsequently identified Liang as the man he served from a photo array.  *Id.*  Plaintiffs argue service of Liang as described would comply with § 311(a)(1), and "Liang's attempted obstruction cannot defeat service." *Id.* at 37–38.  Moreover, even if Liang's service was insufficient, Plaintiffs argue their service on Nations USA's registered agent Xin Sao, through service of Sao's "office manager/receptionist," sufficed because the office manager/receptionist appeared to be in charge according to the process server  *Id.* at 38–40.

In response, Nations USA insists that "[t]here is no support in the record for" Plaintiffs' argument that the John Doe served on May 5, 2022 was in fact Liang.  Doc. 69 at 14.  Additionally, Nations USA disputes that Sao's office manager/receptionist had either actual or apparent authority to receive service.  *Id.* at 15.

The adequacy of both means of service—upon Liang and Sao—turn on factual questions:  whether John Doe was Liang, and whether Sao's office manager/receptionist had apparent authority to accept process.  But the Court need not decide those factual

---

[9] "Although the Federal Rules of Civil Procedure apply to actions after removal, state law governs the sufficiency of service of process before removal."  *Montefiore Med. Ctr. v. Aetna Health, Inc.*, No. 21-cv-7838 (MKV), 2021 WL 5113013, at *1 (S.D.N.Y. Nov. 3, 2021) (citations omitted).

questions.  Where a defendant with actual notice of the suit moves to dismiss under Rule 12(b)(5) and resolution of a factual question is necessary to determine whether service was procedurally proper, in lieu of an evidentiary hearing to decide that factual question, a court may simply deny the motion to dismiss and direct the plaintiff to attempt proper service again.  *See Mashud Parves Rana*, 305 F.R.D. at 65–66; *see also Victoria Sales Corp. v. Emery Air Freight, Inc.*, No. 86-cv-1610 (JFK), 1987 U.S. Dist. LEXIS 8295, at *2 (S.D.N.Y. Sep. 9, 1987) ("when the gravemen [sic] of defendant's motion is insufficiency of process, the motion must be treated as one to quash service, with leave to plaintiffs to attempt valid service" (quoting *Daley v. Alia*, 105 F.R.D. 87, 89 (E.D.N.Y. 1985))).  Accordingly, here, the Court will use its discretion to quash the prior service on Nations USA and direct Plaintiffs to serve Nations USA properly in compliance with Federal Rule of Civil Procedure 4.  *See Ting Qiu Qiu* 2021 U.S. Dist. LEXIS 9633, at *7; *Aries Ventures, Ltd.*, 729 F. Supp. at 303; *Grant* 1989 U.S. Dist. LEXIS 5716, at *8–9. Proper service remains possible, and dismissal is therefore not yet warranted.  *See Romandette*, 807 F.2d at 311.

Finally, the Court warns Defendants that "[s]ervice of process is not intended to be a game of cat and mouse."  *Unite Nat'l Ret. Fund v. Ariela, Inc.*, 643 F. Supp. 2d 328, 336 (S.D.N.Y. 2008).  Although Plaintiffs will be held to their burden of proper service, Nations USA may not escape liability by obstructing service, and the Court will not countenance such gamesmanship as a means of avoiding litigation.  *See Savage Universal Corp. v. Grazier Constr., Inc.*, No. 04-cv-1089 (GEL), 2004 U.S. Dist. LEXIS 16088, at *21 (S.D.N.Y. Aug. 12, 2004) ("Litigants are not entitled to actively avoid service . . . and then seek dismissal of otherwise legally sufficient causes of action on grounds of insufficiency of service of process.").

As with Nations, because service of process is necessary for the Court to obtain personal jurisdiction over Nations USA (and therefore to decide its 12(b)(6) arguments), *see Licci*, 673 F.3d at 59–60, the Court will not decide the remainder of Nations USA's

arguments to dismiss the complaint.  Accordingly, the Nations Defendants' motion to dismiss is denied without prejudice.

**B.  OST's Motion to Dismiss the RICO Claims is Granted.**

To state a claim for a civil RICO violation, a plaintiff must plausibly allege:  (1) a violation of the RICO statute, 18 U.S.C. §1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of the RICO statute.  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018).  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  The elements of a §1962(c) violation thus are (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Kim*, 884 F.3d at 103.

OST moves to dismiss the RICO claim pursuant to Rule 12(b)(6) on the basis that Plaintiffs have not pled (1) the existence of an enterprise, (2) that OST engaged in a pattern of predicate acts, and (3) proximate cause.  Doc. 54 (OST Mem. of L.) at 12–18.  OST also moves to dismiss the RICO conspiracy claim because a conspiracy claim must fail when the underlying substantive allegations are without merit.  *Id.* at 18–20.

*1.  Plaintiffs Fail to Plead the Existence of an Enterprise*

"The heart of any civil RICO claim is the enterprise.  There can be no RICO violation without one."  *BWP Media USA, Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 359 (S.D.N.Y. 2014) (citation omitted).  For purposes of RICO, an "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (alteration in original) (quoting *First Capital Asset Mgmt., Inc. v.*

*Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)).  To plead the existence of such an "association-in-fact," plaintiffs must allege three structural features:  (1) a purpose, (2) relationships among members of the enterprise, and (3) longevity sufficient to permit them to pursue the enterprise's purpose.  *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 667 (2d Cir. 2014).  "In determining whether plaintiffs have alleged the existence of an association-in-fact RICO enterprise, courts analyze the hierarchy, organization, and activities of the alleged association to determine whether its members functioned as a unit.  A plaintiff's conclusory naming of a string of entities does not adequately allege an enterprise."  *BWP Media USA, Inc.*, 69 F. Supp. 3d at 360 (internal quotation marks and citations omitted).  Moreover, the mere existence of an enterprise is not enough:  "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'"  *First Capital Asset Mgmt.*, 385 F.3d at 175–76 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994)).  Thus, "plaintiffs must also allege that the defendants conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," meaning that the defendant "must have had some part in directing the enterprise's affairs."  *Id.* (internal quotation marks and brackets omitted) (citing 18 U.S.C. § 1962(c); *Reves v. Ernst & Young*, 507 U.S. 170, 177–79 (1993)); *see also D. Penguin Bros.*, 587 F. App'x at 668 (dismissing a RICO claim where the complaint failed to allege that the defendants "acted on behalf of the enterprise as opposed to on behalf of themselves in their individual capacities, to advance their individual self-interests" (citation, internal quotation marks, and brackets omitted)).

Here, OST argues that the complaint fails to plead that it played any part in directing the Enterprise, nor that it furthered the Enterprise's alleged goals of stealing semiconductor technology or harassing Dai.  Doc. 54 at 13–14.  OST argues that Plaintiffs' sole allegation as to OST's involvement is that it served as the Enterprise's "strategic base" based on one or two visits from Luo, but such minimal and conclusory

allegations are insufficient to adequately plead that OST was a member of the Enterprise. *Id.* at 14.

Plaintiffs respond that they pled both the existence of the Enterprise and that OST participated in its operation or management.  Doc. 67 (Pls.' Opp. to OST's Mot.) at 18–22.  Specifically, Plaintiffs point to three sets of allegations in the complaint:  (1) that OST "served as the New York base of the Enterprise's operations in the United States"; (2) that OST "played a key role in the scheme to ensnare Plaintiffs into investing in OST," including through the surprise meeting in China between Plaintiffs and HuaXia GPT; and (3) Luo's 2016 and 2017 visits to OST to coordinate Enterprise activities, with the 2017 meeting "explicitly serving as a global summit for the Enterprise at the OST headquarters in New York."  *Id.* at 21.

None of these allegations are sufficient to plead that OST was a member of the Enterprise, however.  It is not enough merely to allege that OST served as the base of Enterprise actions and the situs, or even host, of its meetings.  Some amount of active direction of the Enterprise's activities is required, which Plaintiffs do not sufficiently allege.  *See Reves*, 507 U.S. at 177–79; *First Capital Asset Mgmt.*, 385 F.3d at 175–76; *see also Schmidt v. Fleet Bank*, Nos. 96-cv-5030 (AGS), 96-cv-7836 (AGS), 96-cv-9705 (AGS), 96-cv-9706 (AGS), 1998 U.S. Dist. LEXIS 1041, at *40–41 (S.D.N.Y. Feb. 4, 1998) (dismissing RICO claim against corporation where the complaint neither pled that it "was a central figure in the criminal scheme [n]or that it benefited from [its employee's] alleged participation in the scheme"); *Volmar Distribs. v. N.Y. Post Co.*, 899 F. Supp. 1187, 1193 (S.D.N.Y. 1995) ("RICO only imposes liability on corporations that benefit from the racketeering activity." (citation omitted)).  And, even the most generous reading of the complaint, as to OST's actions vis-à-vis the Enterprise, amounts to little more than allegations that it hosted a nefarious meeting and lobbied for Plaintiffs to invest in it.  *See* Doc. 67 at 21.  That is simply not enough to plead that OST had some part in directing the

Enterprise's affairs.  *See First Capital Asset Mgmt.*, 385 F.3d at 176; *see also Reves*, 507 U.S. at 177–79.  Accordingly, the RICO claim must be dismissed as against OST.

    *2.  Plaintiffs Fail to Plead a Pattern of Predicate Acts*

    The RICO claim against OST must also be dismissed for the independent reason that Plaintiffs fail to plead OST engaged in a pattern of racketeering activity.  A "pattern of racketeering activity" requires that Plaintiffs plausibly allege *each defendant*—not merely the Enterprise as a whole—engaged in at least two predicate acts.  *Buhannic v. Am. Arbitration Ass'n*, No. 18-cv-2430 (ER), 2019 U.S. Dist. LEXIS 167073, at *14–15 (S.D.N.Y. Sep. 27, 2019); *cf. BWP Media USA*, 69 F. Supp. 3d at 360 (dismissing RICO claim where plaintiffs merely attributed conduct to "defendants" collectively without specifying individual defendant's own conduct).  Accordingly, where the complaint alleges a defendant committed no, or only one, predicate act, the RICO claim must be dismissed as against that defendant.  *See, e.g.*, *Bayshore Capital Advisors, LLC v. Creative Wealth Media Fin. Corp.*, No. 22-cv-1105 (KMK), 2023 U.S. Dist. LEXIS 57048, at *84 (S.D.N.Y. Mar. 31, 2023); *Kashelkar v. Rubin & Rothman*, 97 F. Supp. 2d 383, 394 (S.D.N.Y. 2000).

    Here, OST argues that the complaint only alleges that OST committed wire fraud; the allegations as to the other predicate acts constitute "improper group pleading."  Doc. 54 at 14.  Plaintiffs, however, allege that OST also "aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs," implicating predicate acts of "witness intimidation, obstruction of justice, or kidnapping."  Doc. 67 at 25.  Moreover, Plaintiffs argue that "'group pleading' is not per se verboten" under Federal Rule of Civil Procedure 8(a).  *Id.* at 26 (citing *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14-cv-9687 (VEC), 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11. 2016)).

    First, although group pleading may be permissible under Rule 8, that does not save Plaintiffs from RICO's requirement that predicate acts not be merely pled as a group.  *See Zito v. Leasecomm Corp.*, No. 02-cv-8074 (GEL), 2003 U.S. Dist. LEXIS

17236, at *37 (S.D.N.Y. Sep. 30, 2003) ("It is not enough to allege that predicate acts were committed by somebody, in furtherance of an enterprise in which the defendants were involved.  Rather, to state a violation of § 1962(c) by any defendant, plaintiffs must allege that *that defendant* personally committed two or more predicate acts." (emphasis added)).  And Plaintiffs' citation to *Bancorp Services* is unavailing because that case did not involve a RICO claim.  *See* 2016 WL 4916969, at *1.

Second, the Court agrees that, other than wire fraud,[10] the complaint does not attribute predicate acts to OST except by reference to Defendants collectively.  *See Zito*, 2003 U.S. Dist. LEXIS 17236, at *37; *BWP Media USA*, 69 F. Supp. 3d at 360. Plaintiffs' citation to dozens of conclusory paragraphs of the complaint, and its attempt to rest various predicate acts on a fraction of a sentence that merely says that OST "aided the Enterprise in its campaign to retaliate against and intimidate Plaintiffs," necessarily fail.  *See* Doc. 67 at 25 (citing Doc. 35 ¶¶ 88–109, 121(ix)).  And only one predicate act is insufficient to plead a pattern of predicate activity against OST.  *See Bayshore Capital Advisors*, 2023 U.S. Dist. LEXIS 57048, at *84; *Kashelkar*, 97 F. Supp. 2d at 394. Accordingly, the RICO claim against OST must be dismissed for this reason as well.

---

[10] OST also argues that Plaintiffs failed to plead with particularity the wire fraud predicate offense, which is governed by the heightened pleading standard of Federal Rule of Civil Procedure 9(b) rather than the general pleading requirements of Rule 8.  Doc. 54 at 15–16.  Further Plaintiffs' failure to identify the purpose of the wire fraud scheme, as well as the speakers and recipients of the communications and their time frame, number, and subject matter, are deficient under Rule 9(b).  *Id.* at 16.  Plaintiffs respond that Rule 9(b) does not require they plead the temporal or geographic particulars of each communication so long as they specify the overall fraudulent scheme.  Doc. 67 at 23.

Plaintiffs are correct that where a plaintiff alleges that the wires were "simply used in furtherance of a master plan to defraud," rather than that the communications themselves contained false or misleading information, Rule 9(b) is satisfied so long as the nature of the overall RICO scheme to defraud is sufficiently pled.  *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145–46 (S.D.N.Y. 2014).  But the sufficiency of Plaintiffs' pleading that OST engaged in wire fraud cannot save Plaintiffs' RICO claim against OST where the complaint fails to properly plead that OST was a member of the Enterprise and engaged in two predicate acts, as discussed above.

*3. The Court Need Not Decide Whether Plaintiffs Sufficiently Pled Proximate Causation*

Finally, OST argues that Plaintiffs fail to allege that *OST's actions* (as opposed to the Enterprise's) caused Plaintiffs' injuries, and the RICO claim against it should therefore be dismissed for lack of proximate causation.  Doc. 54 at 17–18; Doc. 72 (OST Reply) at 12 (citing *Red Ball Interior Demolition Corp. v. Pamadessa*, 874 F. Supp. 576, 583 (S.D.N.Y. 1995)).  Plaintiffs respond that the complaint sufficiently alleges that they "relied on Defendants' representations as part of the fraudulent scheme—that OST materially supported and encouraged—to their detriment, including by entering the [p]artnership [a]greement and expending huge sums pursuant to the Partnership."  Doc. 67 at 27 (citing Doc. 35 ¶ 144).  They further argue that proximate causation is satisfied so long as they "plead facts demonstrating that they were the 'target' of Defendants' scheme" without pleading that OST's actions, specifically, proximately cause Plaintiffs' injuries.  *Id.* (citing *In re Parmalat Sec. Litig.*, 412 F. Supp. 2d 392, 404 n.82 (S.D.N.Y. Jan. 31, 2006)).

A RICO plaintiff must show the RICO predicate offense was both a "but for" and proximate cause of the injury.  *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).  Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged," and cannot rest on a link that is "too remote," "purely contingent," or "indirec[t]."  *Id.* (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268, 271, 274 (1992)).  Thus, "the compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm caused by [the] predicate acts.'"  *Id.* at 13 (alteration in original) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006)).  Neither Plaintiff's nor OST's cited authority, however, squarely answer whether the Court may consider only those predicate acts attributed to OST, as opposed to the Enterprise generally, to determine if the predicate acts proximately caused Plaintiffs' injuries.  Consequently, and because the RICO claims are already subject to dismissal as

against OST for failure to plead the existence of an enterprise and a pattern of predicate acts, the Court need not decide whether Plaintiffs properly pled proximate causation.

### 4.  *Plaintiffs' RICO Conspiracy Claim is Dismissed*

Finally, OST argues that Plaintiffs' RICO conspiracy claim must be dismissed because Plaintiffs failed to establish both that OST committed RICO predicate acts and that it agreed to join the RICO conspiracy.  Doc. 54 at 18–20.  Plaintiffs respond that a party who did not commit the requisite predicate acts may nonetheless be held liable for RICO conspiracy.  Doc. 67 at 29 (citing *Salinas v. United States*, 522 U.S. 52, 63 (1997); *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014)).  Moreover, Plaintiffs argue they alleged sufficient facts showing OST's involvement in the conspiracy.  *Id.* at 30–32.

Plaintiffs are correct that the requirement that a defendant commit two or more predicate acts applies only to a substantive § 1962(c) RICO violation, and not a § 1962(d) RICO conspiracy claim.  *Salinas*, 522 U.S. at 65.  This is meant to allow § 1962(c) claims to reach even defendants who "agree[] to facilitate only some of the acts leading to the substantive [RICO] offense," even if the defendant does not successfully himself commit any predicate act.  *Id.*  Likewise, the § 1962(c) requirement that a defendant direct the enterprise's affairs does not apply to a § 1962(d) claim.  *Bello*, 579 F. App'x at 17. Nonetheless, "courts ordinarily dismiss any accompanying counts alleging a RICO conspiracy in violation of subsection 1962(d) once they have dismissed substantive counts in the same complaint alleging a violation of subsections 1962(a), (b), or (c)." *Paul Hobbs Imps. Inc. v. Verity Wines LLC*, No. 21-cv-10597 (JPC), 2023 U.S. Dist. LEXIS 12184, at *51–52 (S.D.N.Y. Jan. 24, 2023) (collecting cases); *see also D. Penguin Bros.*, 587 F. App'x at 669 ("The failure to state a claim for a substantive RICO violation, moreover, is fatal to plaintiffs' RICO conspiracy claim under § 1962(d)." (citing *First Capital Asset Mgmt.*, 385 F.3d at 182)); *Highmore Fin. Co. I LLC v. Greig Cos.*, No. 21-cv-11021 (AT), 2023 U.S. Dist. LEXIS 132037, at *17 (S.D.N.Y. July 31, 2023) ("[A] failure to plead a substantive RICO claim under § 1962(c) 'necessarily defeats' a

conspiracy claim under § 1962(d)." (quoting *Lynn v. McCormick*, 760 F. App'x 51, 54 (2d Cir. 2019) (summary order)); *Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, No. 14-cv-7349 (AJN), 2016 U.S. Dist. LEXIS 44265, at *37–38 (S.D.N.Y. Mar. 31, 2016) (collecting cases).

Even if the Court did not find Plaintiffs' failure to state a § 1962(c) claim "necessarily" "fatal" to the § 1962(d) claim (*Lynn*, 760 F. App'x at 54; *D. Penguin Bros.*, 587 F. App'x at 669), Plaintiffs would still need to plead the crux of a conspiracy claim: that OST knew of the RICO scheme and agreed to facilitate it (*see Bello*, 579 F. App'x at 17; *Paul Hobbs Imps.*, 2023 U.S. Dist. LEXIS 12184, at *53). So pleading requires more than boilerplate or conclusory allegations that Defendants agreed to commit the violations. *See Paul Hobbs Imps.*, 2023 U.S. Dist. LEXIS 12184, at *53–54 (collecting cases). Plaintiffs allege they have satisfied their pleading burden because they alleged that Luo visited OST and its executives at least twice, the Enterprise wanted Plaintiffs to invest in OST (which also serves as OST's motive to participate in the Enterprise), and Luo and Li have "longstanding ties." Doc. 67 at 30–31.

But these facts are not sufficient to show that OST had a "meeting of the minds" and agreed to commit the alleged RICO violations. Plaintiffs plead the existence of meetings between Luo and OST, but not their content or nature as being nefarious or otherwise advancing the conspiracy; likewise describing Luo and Li as "old friends" does not create an inference that OST conspired to perpetrate a RICO scheme. *See Feinberg v. Katz*, No. 99-cv-45 (CSH), 2002 U.S. Dist. LEXIS 13771, at *48 (S.D.N.Y. July 26, 2002) (noting that general allegations of associations between individuals or participation in the same industry are insufficient to plead a RICO claim); *Cf. Rudersdal v. Harris*, No. 1:18-cv-11072 (GHW), 2022 U.S. Dist. LEXIS 16004, at *38 (S.D.N.Y. Jan. 28, 2022) (holding that "vague allegations of meetings" are insufficient to plead a conspiracy theory of jurisdiction over a RICO claim, "as they do not allege how the 'discussions' advanced the conspiracy"); *Carvel v. Durst*, No. 09-cv- 6733 (LAP) (GAY), 2013 U.S. Dist. LEXIS

185530, at *8–9 (S.D.N.Y. Oct. 11, 2013) (in context of § 1983 civil conspiracy, holding that "[a] plaintiff is not required to list the place and date of defendants' meeting and the summary of their conversations when he pleads conspiracy . . . but the pleadings must present facts tending to show agreement and concerted action" (citing *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005))), *R&R adopted by* 2014 U.S. Dist. LEXIS 24696 (S.D.N.Y., Feb. 24, 2014).  To be sure, OST may have welcomed Plaintiffs' investment in its business for purely selfish reasons, with no intent to further the Enterprise.  *See D. Penguin Bros.*, 587 F. App'x at 668.

And Plaintiffs' citations to *In re Motel 6 Sec. Litig.*, Nos. 93-cv-2183 (JFK), 93-cv-2866 (JFK), 1997 WL 154011, at *4–5 (S.D.N.Y. Apr. 2, 1997), and *Trib. Co. v. Purciglotti*, 869 F. Supp. 1076 (S.D.N.Y. 1994), *aff'd sub nom. Trib Co. v. Abiola*, 66 F.3d 12 (2d Cir. 1995), do not require a different result on the basis of OST's "longstanding ties" because neither case stands for the proposition that a defendant's mere association with an alleged member of a RICO conspiracy, without substantially more involvement in the RICO scheme itself, is sufficient to render that defendant also a member of the RICO conspiracy.  Moreover, while a motive can be some evidence of conspiracy, it is not enough to merely say that a defendant would receive some compensation if the conspiracy were successful without alleging that the defendant knew the compensation was the proceeds of the unlawful or fraudulent scheme and worked to achieve that aim. *See De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 655 (S.D.N.Y. 2015); *Kriss v. Bayrock Grp. LLC*, No. 10-cv-3959 (LGS), 2016 U.S. Dist. LEXIS 167149, at *53 (S.D.N.Y. Dec. 2, 2016).  Thus, because "a complaint cannot survive a motion to dismiss if 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,'" Plaintiffs' RICO conspiracy claim must also be dismissed.  *Paul Hobbs Imps.*, 2023 U.S. Dist. LEXIS 12184, at *53 (quoting *Iqbal*, 556 U.S. at 679) (dismissing § 1962(d) claim on the same basis).

## IV.    CONCLUSION

For the foregoing reasons, the Nations Defendants' motion to dismiss is DENIED without prejudice,[11] and OST's motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 46 and 53.

The parties are directed to appear for a telephonic conference on November 3, 2023 at 10:00 AM.  The parties are directed to call (877) 411-9748 at that time and enter access code 3029857#.

It is SO ORDERED.

Dated:    September 19, 2023
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

---

[11] The Nations Defendants request for oral argument is denied as moot.