UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KHAN FUNDS MANAGEMENT
AMERICA, INC. *and* XUEFENG
DAI,

Plaintiffs,

– *against* –

NATIONS TECHNOLOGIES INC.,
NATIONS TECHNOLOGIES (USA)
INC., SHENZHEN QIANHAI
NATIONS INVESTMENT
MANAGEMENT CO. LTD.,
ZHAOXUE LUO, YINGTONG SUN,
BAOXIN HUANG, JUNEE YU,
YAPING CHEN, HUAXIA GENERAL
PROCESSOR TECHNOLOGIES INC.,
OPTIMUM SEMICONDUCTOR
TECHNOLOGIES INC. *d/b/a*
GENERAL PROCESSOR
TECHNOLOGIES, KEYI LI, *and* DOES
1–20,

Defendants.

**OPINION & ORDER**

22-cv-05055 (ER)

RAMOS, D.J.:

Khan Funds Management America, Inc. ("Khan Funds") and its chief executive

officer, Xuefeng "Eric" Dai (together, "Plaintiffs"), bring this action for civil racketeering,

conspiracy, and fraud in connection with an alleged enterprise to coerce Plaintiffs into

stealing American technology for the Chinese military. Doc. 35 (Am. Compl.).

Defendants are Nations Technologies Inc. ("Nations") and its subsidiaries Nations

Technologies (USA) Inc. ("Nations USA") and Shenzen Qianhai Nations Investment

Management Co. Ltd. ("Nations Investment"); Nations directors and officers Zhaoxue

Luo, Yingtong Sun, and Junee Yu (a/k/a Junjie Yu) (together "Nations Officers"); Baoxin

Huang; Yaping Chen; HuaXia General Processor Technologies Inc. ("HuaXia GPT") and

its subsidiary Optimum Semiconductor Technologies Inc. ("OST")); and OST chairman of the board Keyli "Kerry" Li (collectively, "Defendants").  *Id.* ¶¶ 21–30.

Before the Court are two motions to dismiss the complaint, both pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6):  (1) Luo, Sun, Yu, and Huang's (the "Individual Defendants"), and (2) Nations Investment's.  Docs. 109 and 126.  For the following reasons, the motions are DENIED.

## I.    BACKGROUND

### A.  Factual Background

1.  *Plaintiffs*

Dai was born in Chongqing, China, and in 2006, he founded Khan Funds based in Shenzhen, China ("Khan Funds China").  Doc. 35 ¶ 58.  Khan Funds China is a hedge fund focused on investments in biomedical and pharmaceutical companies.  *Id.* ¶¶ 2, 58. Khan Funds China became an "industry giant" and, at its height, ran fourteen hedge funds with assets totaling over one billion dollars.  *Id.* ¶ 58.

In 2014, Dai wanted to expand into the U.S. market with a focus on merging U.S. biotechnology, healthcare, and pharmaceutical companies with Chinese publicly traded companies.  *Id.* ¶¶ 2, 59.  In October 2014, Dai founded Khan Funds in the United States to serve as the global headquarters for his business and as the umbrella parent company to the wholly owned affiliated entities in China, Singapore, and elsewhere.  *Id.* ¶ 59. Beijing Qilong Medical and Pharmaceutical Holding Co., Ltd. ("Khan Funds Beijing"), one of Khan Funds' wholly owned subsidiaries, serves as the base in China for Khan Funds' project focusing on merging U.S. companies with Chinese companies.  *Id.*

In January 2014, Dai obtained a U.S. visa, and in October 2015, he moved to New York to run Khan Funds.  *Id.*  In 2017, he became a U.S. lawful permanent resident.  *Id.* ¶¶ 2, 64.

2. *Defendants*

Nations, incorporated in China in 2000, is a publicly traded company, and is a leader in China's information security and integrated circuit design industry. *Id.* ¶¶ 3, 43. Nations is closely affiliated with the Chinese government, which is also an indirect controlling shareholder and one of its major clients. *Id.* ¶ 43. Plaintiffs allege Nations' mission is to convert civilian technology to military use as part of China's effort to win the arms race for next-generation weapons—which require semiconductor chips—"by any means necessary," including by stealing designs and expertise. *Id.* ¶¶ 40–43. Nations USA is Nations' wholly owned subsidiary with a principal place of business in California. *Id.* ¶ 22. Nations Investment is also Nations' wholly owned subsidiary. *Id.* ¶ 3.

Luo was Nations' independent director from 2009 to 2012, and its president from 2014 to 2018. *Id.* ¶ 23. Luo was allegedly appointed as Nations' president by top Chinese government officials because of his work in and with the Chinese military. *Id.* ¶¶ 44–45. Sun is Nations' general manager and current president. *Id.* ¶ 24. Sun has close ties to the Chinese government and was a former delegate on the Shenzhen City National People's Congress *Id.* ¶ 46. Yu was Nations' chief financial officer and vice general manager from approximately 2014 to 2018. *Id.* ¶ 25.

Huang is a former cabinet-level official in the Chinese government who served in various roles in China's national security apparatus, and is Luo's longtime friend. *Id.* ¶¶ 26, 61.

Chen, who has not appeared in this case, is a semiconductor expert and founded semiconductor company Chengdu RML Technology Co., whose sales are primarily to the Chinese military. *Id.* ¶¶ 27, 47. Chen was indicted in 2018 in the U.S. District Court for

the Central District of California on economic espionage charges and other crimes. *Id.* ¶¶ 27, 98.[1]

HuaXia GPT is a Chinese company focused on semiconductor research in New York and China, and OST[2] (d/b/a GPT) is its wholly owned subsidiary with a principal place of business in New York. *Id.* ¶¶ 28–29. Plaintiffs allege OST is partially and indirectly owned by Nations. *Id.* ¶¶ 51, 54. Li is HuaXia GPT and OST's Chairman of the Board. *Id.* ¶ 30. Li is associated with several other semiconductor companies and linked to the Chinese Communist Party and the Chinese government. *Id.* ¶¶ 51–52.

### 3. *The Enterprise*

Plaintiffs allege that the Defendants are members of an enterprise to steal semiconductor research and expertise in service of the Chinese military ("the Enterprise"). *Id.* ¶¶ 7, 47, 53, 121. Plaintiffs allege that the Enterprise's common purpose is that "American-based members of the Enterprise in California and New York would acquire and secretly export American blueprints, technical designs, and raw materials necessary to build a semiconductor fabrication plant in Chengdu, China . . . [and] [that] plant would produce the computer chips necessary for next-generation [Chinese] military technology such as fighter jets and surface-to-air missiles." *Id.* ¶ 7.

Luo and Sun were responsible for recruiting and managing members of the Enterprise, including Chen and Li. *Id.* ¶¶ 47, 53, 121(ix). Plaintiffs describe Luo as the "mastermind" of the Enterprise with final authority over all its decisions, policies, and practices. *Id.* ¶ 121(i). Sun also serves as "a leader" of the Enterprise, contributing to its decisions, policies, and practices. *Id.* ¶ 121(ii). Nations, including through its subsidiary

---

[1] The complaint variously notes that Chen was indicted in both the Southern District of California *and* the Central District of California. Doc 35 ¶¶ 7, 14, 27, 98. However, Chen was only indicted in the Central District of California. *See United States v. Yi-Chi Shih, et al.*, No. 18-cr-00050 (C.D. Cal. 2018). Additionally, according to the criminal docket, Chen has not appeared in that criminal case. *See id.*

[2] OST filed a motion to dismiss, which was granted without prejudice. Doc. 74. However, Plaintiffs did not file an amended complaint. Docs. 76, 80. Accordingly, OST is no longer a defendant.

Nations Investment, manages the Enterprise and orchestrates its schemes to illicitly procure protected technologies and commodities for use by the Chinese government. *Id.* ¶ 121(iii)–(v). Yu was responsible for the day-to-day affairs of the Enterprise. *Id.* ¶ 121(vi). Huang tried to recruit Plaintiffs to the Enterprise and induce them to commit crimes for it. *Id.* ¶ 121(vii). Chen managed and compensated members of the Enterprise, and he also coordinated with Nations, Luo, and Sun concerning intimidation and retaliation campaigns against Plaintiffs. *Id.* ¶¶ 47, 121(viii). OST served as the Enterprise's strategic base, including management of its technical experts. *Id.* ¶ 53. Li, at Luo and Sun's directive and through OST, managed the Enterprise's New York activities, including coordinating the scheme to induce Plaintiffs to enter a partnership with Nations and aiding the Enterprise's efforts to retaliate against and intimidate Plaintiffs. *Id.* ¶¶ 7, 121(x). HuaXia GPT serves as OST's Chinese base. *Id.* ¶ 121(xi).

The Enterprise consists of twenty-five named individuals and entities[3] along with additional individuals and entities whose existence, identities, and roles have been concealed from Plaintiffs by Defendants. *Id.* ¶ 114.

### 4. *Non-Parties*

Yi-Chi Shih, who is not a Defendant, worked closely with Chen and served as Chen's on-the-ground technical expert who facilitated the theft of the semiconductor technology. *Id.* ¶ 48.[4] Other members of the Enterprise include individuals and entities who are not Nations' subsidiaries, affiliates, or employees, including Ishiang Shih, Jieru

---

[3] These twenty-five individuals and entities are (1) Nations, (2) Nations USA, (3) Nations Investment, (4) Luo, (5) Sun, (6) Yu, (7) Jie Liang (Director of Nations USA), (8) Xu Hui (Chief Financial Officer of Nations USA), (9) Huang, (10) Chen, (11) Yi-Chi Shih, (12) Ishiang Shih, (13) Jieru Deng, (14) Chengdu RML, (15) Chengdu Ganide, (16) Chengdu GaStone, (17) HuaXia GPT, (18) OST, (19) Kerry Li, (20) John Glossner, (21) Jian Rong, (22) Yifu Yang, (23) Applied FactsGroup, (24) Reach Perfect, and (25) Ambiq Micro. Doc. 35 ¶ 114.

[4] Yi-Chi Shih was also indicted in the Central District of California. *See United States v. Yi-Chi Shih, et al.*, No. 18-cr-00050 (C.D. Cal. 2018). The complaint variously notes that Yi-Chi Shih was indicted in both the Southern District of California and the Central District of California. Doc 35 ¶¶ 7, 14, 98. However, Yi-Chi Shih was only indicted in the Central District of California. *See United States v. Yi-Chi Shih*, et al., No. 18-cr-00050 (C.D. Cal. 2018).

Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, and Ambiq Micro. *Id.* ¶¶ 7, 16, 47–48, 51–52, 55, 82, 102–104.

Plaintiffs allege relationships among members of the Enterprise, which includes the Individual Defendants, Chinese government officials, and Chinese military personnel. *Id*. ¶¶ 7, 114. Plaintiffs also allege that that the Enterprise has existed since as early as 2006 and that its activities are ongoing, thereby allowing its associates long enough period of time to pursue the Enterprise's purpose. *Id*. ¶¶ 47, 112, 115, 117, 128.

5. *The Partnership*

In May 2014, Huang—who has never had a formal role at Nations—first introduced Dai to Luo and Sun to discuss a potential partnership between Khan Funds and Nations. *Id.* ¶¶ 26, 61. In August 2014 and May 2015, Dai, Luo, Sun, and Huang met again to discuss the potential partnership. *Id.* In October 2015, shortly after Dai moved to New York, Yu informed Dai that Luo wanted Nations to invest in a partnership with Khan Funds. *Id.* ¶ 62. In early October 2015, Dai traveled to China to meet with Luo, who confirmed his interest in the proposed partnership. *Id.* Luo also confirmed Nations' interest in Dai's plan to invest in the U.S. biomedical industry. *Id.* On October 8, 2015, Yu contacted Dai and restated Nations' interest in the proposed partnership. Dai then returned to New York. *Id.*

In following weeks, in October and November 2015, in phone calls between Yu in China, and Dai in New York, Plaintiffs allege that Yu advised that the partnership negotiations between Khan Funds Beijing and Nations Investment were continuing and that he would work with Dai's associates to finalize the deal. *Id.* ¶¶ 62, 156(i). On November 23, 2015, the partnership agreement was finalized. *Id.* ¶¶ 62–63. Specifically, Khan Funds Beijing and Nations Investment entered into a partnership agreement for the purposes of investing in biomedical companies whereby Khan Funds Beijing would serve as the only general partner, and Nations Investment would serve as the only limited

partner ("the Partnership"). *Id.* Khan Funds Beijing had the sole and exclusive right to make independent investment and management decisions for the Partnership, and Nations Investment was expressly forbidden from participating in or interfering with the decisions. *Id.* Nations invested approximately 300 million Chinese renminbi[5] (approximately 42 million United States dollars) in the Partnership. *Id.* ¶ 3.

Plaintiffs allege that although Luo, Sun, Yu, and Huang represented that the plan was for Nations to serve as Khan Funds' exclusive partner for U.S. biomedical investments through the Partnership, Defendants never intended to abide by the Partnership and always intended to use the Partnership to induce Dai and Khan Funds into the Enterprise. *Id.* ¶¶ 66, 156. Specifically, Plaintiffs allege that Yu omitted that Nations Investment did not intend to pursue Dai's biomedical investments strategy, and instead intended the Partnership to be used as a vehicle for economic espionage. *Id.* ¶ 156(i). Over the next two years, Defendants used extortion, fraud, and threats of force to coerce Plaintiffs to use the Partnership to facilitate the acquisition of U.S. semiconductor technology and to launder the proceeds of their illegal activity. *Id.* ¶¶ 68, 72, 75–83.

From October 2015 to November 2017, Huang, in China, called Dai, in New York, once a month. *Id.* ¶ 70. Plaintiffs allege that Huang conducted these calls at the direction of Luo to encourage Dai to continue with the Partnership and gather information on Dai's intentions in furtherance of the scheme. *Id.* ¶ 156(ii). Dai relied on Huang's representations relating to Luo and the Partnership to continue to spend money pursuant to the Partnership's goals. *Id.* For example, from January to September 2016, Dai worked to identify biomedical investment targets for the Partnership, and by May 2016, had identified a San Diego-based company conducting clinical research on diabetes and other endocrine diseases. *Id.* ¶ 65.

---

[5] Renminbi is the official currency of China.

During that time, in February 2, 2016, in a phone call between Luo in China, and Dai in New York, Luo asked Dai to create Zhongxinanxin, a fund intended to identify investment opportunities in the semiconductor industry. *Id.* ¶¶ 67, 156(iii). Dai created the fund and continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith. *Id.* ¶ 156(iii). Plaintiffs allege, however, that Luo actually intended for Zhongxinanxin to serve as a money laundering entity for the Enterprise. *Id.*

Although Dai created the fund due to Luo's request, Khan Funds never procured a license from the Chinese securities regulatory commission nor registered any capital for the fund because Dai did not want to expand into the semiconductor industry. *Id.* ¶ 67. In fact, when Yu demanded that Khan Funds inject 10 million Chinese renminbi (approximately $1.5 million) in capital contributions to Zhongxinanxin, Dai refused. *Id.*

In a March 2016 phone call between Luo in China, and Dai in New York, Plaintiffs allege that Luo requested that Dai open a bank account for Luo in New York as a "personal favor." *Id.* ¶¶ 68, 156(iv). On May 7, 2016, Luo specifically asked Dai to set up an account at the China Merchants Bank's New York branch for a British Virgin Islands company. *Id.* ¶ 68. In reliance on Luo's statement, Dai opened the bank account and continued to spend money in furtherance of the Partnership. *Id.* ¶ 156(iv). Plaintiffs allege that, unbeknownst to Dai, Luo intended to use the account to launder the Enterprise's proceeds and finance its activities. *Id.* ¶¶ 68, 156(iv).

In May 2016, while he was in New York, Plaintiffs allege that Luo requested that Dai acquire a semiconductor company. *Id.* ¶ 156(v). Dai declined the request but continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith in making the request. *Id.* Dai continued with his plans for the San Diego-based biomedical transaction. *Id.* ¶¶ 69–70.

In June 2016, in call between Yu in China, and Dai in New York, Dai shared his suspicions that Luo did not seriously intend to invest in the biomedical industry, but Yu reassured him that his fears were unfounded and told him to proceed as planned. *Id.* ¶¶

71, 156(vi).  Based on Defendants' assurances, "Plaintiffs spent in excess of $1 million on the effort to identify suitable biopharma candidates and huge sums building the internal infrastructure and capacity to handle the expected transactions, including hiring a biopharma expert."  *Id.* ¶ 157.

Plaintiffs also allege that Nations wanted to facilitate an additional capital contribution into the Partnership to bring more money to the United States to further the Enterprise's aims.  *Id.* ¶ 156 (vi).  Dai relied on this misrepresentation to go forward with Nations' 200 million Chinese renminbi (approximately $29 million) capital contribution. *Id.*  In August 2016, with the leverage of the additional $29 million capital contribution, in a phone call between Yu in China, and Dai in New York, Yu told Dai that Luo was angry with Dai's refusal to move forward with the semiconductor acquisition and threatened the termination of the Partnership if Dai did not meet Luo's demand.  *Id.* ¶¶ 72, 156(vii).  Dai continued to refuse to move forward with the effort to expand into the semiconductor industry.  *Id.* ¶ 72.

In September 2016, Yu asked a Khan Funds executive to visit Beijing, so he could introduce her to business contacts.  *Id.* ¶ 73.  However, when the Khan Funds executive arrived, Yu informed her that they would instead be meeting representatives of HuaXia GPT in furtherance of Luo's hope that Khan Funds would invest in OST.  *Id.*  This meeting did not lead to an investment or other transaction.  *Id.*

Also in September 2016, Luo traveled to New York again to try to convince Dai to expand into the semiconductor industry.  *Id.* ¶ 74.  On September 26, 2016, Yu met with Dai in Beijing and threatened to dissolve the Partnership immediately if Plaintiffs did not acquire a semiconductor company.  *Id.* ¶ 75.  Dai proposed to terminate the Partnership in stages in 2018 and 2020 if no acquisition was consummated by that time, and Yu agreed.  *Id.*

In November 2016, Dai met with Luo in Beijing, and Luo again told Dai that he hoped Khan Funds would invest in OST through the Partnership.  *Id.*  In a separate

meeting around the same time, Yu also pushed Dai to acquire OST. *Id.* Dai again refused. *Id.*

On December 7, 2016, Plaintiffs allege that Defendants caused the Chinese Ministry of State Security to send two officials to Khan Funds' office in Shenzhen, purportedly to investigate a U.S. employee of Khan Funds, but really to "demonstrate Defendants' reach and to back up their demands with coercive force." *Id.* ¶ 76. When the officials were refused entry, they said they would return in a few days, but never did. *Id.*

From December 2016 to May 2017, Yu repeatedly requested to meet with Khan Funds employees, including at least once in China, to inquire about Plaintiffs' efforts to acquire a semiconductor company. *Id.* ¶ 77. Luo grew angry at Plaintiffs' lack of progress on the acquisition. *Id.*

Ultimately, during meetings held from September 10 to 14, 2017 in New York— which Dai secretly recorded—Luo admitted to Dai that Nations never intended to use the Partnership to invest in biomedical companies, but that the Partnership was in fact a "special mission from the [Chinese] state" to acquire technology for the Chinese military. *Id.* ¶¶ 78–81. Specifically, Luo demanded Dai to provide 300 million Chinese renminbi (approximately \$42 million) to finance the Enterprise, fully license and provide capital for Zhongxinanxin, and launder money for the Enterprise. *Id.* ¶ 83. Luo also threatened Dai, his family, and his associates if he did not comply—including threatening that the Enterprise would use the Chinese government to harass, investigate, and arrest him on false pretenses—and promised Dai profit, access, and influence if he did comply. *Id.* ¶¶ 78, 84–87.

In response to Luo's threats, on September 12, 2017, Dai arranged for his mother and older sister to flee China, and they reached South Korea the next day. *Id.* ¶ 86.

After the September 2017 meetings in New York, Dai reported the Enterprise's activities to the New York Field Office of the Federal Bureau of Investigation ("FBI"),

which initiated an investigation with the United States Attorney's Office for the Southern District of New York. *Id.* ¶ 88. He met with the FBI four times between April and June 2018 and provided information about Nations, Chen, Luo, Yu, and other Enterprise members. *Id.* Over the next two-and-a-half years, Dai met with federal investigators sixteen times. *Id.*

Knowing that he would be blacklisted in China and fearing that the Enterprise would freeze his assets when his cooperation with U.S law enforcement became known, Dai dissolved Khan Funds' Chinese affiliates, liquidated the private equity funds, and returned the capital to his investors, incurring 10 million Chinese renminbi (approximately $1.5 million) in penalties and other damages arising from the dissolutions. *Id.* ¶ 89.

Shortly after Dai first reported the Enterprise to the FBI, Luo called Dai to request that Dai fund the Enterprise via a British Virgin Islands company, and provided instructions on how to wire the funds. *Id.* Dai equivocated to buy time. *Id.* And, in November 2017, Yu also called Dai to request that he contribute 8 billion Chinese renminbi (approximately $1.5 billion) for a semiconductor fabrication project Nations was trying to establish in China. *Id.* ¶ 90. Dai again equivocated to buy time. *Id.*

In late November 2017, Sophie Xu, a Khan Funds executive, informed Yu that Plaintiffs would not be joining the Enterprise. *Id.* In response, Plaintiffs allege Defendants made good on Luo's prior threats, and on November 30, 2017, initiated a "Fox Hunt," a tactic by which the Chinese government threatens the family and friends of U.S.-based dissidents, conducts extensive surveillance, and otherwise harasses the dissident and their families to try to force them to repatriate to China to stand trial for their crimes against the Chinese state. *Id.* ¶¶ 92–93. Plaintiffs allege that Luo and Sun took leading roles in coordinating the Fox Hunt. *Id.* ¶ 121(i)–(ii). Nations first falsely announced that Dai and his colleagues had absconded from China, and otherwise ruined his reputation in the business community in China by engaging in a years-long press

campaign accusing Dai and his associates of embezzling funds.  *Id.* ¶ 93.  In December 2017, the Funds Association of China, a government agency, suspended the financial license of Khan Funds China without notice or opportunity to appeal or dispute the suspension, preventing Plaintiffs from doing business in China.  *Id.* ¶ 94.

In January 2018, a few weeks after the suspension, U.S. federal authorities arrested Yi-Chi Shih and a co-conspirator,  who are both alleged Enterprise members, for violations of the International Emergency Economic Powers Act ("IEEPA"), and conspiracy for attempts to transfer semiconductor technology from the United States to China.  *Id.* ¶¶ 12, 95.  Defendants assumed the arrests meant that Dai had reported the Enterprise's activities to the authorities and, the same day as Yi-Chi Shih's arrest, retaliated by burglarizing Khan Funds' office in Singapore and changing its locks.  *Id.*

In February 2018, Dai's younger sister traveled to New York and told him she wanted to move to the United States permanently because she feared retaliation from the Chinese government.  *Id.* ¶ 96.  The next day, Dai told her that he had reported Luo to the authorities.  *Id.*  She then told him that she was returning to China.  *Id.*  Plaintiffs allege Luo ordered Huang to arrange for her to travel to New York to collect intelligence on Dai, a known Fox Hunt maneuver.  *Id.*

In May 2018, the Enterprise brought a lawsuit in China to remove Khan Funds Beijing as general partner of the Partnership.  *Id.* ¶ 97.  Nations Investment alleged that they could not locate or reach Dai, resulting in a default judgment against Khan Funds Beijing in February 2019 without ever serving Dai or notifying him of the lawsuit.  *Id.*  Dai first learned about the default judgment, over two years later, in June 2021.  *Id.*  Also, on October 16, 2019, Nations Investment, through the lawsuit in China, formally removed Dai from his position as director of the Partnership.  *Id.* ¶ 106.

Although the United States Attorney's Office declined to bring a case against the Enterprise, on October 18, 2018, one year after Dai had first reported to law enforcement, the Department of Justice filed the first superseding indictment as to Chen, Shih, and

others in the U.S. District Court for the Central District of California for conspiracy to violate IEEPA, Export Administration Regulations, and other forms of economic espionage. *Id.* ¶ 98.

On December 6, 2018, several weeks after the indictment, Plaintiffs allege that Defendants retaliated against Plaintiffs by ordering a cyberattack against Khan Funds' computers and networks in New York to steal confidential documents, including correspondence with legal counsel. *Id.* ¶ 100. On October 27, 2020, Nations Investment commenced a litigation against Dai and other Khan Funds associates for embezzlement in Singapore (the "Singapore Action"), relying, in part, on the documents stolen from Khan Funds' computers on December 6, 2018. *Id.*[6] Plaintiffs allege that Sun had a lead role in coordinating the Singapore Action. *Id.* ¶ 121(ii). Between November 2020 and September 2021, as part of the Singapore Action, Nations Investment hired three process service entities—who Plaintiffs allege were actually investigators employed as part of the Fox Hunt—to surveil Dai's property in New York, purportedly to serve Dai a subpoena in connection with the litigation. *Id.* ¶¶ 107–09. Dai was eventually served by email—i.e., not based on the surveillance. *Id.* ¶ 107.

On December 25, 2018, Nations announced that the Shenzhen People's Procuratorate[7] had approved the arrest of Dai and his colleagues as fugitives suspected of embezzlement, as a result of which Dai cannot travel to any country honoring China's extradition requests, and his assets in China were frozen. *Id.* ¶ 101. Nations allegedly used its connections with the Chinese government and false testimony to obtain the arrest warrants. *Id.*

---

[6] Plaintiffs allege that they first became aware in June 2021, after reviewing the initiating documents provided by Dai's Singaporean counsel, that Defendants had stolen confidential documents and filed them in Singapore Action. Doc. 35 ¶ 97, 164.

[7] Plaintiffs allege that the "Procuratorate is a local branch of the highest State [prosecuting] authority in China—an agency under direct supervision of the National People's Congress and its Standing Committee, the highest organ of the [Chinese Communist Party]." Doc. 35 ¶ 101.

Between January and March 2019, Dai received a series of "threatening and degrading" Twitter messages by a user Plaintiffs allege to be a family member of the former Chinese vice premier acting on behalf of the Enterprise. *Id.* ¶¶ 103–04.

In addition, the Enterprise's Fox Hunt efforts were also an attempt to obstruct the proceedings against Yi-Chi Shih, Ishiang Shih,[8] and Chen and the FBI's investigation into the Enterprise's broader activities. *Id.* ¶¶ 12, 14, 91–92, 96, 98, 100, 133, 163.

In August 2019, the FBI interviewed Dai about Jay Liang, Nations USA's director. *Id.* ¶ 105. And in October and November 2019, the FBI sought Dai's assistance with an investigation into the Fox Hunt, and Plaintiffs allege that the FBI investigation was meant to target Sun. *Id.*

In February 2022, during a call with Dai, Huang admitted that the Singapore Action was "inspired by the Enterprise's personal animosity toward Dai." *Id.* ¶ 106.

**B.  Procedural History**

On April 6, 2022, Plaintiffs brought suit against Nations, Nations USA, Luo, Yu, Sun, Huang, and Does 1-20 in New York state court for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), RICO conspiracy, fraud, defamation, prima facie tort, and civil conspiracy. Doc. 1-1. On June 16, 2022, those Defendants removed the case to this Court. Doc. 1.

On December 19, 2022, Plaintiffs amended their complaint, adding Nations Investment, Chen, HuaXia GPT, OST, and Keyi Li as defendants. Doc. 35. The amended complaint asserts four claims: (1) RICO violations against all Defendants, (2) conspiracy to violate RICO against all Defendants, (3) common law fraud against Nations, Nations USA, Nations Investment, Luo, Yu, and Huang, and (4) violation of the Computer Fraud

---

[8] Ishiang Shih was indicted on economic espionage charges and other crimes related to the Enterprise in the Central District of California on October 18, 2018. *See United States v. Yi-Chi Shih, et al.*, No. 18-cr-00050 (C.D. Cal.2018).

and Abuse Act against the Nations, Nations USA, Luo, and Sun.  *Id.*  As to the RICO

claims, Plaintiffs allege predicate acts of:

- wire fraud (based on Defendants' international communications related to the Partnership and inducing Plaintiffs to invest in OST);

- witness tampering, retaliation, and obstruction of justice (based on the Fox Hunt, including the negative press campaign, revocation of Khan Funds' financial license, inducing Dai's younger sister to investigate him, burglary of Khan Funds' Singapore office, the cyberattack, the fraudulent lawsuits in China and Singapore, inducing the arrest warrant in China against Dai, pervasive surveillance, attempted kidnapping, and the Twitter threats);

- extortion (based on threats against Dai, his family, and his associates); and

- kidnapping (based on the Fox Hunt's ultimate goal of seeking to repatriate Dai to China).

*Id.* ¶¶ 129–37.[9]

On May 13, 2024, the Individual Defendants jointly moved to dismiss the

amended complaint for lack of personal jurisdiction and failure to state a claim as to the

claims brought against each of them.  Doc. 109.  On July 26, 2024, Nations Investment

moved to dismiss the amended complaint for lack of personal jurisdiction and failure to

state a claim as to the three claims brought against it—RICO, RICO conspiracy, and New

York common law fraud claims.  Doc. 126.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Plaintiffs "opposing a motion to dismiss under Rule 12(b)(2) for lack of personal

jurisdiction ha[ve] the burden of establishing that the court has jurisdiction over the

defendant."  *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02-cv-4695

(LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels

Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  Plaintiffs

---

[9] Plaintiffs also allege (1) economic espionage, (2) theft of trade secrets, (3) transportation in foreign commerce of technology converted or taken by fraud, and (4) money laundering.  Doc. 35 ¶ 137.  However, Plaintiffs explain that since Defendants solely possess the information regarding the wrongdoing related to these claims, they are not pressing these claims at this stage.  Doc. 117 at 52 n.11.  Plaintiffs note that they reserve the right to seek leave to further amend their pleading with these claims.  *Id.*

"must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To meet this burden, Plaintiffs must plead facts sufficient for a prima facie showing of jurisdiction. *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 502, 507 (2d Cir. 1994)). The Court construes all of Plaintiffs' allegations as true and resolves all doubts in Plaintiffs' favor. *Casville Investments, Ltd. v. Kates*, No. 12-cv-6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *see also Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012). "However, [Plaintiffs] may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14-cv-3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citation omitted). The Court may rely on additional materials outside the pleading when ruling on 12(b)(2) motions. *John Hancock Property & Casualty Insurance Co. v. Universale Reinsurance Co.*, No. 91-cv-3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *see also Darby Trading Inc. v. Shell International Trading & Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008) (citations omitted).

### B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that

a defendant has acted unlawfully." *Id.* However, this "flexible plausibility standard" is not a heightened pleading standard. *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted). And "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F3d 150, 155 (2d Cir. 2006)). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citing *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013)). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. New York University*, No. 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.    DISCUSSION

The Individual Defendants and Nations Investment (together the "moving Defendants") move to dismiss the action, in its entirety, for lack of personal jurisdiction pursuant to Rule 12(b)(2), and failure to state a claim pursuant to Rule 12(b)(6). *See* Doc. 114 (The Individual Defendants' Mem. of L.); Doc. 128 (Nations Investment's

Mem. of L.).  When the Court is confronted by a motion raising a combination of Rule
12(b) defenses, it will first address jurisdictional issues before considering whether the
complaint states a claim.  *Mende v. Milestone Technology, Inc.*, 269 F. Supp. 2d 246, 251
(S.D.N.Y. 2003) ("Before addressing Defendants' Rule 12(b)(6) motion to dismiss, the
Court must first address the preliminary questions of service and personal jurisdiction.");
*see also Darby Trading*, 568 F. Supp. 2d at 335.  Accordingly, the Court will first address
whether it has personal jurisdiction over the Individual Defendants and Nations
Investment, and if it does, will next address whether Plaintiffs have stated a claim upon
which relief may be granted.

### A.  The Court Has Personal Jurisdiction Over the Moving Defendants

Courts evaluating personal jurisdiction over out-of-state defendants take a two-
step approach:  first, the Court must determine if jurisdiction exists under the law of the
forum state; second, if so, the Court must then evaluate whether the exercise of personal
jurisdiction comports with due process under the United States Constitution.  *Yih v.
Taiwan Semiconductor Manufacturing Co.*, 815 F. App'x 571, 573 (2d Cir. 2020) (citing
*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)).
"There are two categories of personal jurisdiction:  general and specific personal
jurisdiction.  General, all-purpose jurisdiction permits a court to hear any and all claims
against an entity.  Specific jurisdiction, on the other hand, permits adjudicatory authority
only over issues that arise out of or relate to the entity's contacts with the forum."
*Thackurdeen v. Duke University*, 130 F. Supp. 3d 792, 798 (S.D.N.Y. 2015) (alterations
adopted) (quoting *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014)).
The parties do not dispute that the Court does not have general jurisdiction over the
moving Defendants.  Ultimately, the Court concludes that it may exercise specific
personal jurisdiction over them.

1. *Specific Jurisdiction*

Under New York law, "[s]pecific jurisdiction is governed by C.P.L.R. § 302(a), which empowers courts to exercise jurisdiction over non-domiciliaries when the causes of action in the case arise from specific kinds of contact within New York." *Thackurdeen*, 130 F. Supp. 3d at 801 (alterations adopted) (internal quotation marks omitted). C.P.L.R. § 302(a) states:

> Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: [(1)] transacts any business within the state or contracts anywhere to supply goods or services in the state; or [(2)] commits a tortious act within the state . . . ; or [(3)] commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or [(4)] owns, uses or possesses any real property situated within the state.

Plaintiffs argue that Luo, Yu, and Sun purposefully availed themselves of the forum; thus, the Court has jurisdiction over them under C.P.L.R § 302(a)(1). Doc. 117 at 23–26. Plaintiffs further argue that each of the moving Defendants committed tortious conduct while physically located in New York, and outside of New York that caused injury in New York; therefore, the Court has jurisdiction over the moving Defendants under C.P.L.R § 302(a)(2)–(3). Doc. 117 at 26–31; Doc. 139 at 10–13.

The Court will address the application of New York's long-arm statute to each Defendant in turn.[10]

---

[10] Plaintiffs assert personal jurisdiction over Luo, Yu, and Sun pursuant to three provisions of C.P.L.R. § 302(a) and Huang and Nations Investment pursuant to two provisions of C.P.L.R. § 302(a). The Court does not need to address the alternate bases alleged for personal jurisdiction because the Court ultimately finds jurisdiction for (1) Luo, Yu, and Sun pursuant to C.P.L.R. § 302(a)(1), (2) Huang pursuant to C.P.L.R. § 302(a)(2), and (3) Nations Investment pursuant to C.P.L.R. § 302(a)(3). *See Pearson Education, Inc. v. ABC Books, LLC*, No. 19-cv-7642 (RA), 2020 WL 3547217, at *6 (S.D.N.Y. June 30, 2020) ("Because the Court concludes that personal jurisdiction is proper under § 302(a)(1), it need not determine whether it would also be proper under § 302(a)(3).").

      i.  *The Court Has Personal Jurisdiction over Luo, Yu, and Sun under C.P.L.R §*
        *302(a)(1)*

Under C.P.L.R. § 302(a)(1), a court may exercise personal jurisdiction over any

non-domiciliary who, either in person or through an agent, "transacts any business within

the state or contracts anywhere to supply goods or services in the state." Under §

302(a)(1), a court examines "(1) whether the defendant transacts any business in New

York and, if so, (2) whether this cause of action arises from such a business transaction."

*Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (alterations adopted)

(citing *Deutsche Bank Securities, Inc. v. Montana Board of Investments*, 7 N.Y.3d 65

(N.Y. 2006)). In addition, "[S]ection 302 is a 'single act statute,'" meaning that "proof of

one transaction in New York is sufficient to invoke jurisdiction, even though the

defendant never enters New York, so long as the defendant's activities here were

purposeful and there is a substantial relationship between the transaction and the claim

asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010)

(quoting *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988)). As the New

York Court of Appeals has noted, "it is not the quantity but the quality of the contacts that

matters under our long-arm jurisdiction analysis." *Paterno v. Laser Spine Institute*, 23

N.E.3d 988, 994 (N.Y. 2014) (citing *Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d

893, 899 (N.Y. 2012)). Further, the "arising from" prong of § 302(a)(1) does not require

a causal link, but rather requires "a relatedness between the transaction and the legal

claim such that the latter is not completely unmoored from the former." *Licci*, 732 F.3d

168 (citing *Licci*, 984 N.E.2d 900).

      a.  *Luo*

Luo, as Nations' president and leader of the Enterprise, allegedly traveled to New

York numerous times to advance the purposes of the Partnership. Doc. 35 ¶¶ 23, 68–69,

74, 78–87. While physically in New York, Luo (1) set up a bank account with Dai's

assistance in May 2016, which was intended to be used to launder funds for the

Enterprise, (2) attempted to convince Dai to purchase a semiconductor company through

the Partnership in September 2016, and (3) had several meetings with Dai where he both outlined the plan to steal U.S. semiconductor technology and threatened Dai if he did not cooperate with the plan. *See id.*[11]  Although Luo argues that he only visited the United States four times and mainly for personal reasons, he does not deny that he also came for business reasons.  Doc. 134 at 9.  And the quality not the quantity of the contacts in New York is what matters for jurisdiction purposes.  *See Paterno*, 23 N.E.3d at 994.  In fact, to satisfy the first prong for jurisdiction under § 302(a)(1), defendants do not need to be physically present in New York to "transact business" if activities were purposeful.  Doc. 117 at 23; *see Porco v. Phoenix Building Corp.,* 2019 WL 2210659, at *4 (S.D.N.Y. May 21, 2019) ("[B]usiness solicitations, communications, and negotiations constitute 'business transactions' and are sufficient to satisfy CPLR Section 302(a)(1).").  Here, Luo allegedly conducted purposeful business activities while physically present in New York.  *See* Doc. 35 ¶¶ 23, 68–69, 74, 78–87.  Moreover, Plaintiffs' claims arise from Luo's transactions in New York because his actions—including while physically present in New York—were for the purpose of advancing the goals of the Enterprise.  *Id.* ¶¶ 47, 62, 68–69, 74, 78–87, 121(ii), 156(i), App. 6–8.  In addition, Luo's communications with Dai in New York were part of the scheme to coerce Dai into stealing U.S. semiconductor technology for the Chinese military.  *Id.* ¶¶ 68–69, 78–87.  Thus, these acts by Luo in New York were part of the alleged RICO conspiracy.  Accordingly, the Court finds that personal jurisdiction over Luo is proper under § 302(a)(1).

    *b.  Yu*

     "New York law is clear that a party is subject to personal jurisdiction when that party makes repeated, purposeful telephone calls into the state for the purpose of

---

[11] Luo's declaration in support of the motion states that he has "never had a bank account in the State of New York (or anywhere else in the United States," contradicting Plaintiffs' allegations.  Doc. 112 at 1. However, at this procedural juncture, the Court must construe Plaintiffs' allegations such that any conflicts are resolved in their favor.  *City of New York v. Hatu*, No. 18-cv-848 (PAE), 2019 WL 2325902, at *5 (S.D.N.Y. May 31, 2019); *see also Love v. West*, No. 19-cv-10799 (ER), 2021 WL 431210, at *4 (S.D.N.Y. Feb. 8, 2021).

transacting business." *Roxx Allison Ltd. v. Jewelers Inc.*, 385 F. Supp. 3d 377, 381 (S.D.N.Y. 2019); *see also Stevens v. Mad River Holdings, LLC*, 2002 WL 826959, at *3 (S.D.N.Y. May 1, 2002) (finding jurisdiction under § 302(a)(1) where "parties negotiated the terms of the agreement constituting the very basis of plaintiff's action in New York by means of an interstate exchange of telephone calls and correspondence").  Here, Yu, as Nations' CFO, allegedly frequently communicated with Dai to facilitate work of the Partnership and called Dai in New York numerous times to (1) communicate Luo's interest in a partnership with Khan Funds, a New York corporation, and (2) update Dai on negotiations regarding the Partnership agreement.  Doc. 35 ¶¶ 25, 62.[12]  Yu's actions in New York were for the purpose of advancing the Enterprise's goals, including to coerce Dai into stealing U.S. semiconductor technology.  *Id.* ¶¶ 60, 62, 156(i); *see Porco*, 2019 WL 2210659, at *5 (finding jurisdiction under § 302(a)(1) when "[p]laintiff's main grievance arises directly out of the allegedly fraudulently induced projects about which [defendant] emailed [p]laintiff").  Thus, these acts by Yu were part of the alleged RICO conspiracy.  Accordingly, the Court finds that personal jurisdiction over Yu is proper under § 302(a)(1).

    *c.  Sun*

    "[A]n employee's single act . . . into the State of New York, combined with the employer's other business activity involving the State of New York, [can] give[] rise to an inference that the defendant purposefully availed himself of the privilege of conducting activities within the forum State."  *Chloe*, 616 F.3d at 165 n.3 (internal quotation marks omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475

---

[12] Yu's declaration in support of the motion states that he has not "interacted in the State of New York or anywhere in the United States with the Plaintiffs," contradicting Plaintiffs' allegations.  Doc. 111 at 2. However, at this procedural juncture, the Court must construe Plaintiffs' allegations such that any conflicts are resolved in their favor.

(1985)).  Sun, as Nations' general manager and CEO, allegedly (1) recruited Li and others to work with Dai and the Partnership in New York, (2) coordinated Fox Hunt efforts targeting Dai in New York, and (3) directed individuals—including those physically present in New York—to act in furtherance of the Enterprise's goals.  Doc. 35 ¶¶ 44, 47, 121(ii), 121(x).[13]  These acts, combined with Nations' significant business activities within New York, justify personal jurisdiction.  *See Chloe*, 616 F.3d at 165 n.3.  Sun's actions in New York were for the purpose of advancing the Enterprise's goals.  Doc. 35 ¶¶ 47, 121(ii).  Sun's communications with others in New York and other acts were part of the scheme to coerce Dai into stealing U.S. semiconductor technology.  *See id.*  Thus, these acts by Sun were part of the alleged RICO conspiracy.  Accordingly, the Court finds that personal jurisdiction over Sun is proper under § 302(a)(1).

  ii. *The Court Has Personal Jurisdiction Over Huang under C.P.L.R. § 302(a)(2)*

  Under § 302(a)(2), a court may exercise personal jurisdiction over a non-domiciliary who "commits a tortious act within the state."  "[T]here is no minimum threshold of activity required so long as the cause of action arises out of the allegedly infringing activity in New York."  *City of New York v. Hatu*, No. 18-cv-848 (PAE), 2019 WL 2325902, at *5 (S.D.N.Y. May 31, 2019) (quoting *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 567 (S.D.N.Y. 2000)).  Additionally, "New York courts have recognized that jurisdiction under § 302(a)(2) may extend to out-of-state individuals who did not themselves commit a tort while physically present in New York but who can be deemed responsible for such a tort based upon theories of agency or conspiracy."  *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014).  "As used in Section 302(a)(2), 'agent' is defined broadly to include a defendant's formal agents and, under certain circumstances, a defendant's co-conspirators."  *Biz2Credit, Inc. v. Kular*, No. 14-

---

[13] Sun's declaration in support of the motion states that he has not "interacted in the State of New York or anywhere in the United States with the Plaintiffs," contradicting Plaintiffs' allegations.  Doc. 113 at 1.  However, at this procedural juncture, the Court must construe Plaintiffs' allegations such that any conflicts are resolved in their favor.

cv-8223 (ER), 2015 WL 2445076, at *7 n.14.  Accordingly, "[w]hether a defendant's representative is an agent for purposes of § 302(a) hinges on whether the representative acted for the benefit of and with the knowledge and consent of the defendant and the defendant exercised some control over the agent in the matter."  *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012) (alterations adopted) (quoting *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 44 (N.Y. 1988)).

The Court has jurisdiction over Huang pursuant to § 302(a)(2) because Plaintiffs allege that Huang's co-conspirator, Luo, committed "a tortious act within the state" and that Huang had knowledge of Luo's acts.  Doc. 35 ¶¶ 23, 35, 68–69, 74, 78–87.  As previously discussed, Luo allegedly traveled to New York multiple times .  *See* Doc. 35 ¶¶ 68–69, 78, 85–87.  Luo's acts in New York included allegedly deceiving Dai into opening a bank account to launder money and inducing him to join the scheme to steal U.S. semiconductor technology.  *Id.*  Thus, Luo's in-state conduct was tortious and amounted to extortion—or at least attempted extortion— which is a RICO predicate act and cognizable tort.  *See id.*; *see also Fashion Fragrance & Cosmetics v. Croddick*, 2003 WL 342273, at *6 (S.D.N.Y. Feb. 13, 2003) (citing fraud as one of the torts allowing for jurisdiction under § 302(a)(2)).

For § 302(a)(2) to apply to Luo's out-of-state conspirators, like Huang, Plaintiffs must establish that Huang was "part of a conspiracy involving . . . overt . . . acts in New York."  *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 126 (2d Cir. 2023) (internal quotation marks and citation omitted).  In addition, Plaintiffs must show:  "(1) that [Huang] had an awareness of the effects of the activity in New York, (2) that [Luo's] activity was for the benefit of [Huang], and (3) that [Luo] acted at the behest of or on behalf of, or under the control of [Huang]."  *In re Sumitomo Copper Litigation*, 120 F. Supp. 2d 328, 340 (S.D.N.Y. 2000) (citation omitted).

Here, Plaintiffs have sufficiently alleged that Huang was a co-conspirator with Luo because:  (1) he was intimately aware of the Enterprise's activities in New York,

24

which included calls he placed to Dai in New York; (2) Luo's in-state tortious conduct benefited the Enterprise, which Huang was a member of; and (3) Luo's in-state tortious acts—which Huang was aware of—were on behalf of all Enterprise members, including Huang. *See* Doc. 35 ¶¶ 44, 61, 70, 96, 106, 121. The requirement that the co-conspirator act on behalf of a Defendant "is satisfied where a plaintiff alleges that the out-of-state co-conspirator has knowledge of the tortious acts being perpetrated in New York." *Fat Brands*, 75 F.4th at 127. Here, Huang allegedly had knowledge of Luo's tortious in-state acts. *See* Doc. 35 ¶¶ 44, 61, 70, 96, 106, 121. Accordingly, the Court finds that personal jurisdiction over Huang is proper under § 302(a)(2).

### iii.  The Court Has Personal Jurisdiction Over Nations Investment under C.P.L.R § 302(a)(3)

Under § 302(a)(3), a court may exercise personal jurisdiction over any non-domiciliary who, either in person or through an agent:  "commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, *or* derives substantial revenue from goods used or consumed or services rendered, in the state, *or* (ii) expects or should reasonably expect the act to have consequences in the state *and* derives substantial revenue from interstate or international commerce[.]"  C.P.L.R. § 302(a)(3) (emphases added).  A "persistent course of conduct" is not limited to contacts solely related to business.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 126 (2d Cir. 2002).  Pursuant to § 302(a)(3), courts apply a "situs-of-injury test, which asks them to locate the 'original event which caused the injury.'"  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999) (quoting *Hermann v. Sharon Hospital, Inc.*, 135 A.D.2d 682, 683 (2d Dep't 1987)).

Here, Nations Investment allegedly committed many tortious acts outside of New York through its agents—including extortion and fraud—and by filing a fraudulent legal action in China to intimidate Plaintiffs in New York, among other things.  *See* Doc. 35 ¶¶

68, 71, 97, 101, 103. These tortious acts caused injury in New York because the acts injured both Dai, a New York resident at the time, and Khan Funds, a New York corporation. *Id.* ¶¶ 19–20. The acts also allegedly damaged Plaintiffs' reputation and ruined their business, causing both financial and emotional harm. *Id.* ¶¶ 140–46.

The Court also finds that both subsections of § 302(a)(3) are satisfied, though only one is required for jurisdiction purposes. *See* C.P.L.R § 302(a)(3).[14] Section 302(a)(3)(i) is satisfied because Nations Investment, through its agents, engaged in a persistent course of conduct over several years. *See* Doc. 35 ¶¶ 51, 73, 75, A-7. This conduct included communications with Dai, a New York resident at the time, to acquire New York-based entities, including OST. *Id.*

Section 302(a)(3)(ii) is also satisfied because Plaintiffs allege that Nations Investment should have expected their acts to have an impact in New York because both Plaintiffs were located New York during the relevant time. *Id.* ¶¶ 19–20. In addition, Nations Investment, through its agents, encouraged Plaintiffs to invest in New York-based companies in furtherance of the Partnership. *Id.* ¶¶ 73–75. Specifically, in September 2016, (1) Yu, a Nations Investment executive, set up a meeting with a Khan Funds executive and HuaXia GPT representatives in Beijing in furtherance of Luo's hope that Khan Funds would invest in OST, which is based in New York, (2) Luo, a Nations Investment executive, traveled to New York to try to convince Dai to expand into the semiconductor industry, specifically to acquire OST, and (3) Yu met with Dai in Beijing and threatened to dissolve the Partnership immediately if Plaintiffs did not acquire a

---

[14] Nations Investment argues that it specifically controverted § 302(a)(3)(i) and (ii) through the declaration of Yongde Yu, a Nations Investment director, who stated that Nations Investment (1) "is not registered to do business in New York," (2) "does not transact business in New York or contract anywhere to supply good or services to New York," and (3) "does not regularly do or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in New York." Doc. 127 at 2; Doc. 144 at 9. However, at this procedural juncture, the Court must construe Plaintiffs' allegations such that any conflicts are resolved in their favor.

semiconductor company. *Id.* And in November 2016, Luo met with Dai in Beijing and told him that he hoped Khan Funds would invest in OST through the Partnership, and Yu pushed Dai in a separate meeting to acquire OST. *Id.* ¶ 75.

Section 302(a)(3)(ii) also requires that a defendant derives substantial revenue from interstate or international commerce. Although Plaintiffs acknowledge that they have not demonstrated that Nations Investment derives substantial revenue from interstate or international commerce, Plaintiffs explain that it is not necessary at this stage, citing to *Manufacturing Technology, Inc. v. Kroger Co.*, 2006 WL 3714445, at *3 (S.D.N.Y. Dec. 13, 2006). In *Manufacturing Technology*, the Court found that dismissal for lack of personal jurisdiction "inappropriate even where there is no proof that a defendant derives substantial revenue from interstate or international commerce, where that knowledge is peculiarly under the control of [the defendants], and may come to light in the course of subsequent discovery." *Id.* (internal quotation marks and citations omitted) (alterations adopted); *see also Dental Recycling North America, Inc. v. Stoma Ventures, LLC*, No. 21-cv-9147 (KPF), 2023 WL 373143, at *7 (S.D.N.Y. Jan. 24, 2023) (explaining that courts in "this District have long held, dismissal for lack of personal jurisdiction is inappropriate under Section 302(a)(3)(ii) even where there is no proof that a defendant derives substantial revenue from interstate or international commerce, where that knowledge is peculiarly under the control of the defendant, and may come to light in the course of subsequent discovery.") (internal quotation marks and citations omitted) (alterations adopted). The Court finds that at this stage, it is not necessary for Plaintiffs to demonstrate Nations Investment derives substantial revenue from interstate or international commerce.

2. *Due Process*

Having found that Plaintiffs have sufficiently established personal jurisdiction over the Individual Defendants and Nations Investment pursuant to § 302(a)(1)–(3), the Court turns to whether the exercise of personal jurisdiction in this case comports with due

process. For § 302(a)(1), the Court realizes, in particular, that "it would be a 'rare' case where . . . § 302(a)(1) was satisfied by a defendant's transaction of business but the assertion of specific jurisdiction arising out of the transaction nonetheless violated due process." *National Hockey League v. Hockey Cup LLC*, No. 18-cv-6597 (DC), 2019 WL 130576, at *6 (S.D.N.Y. Jan. 8, 2019) (citing *Licci*, 732 F.3d at 170).

The due process inquiry requires analyzing whether the defendant has sufficient minimum contacts with the forum state to establish personal jurisdiction and whether exercising personal jurisdiction would be reasonable given the circumstances of this case. *See Chloe*, 616 F.3d at 164. As with New York's long-arm statute, these minimum contacts must be related to Plaintiffs' claims. *Id.* at 166 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) ("When a controversy is related to or arises out of a defendant's contacts with the forum, the Court has said that a relationship among the defendant, the forum, and the litigation is the essential foundation of in personam jurisdiction.") (internal quotation marks and citation omitted)). Reasonableness is then assessed using five factors: (1) the burden that the exercise of jurisdiction will impose on the defendant, (2) the interests of the forum state in adjudicating the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) the shared interest of the states in furthering substantive social policies. *Id.* at 164–65 (citing *Asahi Metal Industries Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987)).

The Court will address whether the exercise of jurisdiction under § 302(a) comports with due process with respect to the Individual Defendants[15] and Nations Investment in turn.

    *i.   The Individual Defendants*

---

[15] The parties primarily dispute whether the exercise of jurisdiction comports with due process by analyzing Luo, Yu, Sun, and Huang as a group.

Plaintiffs assert that the Individual Defendants have sufficient minimum contacts with New York to satisfy due process for the same reasons that there is personal jurisdiction pursuant to § 302(a)(1)–(2).  Doc. 117 at 32–33.  The Court agrees.  Here, Luo allegedly traveled to New York to advance the work of the Partnership and the Enterprise with Dai.  While in New York, among other things, he set up a bank account through Dai to be used to launder funds for the Enterprise and had meetings with Dai where he threatened Dai if he did not cooperate with the plan to steal U.S. semiconductor technology.  *See* Doc. 35 ¶¶ 23, 68–69, 74, 78–87.  Yu frequently called Dai  in New York to facilitate the work of the Partnership and to tell Dai that Luo wanted Nations to invest in a partnership with Khan Funds, a New York corporation.  *See id.* ¶¶ 25, 62.  Sun recruited others to work with Dai and the Partnership in New York, coordinated the Fox Hunt efforts targeting Dai in New York, and directed individuals in New York to act in furtherance of the Enterprise's goals.  *See id.* ¶¶ 44, 47, 121(ii).  Huang was a co-conspirator with Luo, who committed tortious acts in New York, and had knowledge of these tortious acts.  *See id.* ¶¶ 44, 61, 70, 96, 106.

Once minimum contacts are shown, "the exercise of jurisdiction is favored" unless defendants present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Smart Study Co., Ltd. v. A Pleasant Trip Store*, No. 20-cv-1733 (MKV), 2020 WL 2227016, at *4 (S.D.N.Y. May 7, 2020) (citing *Metro Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)).  Here, the Individual Defendants argue that it would be unreasonable to exercise jurisdiction because, among other things, (1) they are citizens and residents of China; (2) they should not be forced to litigate claims in a foreign language; and (3) New York is not the location for "the most efficient resolution" of the controversy.  Doc. 114 at 38–40.  Plaintiffs counter that it is reasonable to exercise jurisdiction because, among other things, (1) the Individual Defendants' burden of litigating in New York is minimal compared to the burden of suing in China, where Plaintiffs risk arrest or other harm by

the Enterprise; (2) the Enterprise' threats to corruptly influence China's judiciary have been achieved; and (3) New York's strong interest in providing "effective means of redress for its residents."  Doc. 117 at 32–33; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 483 (1985) (quoting *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957)).

On balance, the Court finds that its assertion of personal jurisdiction over the Individual Defendants amply comports with due process.  First, New York has a strong interest in adjudicating cases involving alleged RICO violations and fraud that occurred in New York, at least in part, and was perpetrated against Khan Funds, a New York corporation.  *See Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 516 (S.D.N.Y. 2016).  Second, Plaintiffs have a strong interest in efficiently adjudicating this matter in New York because Khan Funds is a New York corporation.  *See id.*  Plaintiffs' claim also arises from the Individual Defendants' contacts with New York.  Third, the Individual Defendants do not assert any substantive social policies that would be furthered by permitting this case to be heard in China or Singapore.  Accordingly, the Individual Defendants have not met their burden to show that personal jurisdiction would be unreasonable.  In addition, the constitutional requirements of personal jurisdiction are also satisfied because application of § 302(a) meets due process requirements.  *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) (citing *United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir. 1966)).

Because the exercise of personal jurisdiction over the Individual Defendants complies with New York's long-arm statute and comports with due process, the Individual Defendants' motion to dismiss the complaint for lack of personal jurisdiction is denied.

### ii.  Nations Investment

Plaintiffs assert that Nations Investment has sufficient minimum contacts with New York to satisfy due process for the same reasons that there is personal jurisdiction

under § 302(a)(3).  Doc. 139 at 14–15.  Nations Investment allegedly committed many tortious acts outside of New York through its agents, which caused injury in New York, including extortion and fraud.  *See* Doc. 35 ¶¶ 19–20, 68, 71, 97, 101, 103.

Once minimum contacts are shown, "the exercise of jurisdiction is favored" unless defendants present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *A Pleasant Trip Store*, 2020 WL 2227016, at *3.  Nations Investment raises no arguments addressing the reasonableness factors in their motion, only emphasizing their alleged de minimis contacts.[16]  Thus, "[t]he Court will not endeavor to find additional hardships on the Defendant where they have not otherwise brought them forward; the Plaintiff's election of forum in this case is dispositive."  *A Pleasant Trip Store*, 2020 WL 2227016, at *4; *see also Pearson Education, Inc.*, 2020 WL 3547217, at *9 (approving exercise of personal jurisdiction where "[defendant] has not offered *any* argument that 'other considerations' would 'render jurisdiction unreasonable here.'") (citations omitted).

Because the exercise of personal jurisdiction over Nations Investment complies with New York's long-arm statute and comports with due process, Nations Investment's motion to dismiss the complaint for lack of personal jurisdiction is denied.

### B.  Plaintiffs Plausibly Plead That the Individual Defendants and Nations Investment Violated Civil RICO (Count 1)

To state a claim for civil RICO, a plaintiff must plausibly allege:  (1) a violation of the RICO statute, 18 U.S.C. § 1962, (2) an injury to business or property, and (3) that the injury was caused by the violation of the RICO statute.  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (citing *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013)).  Section 1962(c) makes it "unlawful for any person employed by or associated with any

---

[16] Plaintiffs argue that personal jurisdiction is reasonable based on the same reasons provided for the Individual Defendants, including that Nations Investments' burden of litigating in New York is minimal, compared to the Plaintiffs' burden of suing in China where they risk arrest or other harm by the Enterprise. Doc. 139 at 14.

enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The elements of a § 1962(c) violation thus are (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Kim*, 884 F.3d at 103 (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).

   1. *Plaintiffs Sufficiently Allege That the Existence of an Associated-in-Fact Enterprise*[17]

   "The heart of any civil RICO claim is the enterprise.  There can be no RICO violation without one."  *BWP Media USA, Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 359 (S.D.N.Y. 2014) (citation omitted).  For purposes of RICO, an "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (alteration in original) (quoting *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)).  To plead the existence of such an "association-in-fact," plaintiffs must allege three structural features:  (1) a purpose, (2) relationships among members of the enterprise, and (3) longevity sufficient to permit them to pursue the enterprise's purpose.  *D. Penguin Brothers Ltd. v. City National Bank*, 587 F. App'x 663, 667 (2d Cir. 2014) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).  "In determining whether plaintiffs have alleged the existence of an association-in-fact RICO enterprise, courts analyze the hierarchy, organization, and activities of the alleged association to determine whether its members functioned as a unit.  A plaintiff's

---

[17] Nations Investment does not argue that Plaintiffs did not sufficiently allege the existence of an associated-in-fact enterprise.

conclusory naming of a string of entities does not adequately allege an enterprise." *BWP Media*, 69 F. Supp. 3d at 360 (internal quotation marks and citations omitted).

Here, Plaintiffs specifically plead the three structural features of an Enterprise "whose mission is to steal semiconductor and related technologies from the United States and elsewhere." Doc. 117 at 34–37; Doc. 35 ¶ 7. Plaintiffs allege a common purpose which is that "American-based members of the Enterprise in California and New York would acquire and secretly export American blueprints, technical designs, and raw materials necessary to build a semiconductor fabrication plant in Chengdu, China . . . [and] [that] plant would produce the computer chips necessary for next-generation [Chinese] military technology such as fighter jets and surface-to-air missiles." Doc. 35 ¶ 7. Plaintiffs also plead the relationships among those associated with the Enterprise, which includes the Individual Defendants, Chinese government officials, and Chinese military personnel. *Id*. ¶ 114. Plaintiffs also plead that the Enterprise has existed long enough to permit those associates to pursue the Enterprise's purpose because the Enterprise has operated since as early as 2006 and that its activities are ongoing. *Id*. ¶¶ 47, 112, 115, 117, 128. In addition, the Enterprise's activities included, among other things, an extensive negative press campaign, corruptly obtaining Dai's arrest warrant, a burglary of Khan Funds' Singapore office, and death threats on social media to prevent Plaintiffs from disclosing the Enterprise's activities. *Id*. ¶¶ 10–16, 60–66, 92–104.

2. *Plaintiffs Allege that the Individual Defendants Conducted or Participated in the Enterprise's Affairs[18]*

The mere existence of an enterprise is not enough: "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'" *First Capital Asset Management*, 385 F.3d at 175–76 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994)). Thus, "[p]laintiffs must also allege that the defendants

---

[18] Nations Investment does not argue that Plaintiffs did not sufficiently allege that it conducted or participated in the Enterprise's affairs.

conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," meaning that the defendant "must have had some part in directing the enterprise's affairs." *Id.* (internal quotation marks and brackets omitted) (citing 18 U.S.C. § 1962(c); *Reves v. Ernst & Young*, 507 U.S. 170, 177–79 (1993)). "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Id.* at 176 (internal citations omitted); *see also D'Addario v. D'Addario*, 901 F.3d 80, 103 (2d Cir. 2018).

Here, Plaintiffs allege that the Individual Defendants played an important role in the management of the Enterprise, satisfying the "operation and management test." *See Reves*, 507 U.S. at 179; *see also Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995) (explaining that the operation and management test was satisfied by alleging that the defendants were "lower-rung participants" who "provided substantial assistance" to "upper management" of the RICO enterprise). Specifically, Plaintiffs allege that Luo, among other things, (1) is the mastermind of the Enterprise, (2) retains final authority on all significant decisions, and (3) recruited and has managed key members of the Enterprise. Doc. 35 ¶¶ 47, 81–82, 121(i). Plaintiffs allege that Yu (1) executes the Enterprise's daily administrative tasks, (2) communicated fraudulent or threatening information to Dai, and (3) threatened to terminate the Partnership if Dai did not meet the Enterprise's demands. *Id.* ¶¶ 71–72, 75, 121(vi). Plaintiffs allege that Sun, among other things, (1) is a leader of the Enterprise, (2) recruited and managed key members of the Enterprise, and (3) took a lead role in coordinating the Enterprise's Fox Hunt efforts. *Id.* ¶¶ 47, 121(ii). Plaintiffs allege that Huang (1) intentionally encouraged Plaintiffs to join the Partnership, (2) urged Plaintiffs to participate in the scheme to steal U.S. semiconductor technology, and (3) ordered Dai's sister to travel to New York to determine if Dai had reported the Enterprise's criminal activities to U.S. law enforcement

authorities.  *Id.* ¶¶ 12, 61, 121(vii).  Thus, Plaintiffs sufficiently allege that the Individual Defendants conducted or participated in the affairs of the Enterprise.

### 3.  *Plaintiffs Allege That the Individual Defendants and Nations Investment Are Distinct from the Enterprise*

The "enterprise" is distinct from the "person[s]" who participate in the conduct of its affairs.  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2002) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities:  (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."); *see also Weir v. Cenlar FSB*, No. 16-cv-8650 (CS), 2018 WL 3443173, at *5 (S.D.N.Y. July 17, 2018).  "The core question" of distinctiveness "is whether the RICO enterprise" as an entity "is distinct from each of the RICO persons, in which case it satisfies the distinctness requirement."  *Board of Managers of Trump Tower at City Center Condominium by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 454 (S.D.N.Y. 2018).

The moving Defendants argue that Plaintiffs fail to allege the existence of an enterprise distinct from Nations and its affiliated entities and persons.  Doc. 114 at 45; Doc. 128 at 22.  The Individual Defendants also argue that all the actions taken by Sun, Luo, and Yu were directly related to Nations' business or on behalf of Nations.  *Id.*  The Court finds that Plaintiffs satisfy the core question of distinctness.  *See* Doc. 117 at 39; Doc. 64 at 32–34.  Here, the alleged Enterprise "is *not* comprised solely of the RICO defendants and their corporate affiliates and employees"; specifically, "the Enterprise consists of twenty-five named individuals and entities 'along with additional individuals'" and only eleven are RICO defendants.  Doc. 117 at 39; *see also* Doc. 35 ¶¶ 114, 121.  In addition, the fourteen members of the Enterprise who are not Defendants include numerous persons and entities who are not Nations' subsidiaries, affiliates, or employees, including Yi-Chi Shih, Ishiang Shih, Jieru Deng, Chengdu RML, Chengdu Ganide, Chendgu GaStone, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group,

and Ambiq Micro, and the Plaintiffs discuss each of the non-Defendants. *See* Doc. 35 ¶¶ 7, 16, 47–48, 51–52, 55, 82, 102, 103; Doc. 117 at 39. The Enterprise also does not collapse into Nations because sixteen of the twenty-five members of the Enterprise are unrelated to Nations, and these alleged members coordinated with the other Enterprise members to achieve its common goals. Doc. 35 ¶¶ 115–16. Notably, one of the Enterprise's members includes Huang who was never employed by Nations.

   4.   *Plaintiffs Allege That the Individual Defendants and Nations Investment Engaged in Predicate Acts*

A "pattern of racketeering activity" requires that Plaintiffs plausibly allege *each defendant*—not merely the Enterprise as a whole—engaged in at least two predicate acts. *Buhannic v. American Arbitration Association*, No. 18-cv-2430 (ER), 2019 WL 4735005, at *5 (S.D.N.Y. Sep. 27, 2019) (citing *Palatkevich v. Choupak*, 152 F. Supp. 3d 201, 214 (S.D.N.Y. 2016)). "[C]ivil RICO claims are generally subject to the notice pleading requirements of Federal Rule of Civil Procedure 8(a); the heightened pleading requirements of Rule 9(b) apply only to the alleged predicate acts involving fraud." *Secure Source Claims Co., LLC v. Miller*, No. 22-cv-9764 (JGLC) (OTW), 2024 WL 1342804, at *3 (S.D.N.Y. Mar. 29, 2024) (citations omitted).

   a.   *Wire Fraud*

Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1343 relating to wire fraud. 18 U.S.C. § 1961(1)(B). To allege wire fraud, a plaintiff must allege the following with particularity: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). A scheme to defraud is defined as "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal quotation marks omitted) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)).

Allegations of wire fraud "should state the contents of the communications, who was involved, and where and when they took place, and should explain why they were fraudulent." *Spool v. World Child International Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (alterations adopted) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)). "However, courts in the Second Circuit have applied a different standard in cases where a plaintiff claims … wires were simply used in furtherance of a master plan to defraud, but does not allege that the communications themselves contained false or misleading information." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (alterations adopted) (quoting *In re Sumitomo Copper Litigation*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998)). "In such cases, including complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity." *Id.* at 146 (internal quotation marks omitted). Instead, "Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Id.*

    i.   *The Individual Defendants*

The Individual Defendants argue that that Plaintiffs' allegations are just about Nations' supposed failure to comply with the Partnership agreement and that such allegations do not establish wire fraud.[19]  Plaintiffs argue that they sufficiently allege wire fraud because they allege all the requirements, including specific communications by the Individual Defendants that constitute wire fraud with particularity.

Here, Plaintiffs allege both (1) a scheme to defraud, and (2) money or property as the object of the scheme.  Plaintiffs allege that from the moment they were solicited, Luo,

---

[19] The Individual Defendants repeatedly argue that the fraud claims are essentially breach of contract claims.  *See e.g.*, Doc. 114 at 33, 47.  As Plaintiffs point out, a breach of contract claim could not be brought in this case because Plaintiffs and the Individual Defendants are not parties to the Partnership agreement.  See Doc. 117 at 27, 45–46.

Yu, Sun, and Huang "intended to lure Plaintiffs into creating the Partnership and then leverage Nations' investment to co-opt Plaintiffs into participating in Defendants' criminal scheme." Doc. 35 ¶¶ 66, 156. Plaintiffs also allege the requisite communications in furtherance of the scheme by Luo, Yu, and Huang with specificity. *See Mills*, 12 F.3d at 1175. In October and November 2015, in phone calls between Yu and Dai, in China and New York respectively, Yu indicated, among other things, that he would work with Dai's associates to finalize the Partnership agreement. Doc. 35 ¶ 156(i). Yu omitted that Nations Investment was negotiating in bad faith and intended to use the Partnership for espionage purposes. *Id.* Subsequently, in reliance on Yu's omissions, Dai entered the Partnership with Nations Investment. *Id.* In March 2016, in a phone call between Luo and Dai, in China and New York respectively, Luo requested that Dai open a bank account for Luo in New York and omitted that he intended to use the account to launder money for the Enterprise in furtherance of its espionage activities. *Id.* ¶ 156(iv). Subsequently, based on Luo's omission, Dai opened the bank account and continued to spend money in furtherance of the Partnership. *Id.* From October 2015 through November 2017, in monthly phone calls between Huang and Dai, in China and New York respectively, Huang asked about the Partnership's status and Dai's relationship with Luo, and he conducted these calls at Luo's direction to gather information regarding Dai's intentions in furtherance of the scheme and encourage Dai to continue with the Partnership. *Id.* ¶ 156(ii). Huang omitted that he was intending to induce Dai to join a conspiracy with a goal in stealing U.S. semiconductor technology and that Luo and Nations Investment did not intend to abide by the Partnership agreement. *Id.* Based on Huang's representations, Dai continued to spend money pursuant to the Partnership's goals. *Id.* Although Plaintiffs allege specific wire communications by Luo, Yu, and Huang, they do not allege any specific wire communication by Sun. Accordingly, Plaintiffs sufficiently allege wire fraud only as to Luo, Yu, and Huang.

*ii.   Nations Investment*

Nations Investment argues that Plaintiffs fail to plead with particularity any specific material misrepresentation or omission made with fraudulent intent attributable to any defendant to establish a scheme to defraud.  Doc. 128 at 23.  As already discussed, Plaintiffs allege a scheme to defraud and money or property as the object of the scheme.  Doc. 35 ¶¶ 66, 156.  Plaintiffs also allege numerous communications in furtherance of the scheme taken by Nations Investment that constitutes wire fraud as a predicate act.  For example, as already mentioned, in October and November 2015, in phone calls between Yu, a Nations Investment executive, and Dai, in China and in New York respectively, Yu indicated that the Partnership negotiations were continuing and that he would work with Dai's associates to finalize the deal.  *Id.* ¶ 156(i).  Yu omitted that Nations Investment was negotiating in bad faith and intended to use the Partnership as a vehicle for espionage, which led Dai to enter the Partnership with Nations Investment in reliance on these omissions.  *Id.*  Accordingly, Plaintiffs sufficiently allege wire fraud as to Nations Investment.

*b.   Witness Tampering, Witness Retaliation, and Obstruction of Justice*[20]

Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under the witness tampering statute, the witness retaliation statute, or the obstruction of justice statute.  *See* 18 U.S.C. §§ 1512, 1513, 1503.  A plaintiff plausibly establishes witness tampering by alleging that a defendant "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a [f]ederal offense."  18 U.S.C. § 1512(b)(3).  A plaintiff plausibly establishes witness

---

[20] The parties appear to refer to witness tampering and witness retaliation collectively as witness intimidation.

retaliation by alleging that a defendant "knowingly engages in any conduct and thereby . . . damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for . . . any information relating to the commission or possible commission of a [f]ederal offense," 18 U.S.C. § 1512(b)(2), or "knowingly with the intent to retaliate, takes any action harmful to any person . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any [f]ederal offense," 18 U.S.C. § 1512(e).  To allege obstruction of justice, a plaintiff must allege that "(1) that there is a pending judicial . . . proceeding . . . , (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the . . . proceeding, whether or not the defendant is successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018) (quoting *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006)); *see* 18 U.S.C. § 1503(a); *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 593 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016). "There must be a nexus in time, causation, or logic between the conduct and its effect on the proceeding:  A defendant must know that his corrupt actions are likely to affect the proceeding." *United States v. Jahedi*, 681 F. Supp. 2d 430, 434 (S.D.N.Y. 2009) (alterations adopted) (citing *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).

i.  *The Individual Defendants*

The Individual Defendants argue that Plaintiffs fail to allege the nexus to federal proceedings that would allow them to substantiate the predicate acts of witness intimidation and obstruction of justice.  Doc. 114 at 48–49.  Here, Plaintiffs allege that Defendants believed Dai was cooperating with U.S. law enforcement when Yi-Chi Shih was arrested on January 18, 2018 on charges of economic espionage, and reacted to Dai's cooperation with the FBI by committing various retaliatory acts in violation of the witness tampering, witness retaliation, and obstruction of justice statutes.  Doc. 117 at 46.

Plaintiffs allege Luo, Sun, and Huang, but not Yu, engaged in a retaliation method designed to tamper with a witness to a federal crime, obstruct justice, or punish Plaintiffs for reporting a crime. Specifically, the month after Yi-Chi Shin's arrest, Luo allegedly ordered Huang to arrange for Dai's sister to travel to New York to confirm that Dai was cooperating with U.S. law enforcements—a Fox Hunt maneuver to intimidate Dai—so both Luo and Huang were involved in this act. Doc. 35 ¶¶ 12, 92, 96. Weeks after the indictment of Chen and Yi-Chi Shih on economic espionage charges, Luo and Sun allegedly directly, or through agents, ordered a cyberattack on Khan Funds' computer systems to steal confidential documents, and these documents were used in the Singapore Action against Dai. *Id.* ¶¶ 14, 98, 100, 163. Luo and Sun are specifically alleged to have taken leading roles in the Fox Hunt efforts. *Id.* ¶ 121(i)–(ii). In directing these various acts, Luo, Sun, and Huang attempted to obstruct the proceedings against Yi-Chi Shih, Ishiang Shih, and Chen and the FBI's investigation into the Enterprise's broader activities. *Id.* ¶¶ 12, 14, 91–92, 96, 98, 100, 133, 163. Plaintiffs do not allege that Yu engaged in an act in violation of the witness tampering, witness retaliation, or obstruction of justice statutes, so Plaintiffs have not sufficiently alleged these offenses as to Yu. Accordingly, the Court finds that Plaintiffs adequately allege witness tampering, witness retaliation, and or obstruction of justice as a predicate act as to Luo, Sun, and Huang, but not Yu.

      *ii. Nations Investment*

      Plaintiffs also adequately allege witness tampering, witness retaliation, and obstruction of justice as to Nations Investment. Plaintiffs allege that Defendants believed Dai was cooperating with U.S. law enforcement when Yi-Chi Shih was arrested on January 18, 2018 and that Defendants reacted to Dai's cooperation with the FBI. Doc. 35 ¶¶ 10, 12, 95, 121(i)–(ii). Specifically, Plaintiffs allege that in May 2018, Nations Investment initiated a lawsuit in China to remove Khan Funds Beijing as general partner of the Partnership based on false information, and Nations Investment did not serve Khan

Funds. *Id.* ¶¶ 13, 97; *see Ghandi v. Ehrlich*, 2020 WL 5633416, at *7 (N.D. Ga. Sept. 21, 2020) (holding that the witness tampering statute allows for "fraudulent litigation activity" to support RICO claims). In October 18, 2018, Chen, Yi Chi-Shih, and others were indicted on charges of economic espionage and other crimes. Doc. 35 ¶ 98. A few weeks after the indictment, on December 6, 2018, Nations Investment along with others ordered a cyberattack on Khan Funds' computer systems. *Id.* ¶¶ 100, 163. Nations Investment later filed confidential documents stolen in the cyberattack in the Singapore Action. *Id.* ¶ 100. In directing these various acts, Nations Investment attempted to obstruct the proceedings against Yi-Chi Shih, Ishiang Shih, and Chen and the FBI's investigation into the Enterprise's broader activities. *Id.* ¶¶ 91–92. Accordingly, the Court finds that Plaintiffs adequately allege witness tampering, witness retaliation, and or obstruction of justice as a predicate act as to Nations Investment.

       *c. Extortion*

Section 1961(1) of RICO provides that "racketeering activity" includes any violation of 18 U.S.C. § 1951 or "any act or threat involving . . . extortion" that is "chargeable under State law." 18 U.S.C. § 1961(1). Extortion requires that a defendant obtain property from another, with consent, induced by wrongful use of actual or threatened force, violence, or fear. 18 U.S.C. § 1951(b)(2).

       *i. The Individual Defendants*

The Individual Defendants argue that Plaintiffs fail to adequately allege that they committed extortion because none of the Individual Defendants allegedly obtained property from Plaintiffs, a prerequisite of extortion. Doc. 114 at 50–51. Here, Plaintiffs adequately allege extortion because (1) the Individual Defendants along with others executed a scheme in attempt to extort Plaintiffs, and (2) each of the Individual Defendants carried out an extortionate act in the form of a threat. Doc. 35 ¶¶ 72, 73, 83, 85–87, 121, 134. Plaintiffs specifically allege the Individual Defendants executed a scheme in attempt to extort from Plaintiffs, among other things, 300 million Chinese

renminbi (approximately $42 million) in cash, 10 million Chinese renminbi (approximately $1.5 million) in capital contributions to Zhongxinanxin, and control of the Partnership.  Doc. 117 at 51–52; *see also* Doc. 35 ¶¶ 83, 85–87, 134.  The Individual Defendants' goal was "to obtain Plaintiffs' money, which is sufficient to establish extortion as a predicate act."  Doc. 117 at 51; *see Advance Relocation & Storage*, 2005 WL 665119, at *7 n.8 ("[S]ince an attempt to extort constitutes a predicate act, a defendant need not complete an act of extortion in order for it to be considered part of a 'pattern of racketeering.'").  As to the specific extortionate acts, Luo allegedly repeatedly threatened Dai and his family and threatened to leverage the Chinese government and judiciary to harass, investigate, and arrest him Dai.  *Id.* ¶¶ 83, 85–87, 134.  Yu threatened to dissolve the Partnership if Dai did not meet the Enterprise's demands.  *Id.* ¶¶ 72, 75.  Sun led a harassment and intimidation campaign directed at Plaintiffs.  *Id.* ¶ 121(ii).  Huang used Dai's younger sister to pressure and investigate Dai.  *Id.* ¶ 121(vii).  These threats forced Dai to dissolve his business and evacuate his family from China.  *Id.* ¶ 89.  Accordingly, the Court finds that Plaintiffs sufficiently plead extortion as to Luo, Yu, Sun, and Huang.

### ii.  Nations Investment

Nations Investment argues that Plaintiffs' extortion allegations rest on litigation activity in other jurisdictions, and that "litigation – even if frivolous or malicious – cannot constitute extortion," citing to *Ritchie v. Northern Leasing Systems, Inc.*, 2016 WL 1241531 at *13 (S.D.N.Y. Mar. 28, 2016).  Doc. 127 at 27.  Here, Plaintiffs adequately allege an attempt to extort Plaintiffs because Nations Investment and the other RICO defendants attempted to extort from Plaintiffs, among other things, 300 million Chinese renminbi in cash and the control of the Partnership by use of threats of force, violence, and fear.  Doc. 35 ¶¶ 83, 85–87, 134.

Although Nations Investment is correct that malicious or frivolous litigation cannot constitute extortion, other threats that are alleged do constitute extortion.  *See*

*FindTheBest.com, Inc. v. Lumen View Technology LLC*, 20 F. Supp. 3d 451, 457

(S.D.N.Y. 2014) (explaining that "the filing of a meritless litigation is not a RICO

predicate act.").  For example, Luo, on behalf of Nations Investment, threatened Dai and

his family and threatened to leverage Chinese government and judiciary to harass,

investigate, and arrest Dai on false pretenses.  *Id.* ¶¶ 83, 85–87, 134.  Yu also "threatened

to dissolve the . . . Partnership if Dai did not meet the Enterprise's demands."  Doc. 139

at 25; *see also* Doc. 35 ¶¶ 72, 75.  Nations Investment, through the fraudulent default

judgment obtained in February 2019 in China, also removed Dai from his position as

director of the Partnership on October 16, 2019.  Doc. 35 ¶ 106.  Thus, the Court finds

that Plaintiffs sufficiently plead extortion as to Nations Investment.

     *d.   Kidnapping*

     Section 1961(1) of RICO provides that "racketeering activity" includes "any act

or threat involving . . . kidnapping" that is "chargeable under State law." 18 U.S.C. §

1961(1).  "A person is guilty of kidnapping in the second degree when he abducts another

person."  N.Y. Penal Law § 135.20.  "'Abduct' means to restrain a person with intent to

prevent his liberation by either (a) secreting or holding him in a place where he is not

likely to be found, or (b) using or threatening to use deadly physical force."  N.Y. Penal

Law § 135.00(2); *People v. Denson*, 42 N.E.3d 676, 682 (N.Y. 2015). "Restrain" means

"restrict[ing] a person's movements intentionally and unlawfully in such manner as to

interfere substantially with his liberty by moving him from one place to another, or by

confining him either in the place where the restriction commences or in a place to which

he has been moved, without consent and with knowledge that the restriction is unlawful."

N.Y. Penal Law § 135.00(1); *Denson*, 42 N.E.3d at 684–85.  A person is "restrained"

"without consent" when the defendant accomplishes this by, *inter alia*, "physical force,

intimidation or deception."  N.Y. Penal Law § 135.00(1)*; Carter v. Herbert,* No. 9-cv-

1821 (NAM) (GLS), 2002 WL 975309, at *4 (N.D.N.Y. Jan. 8, 2002).  "Deadly physical

force" is defined as "physical force which, under the circumstances in which it is used, is

readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(11); *Cardona v. Goord*, 811 F. Supp. 2d 655, 665 (E.D.N.Y. 2011).

The Individual Defendants argue that Plaintiffs do not adequately allege "conduct which tends to effect the commission" of kidnapping. Doc. 114 at 51. Nations Investment did not challenge Plaintiffs' allegations of kidnapping, so Nations Investment has waived its right to do so. *See Cruz v. Zucker*, 116 F. Supp. 3d 334, 349 n.10 (S.D.N.Y. 2015) (explaining that arguments not raised in an opening brief are waived). Regardless, the Court finds that Plaintiffs sufficiently allege kidnapping as to Luo, Sun, Huang, and Nations Investment, but not Yu. Plaintiffs allege that Defendants "attempt[ed] to repatriate Dai to [China] through a coordinated Fox Hunt campaign in violation of New York Penal Law § 135.20 (Kidnapping in the Second Degree)." Doc. 35 ¶ 135. Luo, Sun, Huang, and Nations Investment, through Luo and Sun, are all alleged to have been involved in the attempt. *See id.* ¶¶ 121(ii), 135. Specifically, Luo took a leadership role in the Fox Hunt kidnapping plot and used Dai's sister to pressure and investigate him. *Id.* Sun also took a leadership role in the Fox Hunt kidnapping plot. *Id.* Huang was also involved in using Dai's sister to pressure and investigate him. *Id.* ¶ 135. The Defendants also filed a false report leading to the issuance of an arrest warrant for Dai in China, conducted pervasive surveillance activities in the United States, and issued death threats to Dai on social media. *Id.* These acts, among others, were executed to attempt to move Dai to China and prevent his escape by threat of deadly force. Although Plaintiffs specified acts by Luo, Sun, Huang, and Nations Investment committed in furtherance of attempted kidnapping, Plaintiffs do not allege that Yu committed a specific act in furtherance of attempted kidnapping. Thus, the Court finds that Plaintiffs sufficiently allege kidnapping as to Luo, Sun, Huang, and Nations Investment but not Yu.

5.  *Plaintiffs Sufficiently Allege Predicate Acts and Injury Occurred in the United States*

In their reply brief, the Individual Defendants raised two entirely new arguments for the first time, specifically that (1) Plaintiffs' RICO claim must be dismissed on the grounds that all predicate acts occurred abroad, and (2) Plaintiffs do not allege a plausible domestic injury.  *See* Doc. 134 at 15–20.  Subsequently, Plaintiffs filed a motion for leave to file sur-reply to respond to the new arguments, which the Court granted.  Docs. 136, 137.  Both the extraterritoriality and lack of domestic injury arguments fail due to substantial conduct that is alleged against the Individual Defendants in the United States.  Doc. 137 at 5; *see* Doc. 35 ¶¶ 7–8, 12, 14, 16, 34–37, 44, 65, 68–74, 78–90, 96, 100, 107–108, 131–35, 140–46, 156.

a.  *Extraterritoriality*

The Individual Defendants argue that Plaintiffs do not sufficiently demonstrate that their wire fraud, obstruction of justice, extortion, and kidnapping claims are based on conduct alleged to have occurred in New York.[21]  Plaintiffs counter that they have sufficiently alleged that the relevant conduct occurred in New York.  The Court agrees.

The Second Circuit held that a wire fraud claim "involves sufficient domestic conduct when (1) the defendant used domestic . . . wires in furtherance of a scheme to defraud, and (2) the use of the . . . wires was a core component of the scheme to defraud."  *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019).  Plaintiffs satisfy both factors.  First, the Individual Defendants used domestic wires by contacting Dai in New York by phone, in addition to emails and conducted wire payments and bank transfers.  *See* Doc. 35 ¶¶ 62, 68, 70–72, 89–90, 131–132, 156.  Second, the scheme had as its purpose to use Dai, a U.S. resident, and his business, based in New York, to steal U.S. semiconductor technology.  *Id.* ¶¶ 19–20.

---

[21] The Individual Defendants acknowledge that "[t]here is express extraterritorial federal jurisdiction over the [w]itness tampering statutes."  Doc. 134 at 20.

For the other claims—obstruction of justice, attempted kidnapping, and extortion—Plaintiffs adequately allege domestic conduct. The obstruction of justice claim includes allegations that Dai's younger sister pressured and investigated him, and of widespread surveillance and other investigation activities. Doc. 35 ¶¶ 12, 96, 107–09. All of this conduct took place in New York and was intended to intimidate Dai. *Id.* This conduct is also applicable to the attempted kidnapping and extortion claims. *Id.* ¶¶ 134–35. In addition, Luo—in an in-person meeting in New York recorded by Dai—threatened Dai and his family and threatened to use the Chinese government and judiciary to prosecute Dai. *Id.* ¶¶ 83, 85–87, 134, Appendix. Although there were aspects of the extortion, obstruction of justice, and kidnapping claims that occurred abroad, there is substantial conduct in the United States relevant to these claims.

### b. *Domestic Injury*

The Individual Defendants also argue that "Plaintiffs have not plausibly alleged that they have suffered an injury within the United States." Doc. 134 at 20. However, Plaintiffs clearly allege that the scheme injured both Dai, a New York resident at the time, and Khan Funds, a New York corporation. Doc. 35 ¶¶ 19–20. The scheme caused financial and emotional harm and damaged Plaintiffs' reputation, causing financial and emotional harm. *Id.* ¶¶ 140–46. These injuries satisfy the Supreme Court's "contextual approach" to private civil RICO suits recently adopted in *Yegiazaryan v. Smagin*, which held that in determining whether a plaintiff has alleged a domestic injury, "courts should look to the circumstances surrounding the alleged injury to assess whether it arose in the United States." 599 U.S. 533, 545–46 (2023).

Because Plaintiffs allege at least two RICO predicate acts as to each Defendant, the Courts finds that Plaintiffs plausibly allege that the Individual Defendants and Nations Investment violated civil RICO.

### C. Plaintiffs Plausibly Allege That the Individual Defendants and Nations Investment Participated in a RICO Conspiracy (Count 2)

To establish a RICO conspiracy, the "plaintiff must prove "(1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner." *City of New York v. Chavez*, 944 F. Supp. 2d 260, 268–69 (S.D.N.Y. 2013); *see also Loop Production v. Capital Connections LLC*, 797 F. Supp. 2d 338, 350 (S.D.N.Y. 2011) ("A defendant can commit a RICO conspiracy where he 'know[s] the general nature of the conspiracy and that the conspiracy extends beyond [his] individual role[ ].'" (quoting *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000))).  "An agreement can be shown directly, by assent to commit predicate acts of racketeering, or indirectly, by circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." *City of New York v. Chavez*, 2012 WL 1022283, at *7 (S.D.N.Y. Mar. 26, 2012) (internal quotation marks omitted) (quoting *Fuji Photo Film, U.S.A., Inc. v. McNulty*, 640 F.Supp.2d 300, 312 (S.D.N.Y. 2009)).  For a RICO conspiracy claim, the Court must limit its focus to "whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise." *Zichettello*, 208 F.3d at 99 (internal quotation marks and citation omitted).

### 1. *The Individual Defendants*

Plaintiffs sufficiently allege that the Individual Defendants agreed to join the RICO conspiracy under the liberal pleading standard for conspiracy.  *See* Doc. 35 ¶¶ 121(i)–(vii), 152, 153, 154; *see* Doc. 117 at 53.  Plaintiffs allege that the Individual Defendants were "aware of the general scope and nature of the conspiracy," which is sufficient to show agreement to join conspiracy.  *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 321 (S.D.N.Y. Jul. 17, 2009); *see* Doc. 35 ¶¶ 151–54.  Specifically, Plaintiffs allege that (1) the Individual Defendants were aware that the conspiracy

extended beyond their individual roles; (2) each Individual Defendant was "a knowing, willing, and active participant in the Enterprise and its affairs"; (3) the Enterprise's members shared goals of stealing U.S. semiconductor technology for the benefit of the Chinese military[,] and intimidating and retaliating against Plaintiffs for refusing to participate in the scheme and reporting it to U.S. law enforcement authorities; and (4) "the Enterprise could not have operated as it did" in the absence of an agreement. Doc. 35 ¶¶ 151–54; *see also JPMorgan Chase Bank, N.A. v. Nowak*, 2024 WL 1329410, at *6 (S.D.N.Y. Mar. 28, 2024) ("[A] defendant's agreement to join a [RICO] conspiracy . . . can be inferred from circumstantial evidence of the defendant[s'] status in the enterprise or knowledge of wrongdoing") (quoting *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 154 (S.D.N.Y. 2014)). Lastly, as discussed, Plaintiffs also adequately allege civil RICO as to each Defendant, including that each committed at least two predicate acts. *See Palazzolo*, 346 F. Supp. 3d at 462 ("Because the court holds that Plaintiff has properly alleged a RICO claim, the court denies the motion to dismiss the conspiracy claim.") (quoting *SKS Constructors, Inc. v. Drinkwine*, 458 F.Supp.2d 68, 81 (E.D.N.Y. 2006)). Accordingly, the Court finds that Plaintiffs allege a RICO conspiracy as to the Individual Defendants.

### 1. Nations Investment

Plaintiffs sufficiently allege Nations Investment's agreement to join in the RICO conspiracy under the liberal conspiracy pleading standard. Doc. 35 ¶¶ 121(v), 152–154; *see* Doc. 139 at 26–27. Plaintiffs allege that Nations Investment was at minimum "aware of the general scope and nature of the conspiracy," which, again, is sufficient to show agreement to join conspiracy. *Fuji Photo Film*, 640 F. Supp. 2d at 321. Specifically, Nations Investment "knew the nature of the Enterprise," "knew that the Defendants were engaged in a conspiracy to commit the predicate acts" alleged, and "agreed to pursue the same criminal objective." Doc. 35 ¶ 152. Additionally, Nations Investment was "an active participant in the operation and management and in the orchestration, perpetration, and execution of the Enterprise's schemes," and also closely involved in the conspiracy

through the actions of its agents.  *Id.* ¶ 121.  Lastly, as discussed, Plaintiffs also sufficiently allege that Nations Investment committed at least two predicate acts.  *See Palazzolo*, 346 F. Supp. 3d at 462.  Accordingly, the Court finds that Plaintiffs allege a RICO conspiracy as to Nations Investment.

### B.  Plaintiffs Sufficiently Allege That Luo, Yu, Huang, and Nations Investment Engaged in Fraud (Count 3)

To state a claim of common law fraud under New York law, a plaintiff must allege that the defendant made "(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Financial Guaranty Insurance Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015).  "A claim for common law fraud is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)," *id.* at 402–03, which requires that the complaint "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Specifically, to meet this requirement, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).  While a fraud claim may plead scienter generally, the plaintiff "must still allege facts that give rise to a strong inference of fraudulent intent."  *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 585 (S.D.N.Y. 2021) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 472 (S.D.N.Y. 2020)).  This inference may be established by (1) "alleging facts to show that defendants had both motive and opportunity to commit fraud," or (2) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* (quoting *Duran v. Henkel of America, Inc.*, 450 F. Supp. 3d 337, 353 (S.D.N.Y. 2020)).

### 1. Luo, Yu, and Huang

The Individual Defendants argue that Plaintiffs have no standing to bring a fraud claim arising from the Partnership agreement against Luo, Yu, and Huang because Dai and Khan Funds are not parties to the Partnership agreement.  Doc. 114 at 59–60. Plaintiffs counter that the Individual Defendants' argument is only applicable for a breach of contract claim, not a fraud claim.  Doc. 117 at 54.  Plaintiffs further argue that "a fraud claim is duplicative of a breach of contract claim *only if* it is brought against a defendant against whom the breach of contract claim is also viable " and that a fraud claim is also not barred when it is brought "against a person who was not a party to the relevant contract, and is being sued personally for his allegedly willful misrepresentations, not for breach of any contract."  *Id.* at 58 (quoting *Remcoda, LLC v. Ridge Hill Trading (Pty) Ltd.*, 2023 WL 2647854, at *16 (S.D.N.Y. Mar. 27, 2023) (internal quotation marks omitted) (alterations adopted).  The Court finds that Plaintiffs have standing to assert fraud.[22]

Relatedly, the Individual Defendants argue that the fraud allegations are barred because the Partnership agreement has an arbitration clause requiring arbitration in China.  Doc. 114 at 59.  Plaintiffs respond that they are not bound by the provisions in the Partnership agreement because they are not parties to the Partnership agreement and that Plaintiffs are not mentioned at all in the agreement.  Doc. 117 at 54–55.  The Court finds that since Plaintiffs are not parties to the Partnership agreement, the arbitration clause does not apply.  *See City of Almaty v. Sater*, 2021 WL 4940304, at *5 (S.D.N.Y. Oct. 22, 2021) (adopting holding that because "the arbitration provision makes repeated reference to 'the Parties' and a 'Party,'" the arbitration provision was "limited to claims between the parties").

---

[22] In their argument, the Individual Defendants rely on a case analyzing a breach of contract claim, not a fraud claim.  *See Rynasko v. New York University*, 63 F.4th 186, 194 (2d Cir. 2023).

The Individual Defendants next argue that the fraud claim should be dismissed because under New York law, a fraud claim must be timely in the law of the jurisdiction where the claim accrued, which in this case would be China.  Doc. 114 at 60–61.  The Individual Defendants explain that the most recent alleged false statements were made in August 2016 and the statute of limitations for civil actions in China is at most three years. *Id.* at 61.  Plaintiffs counter that a fraud claim accrues "where its economic impact is felt"—which is "normally," though not always, "the plaintiff's residence."  Doc. 117 at 55–56 (citing *In re Petrobras Securities Litigation*, 152 F. Supp. 3d 186, 196 (S.D.N.Y. 2016)).  Here, the economic impact of the fraud was felt in New York.  *See In re Petrobras Securities Litigation* , 152 F. Supp. 3d at 196 ("[T]he Second Circuit has concluded that New York courts would hold that 'loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence.'").  Plaintiffs sufficiently allege that the economic impact of the fraud was felt in New York because Plaintiffs spent (1) in excess of $1 million "on the effort to identify suitable biopharma candidates" and (2) "huge sums building the internal infrastructure and capacity to handle the expected transactions, including hiring a biopharma expert."  Doc. 35 ¶ 157.

The Individual Defendants next argue that Plaintiffs' do not plead fraud with the particularity required by Rule 9(b).  Doc. 114 at 61–62.  The Court finds that Plaintiffs plead Luo, Yu, and Huang's fraudulent statements and omissions with sufficient particularity.  Luo's fraudulent statements and omissions include requesting Dai to open a bank account for him and asking Dai to create a semiconductor focused fund.  Doc. 35 ¶¶ 5, 43, 68, 156.  The complaint alleges that Luo's intention was for the Enterprise to use the account and the fund to launder money in furtherance of its espionage activities.  *Id.* Yu's fraudulent statements and omissions include allegedly falsely reassuring Dai that his fears that Luo did not intend to invest in biomedical industry were unfounded and encouraging him to proceed as planned.  *Id.* ¶¶ 5, 44, 90, 156.  Huang's fraudulent

omissions include allegedly making numerous calls to Dai between 2015 and 2017 to ask about the Partnership, and  Dai's relationship with Luo to encourage Dai to continue with the Partnership.  *Id.* ¶ 156.  In addition, as previously mentioned, a fraud claim is not barred when it is brought "against a person who was not a party to the relevant contract, and is being sued personally for his allegedly willful misrepresentations, not for breach of any contract," which is the case here.  *Remcoda*, 2023 WL 2647854, at *16 (internal quotation marks omitted) (alterations adopted).

Lastly, the Individual Defendants argue that Plaintiffs fail to allege any facts showing, with specificity, that Plaintiffs' reliance on those misstatements or omissions was reasonable because Plaintiffs only allege that they entered into an agreement and suffered damages due to reliance on unspecified misrepresentations by unidentified defendants.  Doc. 114 at 64.  Here, Plaintiffs allege that "the formality of the highly negotiated Partnership [a]greement and the reputation of Luo, Sun[,] and Nations" made it reasonable to rely on what Luo, Sun, and others were saying.  *Id.* ¶ 159.  Plaintiffs allege that they had no "means of knowing, by the exercise of ordinary intelligence, the truth … of the representation," that the Defendants were trying to use Plaintiffs as espionage assets in the United States.  *See Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 483 (S.D.N.Y. 2015).  Plaintiffs also allege because of the Individual Defendants' misrepresentations and omissions, they spent in excess of $1 million to further the purported goals of the Partnership.  Doc. 35 ¶ 157.  This loss is cognizable because Plaintiffs tied their losses to the relevant misrepresentations and omissions, pleading (1) that they only incurred those expenses based on what they had been told about the Partnership and (2) that they could not recover any of these expenses because, among other things, Defendants had never intended to "support acquisitions within the scope of the parties' agreement and understanding."  *Id.*; *see Sawabeh Information Services Co. v. Brody*, 832 F. Supp. 2d 280, 305 (S.D.N.Y. Dec. 16, 2021) ("[L]oss causation only requires that plaintiffs allege a causal link between the alleged

misconduct and the economic harm ultimately suffered by the plaintiff.") (internal quotation marks omitted).  Accordingly, the Court finds that Plaintiffs sufficiently plead fraud as to Luo, Yu, and Huang.

### 2.  Nations Investment

Nations Investment argues that the fraud claim fails to satisfy Rule 9(b) because the fraud allegations are against groups of defendants.  Doc. 128 at 30 (citing *Ellison v. American Image Motor Co.*, 36 F. Supp. 2d 628, 640 (S.D.N.Y. 1999)).  Nations Investment further argues the fraud claim fails to plead any actionable misstatement or omission made with fraudulent intent by Nations Investment.  Doc. 128 at 30–32.  The Court finds that  Plaintiffs' allegations meet the heighted pleading standard under Rule 9(b).  First, Plaintiffs allege fraudulent statements and omissions made by Luo and Yu, on behalf of Nations Investment, with particularity.  Doc. 35 ¶ 5, 43, 44, 66, 68, 90, 156; *see also Koam Produce, Inc. v. DiMare Homestead, Inc.*, 213 F. Supp. 2d 314, 325–26 (S.D.N.Y. 2002), *aff'd*, 329 F.3d 123 (2d Cir. 2003) ("Corporations can only act through their officers and employees, and . . . the acts and knowledge of the employee are imputed to the corporation.").  For example, in phone calls between Yu, in China, and Dai, in New York from October to November 2015, "Yu indicated that the Partnership negotiations were continuing and that he would work with Dai's associates to finalize the deal . . . [and] omitted that Nations Investment was negotiating in bad faith, did not plan to abide by the heavily negotiated agreement, would refuse to honor the exclusive investment authority for which Dai had negotiated, had no interest in pursuing Dai's biomedical investments strategy, and intended to use the Partnership as a vehicle for economic espionage." Doc. 35 ¶ 156.  Dai subsequently entered the Partnership with Nations Investment in reliance on these material omissions.  *See id.*  Plaintiffs also allege facts that plausibly demonstrate Nations Investment's fraudulent intent in making the fraudulent statements and omissions.  *See* Doc. 35 ¶¶ 4, 5, 43–44, 63, 66, 90, 156; *see Bayshore Cap. Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667 F. Supp. 3d

83, 147 (S.D.N.Y. 2023) ("In . . . common law fraud context[], courts have imputed to the corporate defendant intent based on the intent of officers and directors acting within the scope of their employment."). Thus, the Court finds that Plaintiffs' fraud allegations as to Nations Investment satisfy Rule 9(b).

Nations Investment also argues that Plaintiffs fail to plead an actionable injury proximately caused by Plaintiffs' reasonable reliance on misstatements or omissions by Nations Investment or any fact showing with specificity that reliance was reasonable. Doc. 128 at 33–34. Here, Plaintiffs specifically allege that they relied on misrepresentations and omissions in deciding to spend money for the benefit of the Partnership and plead facts to show that reliance was reasonable. Doc. 35 ¶¶ 144, 156–57, 159. Plaintiffs also adequately allege injury because they allege they spent in excess of $1 million to support the work of the Partnership. *Id.* ¶ 157; *see Sawabeh*, 832 F. Supp. 2d at 305 ("[L]oss causation only requires that plaintiffs allege a causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.") (internal quotation marks omitted). Thus, the Court finds that Plaintiffs sufficiently plead fraud against Nations Investment.

### C. Plaintiffs Sufficiently Plead That Luo and Sun Violated the Computer Fraud and Abuse Act[23]

The Computer Fraud and Abuse Act ("CFAA") created a civil right of action for any person who suffered "damages or loss" as a result of individuals who intentionally accessed a protected computer without authorization or in a way that exceeded their authorized access. 18 U.S.C. §§ 1030(a)(2)(C), 1030(g). Under the CFAA, damage refers to "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. §§ 1030(e)(8). Loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment,

---

[23] The Individual Defendants also argue that Plaintiffs fail to state a claim against Huang for violating the Computer Fraud and Abuse Act. Doc. 114 at 65. However, Plaintiffs do not allege that Huang violated the Act. *See* Doc. 35 ¶¶ 161–65.

and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. §§ 1030(e)(11).  Any alleged loss is limited to "economic damages" of at least $5,000.  18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).  This Court has long held that "costs not related to computer impairment or computer damages are not compensable under the CFAA."  *Civic Center Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005); *see also Deutsch v. Human Resource Management, Inc.*, No. 19-cv-5305, 2020 WL 1877671, at *5 (S.D.N.Y. Apr. 15, 2020).

The Individual Defendants argue that this claim is time-barred because this Circuit strictly construes the two-year statute of limitations period and that the alleged cyberattack occurred on December 6, 2018.  Doc. 114 at 65.  Plaintiffs respond that the claim is not time-barred because the date of discovery of the violation—which is alleged to have occurred in June 2021—is what matters.  The Individual Defendants and Plaintiffs cite to the same case to support their argument, *Sewell v. Bernardin*, 795 F.3d 337 (2d Cir. 2015).  In *Sewell*, the Court explained that the plaintiff "discovered the damage" to her email account for CFAA purposes when she learned that she could not log into her account.  795 F.3d at 340.  Here, unlike the plaintiff in *Sewell*, Plaintiffs allege that they were not aware of any damage on the date of the cyberattack.  Plaintiffs allege that they only learned for the first time that confidential documents were stolen more than two-and-half years later, in June 2021, after reviewing documents provided to Dai's Singaporean counsel.  Doc. 35 ¶¶ 163–64.[24]  Plaintiffs also acknowledge that confidential documents were filed on October 27, 2020 by Nations Investment, but specifically allege that they did not become aware of these documents until June 2021.  *Id.* ¶¶ 100, 164.  Regardless, if the discovery date is October 2020 instead of June 2021, it still falls within the two-

---

[24] The Complaint does not allege when Plaintiffs learned of the specific date of the cyberattack.

year limitations period.  Thus, taking these allegations as true, Plaintiffs did not discover the damage for CFAA purposes until October 2020 or June 2021, either of which is within two years of the filing of the suit in April 2022.

The Individual Defendants also argue that this claim is based on "unsupported speculation regarding purported unauthorized access of [Plaintiffs'] computer systems." Doc. 114 at 65.  Plaintiffs counter that the allegations "directly link [Luo and Sun] with the [cyberattack] by alleging their possession of confidential documents taken during the [cyberattack]," and that the only plausible way that the possession of the documents could have been occurred was through a cyberattack.  Doc. 117 at 61.  The Court finds that at this stage, it is sufficient that Plaintiffs allege that Defendants "possessed information . . . available only through [Plaintiff's] computer or email[]" because the Court can draw the reasonable inference of access.  *See Sachdev v. Singh*, 2016 WL 768861, at *10 (S.D.N.Y. Feb. 26, 2016); *see also* Doc. 35 ¶ 163–64.

The Individual Defendants also argue that only losses related to damage of or impairment to the targeted computer may be recovered under the CFAA.  Doc. 114 at 52 (citing *Van Buren v. United States*, 141 S. Ct. 1648, 1659–60 (2021)).  Plaintiffs respond that losses also include costs incurred in an investigation "to identify evidence of a breach, to assess any damage it may have caused, and to determine whether any remedial measures were needed[,]" noting that their injury is "expenses from being forced to investigate the unauthorized access and abuse of its computers and servers."  Doc. 117 at 62 (citing *Saunders Ventures, Inc. v. Salem*, 797 F. App'x 568, 572–73 (2d Cir. 2019)); *see* Doc. 35 ¶ 165.[25]  Plaintiffs also argue that post-*Van Buren*, this Circuit still continues to apply *Saunders Ventures*.  Doc. 117 at 52.  The Court finds that *Saunders Ventures* applies, so losses include costs incurred on conducting an investigation "to identify

---

[25] Plaintiffs allege that due to the cyberattack, Plaintiffs suffered damages, including "expenses from being forced to investigate the unauthorized access and abuse of its computers and servers, with other losses and damages in an amount to be proven at trial, over $5,000 aggregated over a one-year period."  Doc. 35 ¶ 165.

evidence of a breach, to assess any damage it may have caused, and to determine whether any remedial measures were needed," which are the costs specified here. *Saunders Ventures*, 797 F. App'x at 572–73 (2d Cir. 2019); *see also Goodman v. Goodman*, 2022 WL 17826390, at *8 (S.D.N.Y. Dec. 21, 2022) ("As recognized by the Second Circuit, . . . investigating unauthorized access to a [c]omputer in response to an event . . . is a cost of conducting a damage assessment for CFAA purposes." (internal quotation marks omitted) (alteration adopted)); *see also Zap Cellular, Inc. v. Weintraub*, 2022 WL 4325746, at *12 (E.D.N.Y. Sept. 19, 2022) ("[T]he Second Circuit has recently held that the cost of investigating unauthorized access to a database qualifies as a cost of conducting a damage assessment under the CFAA.") (internal quotation marks omitted) (alterations adopted).

Lastly, the Individual Defendants argue that Plaintiffs have not alleged a claim against Luo and Sun.[26]  However, Plaintiffs do specifically allege that Luo and Sun took part in the cyberattack, so the Court finds that Plaintiffs plausibly plead that Luo and Sun's involvement in violating the CFAA.  *See* Doc. 35 ¶ 164; Doc. 117 at 63.

Because Plaintiffs sufficiently allege each claim brought against the Individual Defendants and Nations Investment, the Individual Defendants and Nations Investment's motions to dismiss for failure to state a claim are denied.

## IV.    CONCLUSION

For the foregoing reasons, the Individual Defendants and Nations Investment's motions to dismiss are DENIED.  The parties are directed to appear for a telephonic conference on April 16, 2025 at 10:15 a.m.  The parties are directed to dial (855) 244-8681 and enter access code 2301 087 7354 when prompted.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 126.

---

[26] The Individual Defendants also argue that the declaration submitted by Huang states that he was never employed by Nations, so there is no case against Huang.  Doc. 114 at 67.  Again, Plaintiffs do not allege Huang violated the CFAA.  *See* Doc. 35 ¶¶ 161–65.

It is SO ORDERED.

Dated:    March 31, 2025
          New York, New York

_____
         EDGARDO RAMOS, U.S.D.J.