UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KHAN FUNDS MANAGEMENT
AMERICA, INC. *and* XUEFENG
DAI,

Plaintiffs,

– *against* –

NATIONS TECHNOLOGIES INC.,
NATIONS TECHNOLOGIES (USA)
INC., SHENZHEN QIANHAI
NATIONS INVESTMENT
MANAGEMENT CO. LTD.,
ZHAOXUE LUO, YINGTONG SUN,
BAOXIN HUANG, JUNEE YU,
YAPING CHEN, HUAXIA GENERAL
PROCESSOR TECHNOLOGIES INC.,
OPTIMUM SEMICONDUCTOR
TECHNOLOGIES INC. *d/b/a*
GENERAL PROCESSOR
TECHNOLOGIES, KEYI LI, *and* DOES
1–20,

Defendants.

**OPINION & ORDER**

22-cv-05055 (ER)

R{\scriptsize AMOS}, D.J.:

     Khan Funds Management America, Inc. ("Khan Funds") and its chief executive officer, Xuefeng "Eric" Dai (together, "Plaintiffs"), bring this action for civil racketeering, conspiracy, and fraud in connection with an alleged enterprise to coerce Plaintiffs into stealing American technology for the Chinese military. Doc. 35 (Am. Compl.). Defendants are Nations Technologies Inc. ("Nations") and its subsidiaries Nations Technologies (USA) Inc. ("Nations USA") and Shenzen Qianhai Nations Investment Management Co. Ltd. ("Nations Investment"); Nations directors and officers Zhaoxue Luo, Yingtong Sun, and Junee Yu (a/k/a Junjie Yu) (together "Nations Officers"); Baoxin Huang; Yaping Chen; HuaXia General Processor Technologies Inc. ("HuaXia GPT") and

its subsidiary Optimum Semiconductor Technologies Inc. ("OST")); and OST chairman of the board Keyi "Kerry" Li (collectively, "Defendants"). *Id.* ¶¶ 21–30.[1]

Before the Court is Nations and Nations USA's ("Nations Defendants") motion to dismiss the complaint[2] pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Doc. 46.[3] For the following reasons, the motion is DENIED.

## I.    BACKGROUND

The Court previously issued an opinion on March 31, 2025 ("March 2025 Opinion"), denying the motions to dismiss filed by Luo, Sun, Yu, Huang, and Nations Investment. *See* Doc. 146. The facts of the March 2025 Opinion are incorporated herein, and an abbreviated summary of relevant facts is included below. In addition, the Court relies on the analysis of the March 2025 Opinion and will only discuss what is relevant to the Nations Defendants here, excluding previously addressed arguments.

### A.    Factual Background

#### 1.    *Plaintiffs*

Dai was born in Chongqing, China, and in 2006, he founded Khan Funds based in Shenzhen, China ("Khan Funds China"). Doc. 35 ¶ 58. Khan Funds China is a hedge fund focused on investments in biomedical and pharmaceutical companies. *Id.* ¶¶ 2, 58.

---

[1] OST filed a motion to dismiss, which was granted without prejudice. Doc. 74. However, Plaintiffs did not file an amended complaint. Docs. 76, 80. Accordingly, OST is no longer a defendant.

[2] The Nations Defendants also moved pursuant to Federal Rule of Civil Procedure 9(b). *See* Doc. 46. The Court will discuss Rule 9(b) where relevant.

[3] The Nations Defendants' motion to dismiss the complaint was also pursuant to Federal Rule of Civil Procedure 12(b)(5). On September 19, 2023, the Court denied the Nations Defendants' motion to dismiss without prejudice as premature. Doc. 74. As to Nations, the Court explained that "it is premature for Nations to move to dismiss the complaint for failure to serve in compliance with the Hague Convention when Plaintiffs are currently in the process of doing exactly that." *Id.* at 16. As to Nations USA, the Court used its discretion to quash prior service and directed Plaintiffs to serve Nations USA properly in compliance with Federal Rule of Civil Procedure 4. *Id.* at 18. The Court further noted that dismissal was not warranted because proper service remains possible. *Id.*

On November 3, 2023, at a telephonic conference, Norton Rose Fulbright US LLP, who represents the Nations Defendants, informed the Court that they would accept service of the complaint on behalf of Nations USA. Doc. 84; *see* Doc. 90. On December 8, 2023, Norton Rose Fulbright US LLP informed the Court that they would accept service of the complaint on behalf of Nations. Doc. 90.

Khan Funds China became an "industry giant" and, at its height, ran fourteen hedge funds with assets totaling over one billion dollars. *Id.* ¶ 58.

In 2014, Dai wanted to expand into the U.S. market with a focus on merging U.S. biotechnology, healthcare, and pharmaceutical companies with Chinese publicly traded companies. *Id.* ¶¶ 2, 59. In October 2014, Dai founded Khan Funds in the United States to serve as the global headquarters for his business and as the umbrella parent company of the wholly owned affiliated entities in China, Singapore, and elsewhere. *Id.* ¶ 59. Beijing Qilong Medical and Pharmaceutical Holding Co., Ltd. ("Khan Funds Beijing"), one of Khan Funds' wholly owned subsidiaries, serves as the base in China for Khan Funds' project focusing on merging U.S. companies with Chinese companies. *Id.*

In January 2014, Dai obtained a U.S. visa, and in October 2015, he moved to New York to run Khan Funds. *Id.* In 2017, he became a U.S. lawful permanent resident. *Id.* ¶¶ 2, 64.

2. *Defendants*

Nations, incorporated in China in 2000, is a publicly traded company, and is a leader in China's information security and integrated circuit design industry. *Id.* ¶¶ 3, 43. Nations is closely affiliated with the Chinese government, which is also an indirect controlling shareholder and one of its major clients. *Id.* ¶ 43. Plaintiffs allege Nations' mission is to convert civilian technology to military use as part of China's effort to win the arms race for next-generation weapons—which require semiconductor chips—"by any means necessary," including by stealing designs and expertise. *Id.* ¶¶ 40–43. Nations USA is Nations' wholly owned subsidiary with a principal place of business in California. *Id.* ¶ 22. Nations USA serves as the Enterprise's California base. *Id.* ¶ 121(iv). Nations Investment is also Nations' wholly owned subsidiary. *Id.* ¶ 3.

Luo was Nations' independent director from 2009 to 2012, and its president from 2014 to 2018. *Id.* ¶ 23. Luo was allegedly appointed as Nations' president by top Chinese government officials because of his work in and with the Chinese military. *Id.* ¶¶

44–45.  Sun is Nations' general manager and current president.  *Id.* ¶ 24.  Sun has close ties to the Chinese government and was a former delegate on the Shenzhen City National People's Congress  *Id.* ¶ 46.  Yu was Nations' chief financial officer and vice general manager from approximately 2014 to 2018.  *Id.* ¶ 25.

Chen, who has not appeared in this case, is a semiconductor expert and founded semiconductor company Chengdu RML Technology Co., whose sales are primarily to the Chinese military.  *Id.* ¶¶ 27, 47.  Chen was indicted in 2018 in the U.S. District Court for the Central District of California on economic espionage charges and other crimes.  *Id.* ¶¶ 27, 98.

HuaXia GPT is a Chinese company focused on semiconductor research in New York and China, and OST (d/b/a GPT) is its wholly owned subsidiary with a principal place of business in New York.  *Id.* ¶¶ 28–29.  Plaintiffs allege OST is partially and indirectly owned by Nations.  *Id.* ¶¶ 51, 54.  Li is HuaXia GPT and OST's Chairman of the Board.  *Id.* ¶ 30.  Li is associated with several other semiconductor companies and linked to the Chinese Communist Party and the Chinese government.  *Id.* ¶¶ 51–52.

### 3.  *The Enterprise*

Plaintiffs allege that the Defendants are members of an enterprise to steal semiconductor research and expertise in service of the Chinese military ("the Enterprise").  *Id.* ¶¶ 7, 47, 53, 121.  Plaintiffs allege that the Enterprise's common purpose is that "American-based members of the Enterprise in California and New York would acquire and secretly export American blueprints, technical designs, and raw materials necessary to build a semiconductor fabrication plant in Chengdu, China . . . [and] [that] plant would produce the computer chips necessary for next-generation [Chinese] military technology such as fighter jets and surface-to-air missiles."  *Id.* ¶ 7.

Luo and Sun were responsible for recruiting and managing members of the Enterprise, including Chen and Li.  *Id.* ¶¶ 47, 53, 121(ix).  Plaintiffs describe Luo as the "mastermind" of the Enterprise with final authority over all its decisions, policies, and

practices.  *Id.* ¶ 121(i).  Sun also serves as "a leader" of the Enterprise, contributing to its decisions, policies, and practices.  *Id.* ¶ 121(ii).  Nations, including through its subsidiaries Nations USA and Nations Investment, manages the Enterprise and orchestrates its schemes to illicitly procure protected technologies and commodities for use by the Chinese government.  *Id.* ¶ 121(iii)–(v).  Nations USA serves as the Enterprise's California base.  *Id.* ¶ 121(iv).  Yu was responsible for the day-to-day affairs of the Enterprise.  *Id.* ¶ 121(vi).  Chen managed and compensated members of the Enterprise, and he also coordinated with Nations, Luo, and Sun concerning intimidation and retaliation campaigns against Plaintiffs.  *Id.* ¶¶ 47, 121(viii).  OST served as the Enterprise's strategic base, including management of its technical experts.  *Id.* ¶ 53.  Li, at Luo and Sun's directive and through OST, managed the Enterprise's New York activities, including coordinating the scheme to induce Plaintiffs to enter a partnership with Nations and aiding the Enterprise's efforts to retaliate against and intimidate Plaintiffs.  *Id.* ¶¶ 7, 121(x).  HuaXia GPT serves as OST's Chinese base.  *Id.* ¶ 121(xi).

The Enterprise consists of twenty-five named individuals and entities[4] along with additional individuals and entities whose existence, identities, and roles have been concealed from Plaintiffs by Defendants.  *Id.* ¶ 114.

4. *Non-Parties*

Yi-Chi Shih, who is not a Defendant, worked closely with Chen and served as Chen's on-the-ground technical expert who facilitated the theft of the semiconductor technology.  *Id.* ¶ 48.[5]  Other members of the Enterprise include individuals and entities who are not Nations' subsidiaries, affiliates, or employees, including Ishiang Shih, Jieru

---

[4] The twenty-five individuals and entities are (1) Nations, (2) Nations USA, (3) Nations Investment, (4) Luo, (5) Sun, (6) Yu, (7) Jie Liang (Director of Nations USA), (8) Xu Hui (Chief Financial Officer of Nations USA), (9) Huang, (10) Chen, (11) Yi-Chi Shih, (12) Ishiang Shih, (13) Jieru Deng, (14) Chengdu RML, (15) Chengdu Ganide, (16) Chengdu GaStone, (17) HuaXia GPT, (18) OST, (19) Kerry Li, (20) John Glossner, (21) Jian Rong, (22) Yifu Yang, (23) Applied FactsGroup, (24) Reach Perfect, and (25) Ambiq Micro.  Doc. 35 ¶ 114.

[5] Yi-Chi Shih was also indicted in the Central District of California alongside Chen.  *See United States v. Yi-Chi Shih, et al.*, No. 18-cr-00050 (C.D. Cal. 2018).

Deng, Chengdu RML, Chengdu Ganide, Chengdu GaStone, John Glossner, Jian Rong, Yifu Yang, Applied Facts Group, and Ambiq Micro. *Id.* ¶¶ 7, 16, 47–48, 51–52, 55, 82, 102–104.

Plaintiffs allege relationships among members of the Enterprise, which includes the Nations Defendants, Chinese government officials, and Chinese military personnel. *Id.* ¶¶ 7, 114. Plaintiffs also allege that that the Enterprise has existed since as early as 2006 and that its activities are ongoing, thereby allowing its associates long enough period of time to pursue the Enterprise's purpose. *Id.* ¶¶ 47, 112, 115, 117, 128.

5. *The Partnership*

In May 2014, Huang—who has never had a formal role at Nations—first introduced Dai to Luo and Sun to discuss a potential partnership between Khan Funds and Nations. *Id.* ¶¶ 26, 61. In August 2014 and May 2015, Dai, Luo, Sun, and Huang met again to discuss the potential partnership. *Id.* In October 2015, shortly after Dai moved to New York, Yu informed Dai that Luo wanted Nations to invest in a partnership with Khan Funds. *Id.* ¶ 62. In early October 2015, Dai traveled to China to meet with Luo, who confirmed his interest in the proposed partnership. *Id.* Luo also confirmed Nations' interest in Dai's plan to invest in the U.S. biomedical industry. *Id.* On October 8, 2015, Yu contacted Dai and restated Nations' interest in the proposed partnership. Dai then returned to New York. *Id.*

In following weeks, in October and November 2015, in phone calls between Yu in China, and Dai in New York, Plaintiffs allege that Yu advised that the partnership negotiations between Khan Funds Beijing and Nations Investment were continuing and that he would work with Dai's associates to finalize the deal. *Id.* ¶¶ 62, 156(i). On November 23, 2015, the partnership agreement was finalized. *Id.* ¶¶ 62–63. Specifically, Khan Funds Beijing and Nations Investment entered into a partnership agreement for the purposes of investing in biomedical companies whereby Khan Funds Beijing would serve as the only general partner, and Nations Investment would serve as the only limited

partner ("the Partnership").  *Id.*  Khan Funds Beijing had the sole and exclusive right to make independent investment and management decisions for the Partnership, and Nations Investment was expressly forbidden from participating in or interfering with the decisions.  *Id.*  Nations invested approximately 300 million Chinese renminbi[6] (approximately 42 million United States dollars) in the Partnership.  *Id.* ¶ 3.

Plaintiffs allege that although Luo, Sun, Yu, and Huang represented that the plan was for Nations to serve as Khan Funds' exclusive partner for U.S. biomedical investments through the Partnership, Defendants never intended to abide by the Partnership and always intended to use the Partnership to induce Dai and Khan Funds into the Enterprise.  *Id.* ¶¶ 66, 156.  Specifically, Plaintiffs allege that Yu omitted that Nations Investment did not intend to pursue Dai's biomedical investments strategy, and instead intended the Partnership to be used as a vehicle for economic espionage.  *Id.* ¶ 156(i).  Over the next two years, Defendants used extortion, fraud, and threats of force to coerce Plaintiffs to use the Partnership to facilitate the acquisition of U.S. semiconductor technology and to launder the proceeds of their illegal activity.  *Id.* ¶¶ 68, 72, 75–83.

During that time, in February 2, 2016, in a phone call between Luo in China, and Dai in New York, Luo asked Dai to create Zhongxinanxin, a fund intended to identify investment opportunities in the semiconductor industry.  *Id.* ¶¶ 67, 156(iii).  Dai created the fund and continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith.  *Id.* ¶ 156(iii).  Plaintiffs allege, however, that Luo actually intended for Zhongxinanxin to serve as a money laundering entity for the Enterprise.  *Id.*

Although Dai created the fund due to Luo's request, Khan Funds never procured a license from the Chinese securities regulatory commission nor registered any capital for the fund because Dai did not want to expand into the semiconductor industry.  *Id.* ¶ 67.

---

[6] Renminbi is the official currency of China.

In fact, when Yu demanded that Khan Funds inject 10 million Chinese renminbi (approximately $1.5 million) in capital contributions to Zhongxinanxin, Dai refused. *Id.*

In a March 2016 phone call between Luo in China, and Dai in New York, Plaintiffs allege that Luo requested that Dai open a bank account for Luo in New York as a "personal favor." *Id.* ¶¶ 68, 156(iv). On May 7, 2016, Luo specifically asked Dai to set up an account at the China Merchants Bank's New York branch for a British Virgin Islands company. *Id.* ¶ 68. In reliance on Luo's statement, Dai opened the bank account and continued to spend money in furtherance of the Partnership. *Id.* ¶ 156(iv). Plaintiffs allege that, unbeknownst to Dai, Luo intended to use the account to launder the proceeds of the Enterprise and finance its activities. *Id.* ¶¶ 68, 156(iv).

In May 2016, while he was in New York, Plaintiffs allege that Luo requested that Dai acquire a semiconductor company. *Id.* ¶ 156(v). Dai declined the request but continued to spend money in furtherance of the Partnership in reliance on Luo's apparent good faith in making the request. *Id.* At the time, Khan Funds had already identified a suitable San Diego-based biomedical transaction target, so Dai continued with his plans for this transaction. *Id.* ¶¶ 65, 69–70.

In June 2016, in call between Yu in China, and Dai in New York, Dai shared his suspicions that Luo did not seriously intend to invest in the biomedical industry, but Yu reassured him that his fears were unfounded and told him to proceed as planned. *Id.* ¶¶ 71, 156(vi). Based on Defendants' assurances, "Plaintiffs spent in excess of $1 million on the effort to identify suitable biopharma candidates and huge sums building the internal infrastructure and capacity to handle the expected transactions, including hiring a biopharma expert." *Id.* ¶ 157. Plaintiffs also allege that Nations wanted to facilitate an additional capital contribution into the Partnership to bring more money to the United States to further the Enterprise's aims. *Id.* ¶ 156 (vi). Dai relied on this misrepresentation to go forward with Nations' 200 million Chinese renminbi (approximately $29 million) capital contribution. *Id.*

In August 2016, with the leverage of the additional $29 million capital contribution, in a phone call between Yu in China, and Dai in New York, Yu told Dai that Luo was angry with Dai's refusal to move forward with the semiconductor acquisition and threatened the termination of the Partnership if Dai did not meet Luo's demand. *Id.* ¶¶ 72, 156(vii). Dai continued to refuse to move forward with the effort to expand into the semiconductor industry. *Id.* ¶ 72.

In September 2016, Yu asked a Khan Funds executive to visit Beijing, so he could introduce her to business contacts. *Id.* ¶ 73. However, when the Khan Funds executive arrived, Yu informed her that they would instead be meeting representatives of HuaXia GPT in furtherance of Luo's hope that Khan Funds would invest in OST. *Id.* This meeting did not lead to an investment or other transaction. *Id.*

Also in September 2016, Luo traveled to New York again to try to convince Dai to expand into the semiconductor industry. *Id.* ¶ 74. On September 26, 2016, Yu met with Dai in Beijing and threatened to dissolve the Partnership immediately if Plaintiffs did not acquire a semiconductor company. *Id.* ¶ 75. Dai proposed to terminate the Partnership in stages in 2018 and 2020 if no acquisition was consummated by that time, and Yu agreed. *Id.*

In November 2016, Dai met with Luo in Beijing, and Luo again told Dai that he hoped Khan Funds would invest in OST through the Partnership. *Id.* In a separate meeting around the same time, Yu also pushed Dai to acquire OST. *Id.* Dai again refused. *Id.*

On December 7, 2016, Plaintiffs allege that Defendants caused the Chinese Ministry of State Security to send two officials to Khan Funds' office in Shenzhen, purportedly to investigate a U.S. employee of Khan Funds, but really to "demonstrate Defendants' reach and to back up their demands with coercive force." *Id.* ¶ 76. When the officials were refused entry, they said they would return in a few days, but never did. *Id.*

9

From December 2016 to May 2017, Yu repeatedly requested to meet with Khan Funds employees, including at least once in China, to inquire about Plaintiffs' efforts to acquire a semiconductor company. *Id.* ¶ 77. Luo grew angry at Plaintiffs' lack of progress on the acquisition. *Id.*

Ultimately, during meetings held from September 10 to 14, 2017 in New York— which Dai secretly recorded—Luo admitted to Dai that Nations never intended to use the Partnership to invest in biomedical companies, but that the Partnership was in fact a "special mission from the [Chinese] state" to acquire technology for the Chinese military. *Id.* ¶¶ 78–81. Specifically, Luo demanded Dai to provide 300 million Chinese renminbi (approximately $42 million) to finance the Enterprise, fully license and provide capital for Zhongxinanxin, and launder money for the Enterprise. *Id.* ¶ 83. Luo also threatened Dai, his family, and his associates if he did not comply—including threatening that the Enterprise would use the Chinese government to harass, investigate, and arrest him on false pretenses—and promised Dai profit, access, and influence if he did comply. *Id.* ¶¶ 78, 84–87.

In response to Luo's threats, on September 12, 2017, Dai arranged for his mother and older sister to flee China, and they arrived in South Korea the next day. *Id.* ¶ 86.

After the September 2017 meetings in New York, Dai reported the Enterprise's activities to the New York Field Office of the Federal Bureau of Investigation ("FBI"), which initiated an investigation with the United States Attorney's Office for the Southern District of New York. *Id.* ¶ 88. He met with the FBI four times between April and June 2018 and provided information about Nations, Chen, Luo, Yu, and other Enterprise members. *Id.* Over the next two-and-a-half years, Dai met with federal investigators sixteen times. *Id.*

Knowing that he would be blacklisted in China and fearing that the Enterprise would freeze his assets when his cooperation with U.S law enforcement became known, Dai dissolved Khan Funds' Chinese affiliates, liquidated the private equity funds, and

returned the capital to his investors, incurring 10 million Chinese renminbi (approximately $1.5 million) in penalties and other damages arising from the dissolutions.  *Id.* ¶ 89.

Shortly after Dai first reported the Enterprise to the FBI, Luo called Dai to request that Dai fund the Enterprise via a British Virgin Islands company, and provided instructions on how to wire the funds.  *Id.*  Dai equivocated to buy time.  *Id.*  And, in November 2017, Yu also called Dai to request that he contribute 8 billion Chinese renminbi (approximately $1.5 billion) for a semiconductor fabrication project Nations was trying to establish in China.  *Id.* ¶ 90.  Dai again equivocated to buy time.  *Id.*

In late November 2017, Sophie Xu, a Khan Funds executive, informed Yu that Plaintiffs would not be joining the Enterprise.  *Id.*  In response, Plaintiffs allege Defendants made good on Luo's prior threats, and on November 30, 2017, initiated a "Fox Hunt" against Plaintiffs, a tactic by which the Chinese government threatens the family and friends of U.S.-based dissidents, conducts extensive surveillance, and otherwise harasses the dissident and their families to try to force them to repatriate to China to stand trial for their crimes against the Chinese state.  *Id.* ¶¶ 92–93.  Plaintiffs allege that Luo and Sun took leading roles in coordinating the Fox Hunt.  *Id.* ¶ 121(i)–(ii). Nations first falsely announced that Dai and his colleagues had absconded from China, and otherwise ruined his reputation in the business community in China by engaging in a years-long press campaign accusing Dai and his associates of embezzling funds.  *Id.* ¶ 93. The negative press campaign "involved countless articles and announcements with false claims that Dai and his associates had embezzled funds … [and] also included an extensive so-called 'documentary' on Dai's purported wrongdoing."  *Id.*  In December 2017, the Funds Association of China, a government agency, suspended the financial license of Khan Funds China without notice or opportunity to appeal or dispute the suspension, preventing Plaintiffs from doing business in China.  *Id.* ¶ 94.

In January 2018, a few weeks after the suspension, U.S. federal authorities arrested Yi-Chi Shih for violations of the International Emergency Economic Powers Act ("IEEPA"), and conspiracy for attempts to transfer semiconductor technology from the United States to China. *Id.* ¶¶ 12, 95. Defendants assumed the arrests meant that Dai had reported the Enterprise's activities to the authorities and, the same day as Yi-Chi Shih's arrest, retaliated by burglarizing Khan Funds' office in Singapore and changing its locks. *Id.*

In February 2018, Dai's younger sister traveled to New York and told him she wanted to move to the United States permanently because she feared retaliation from the Chinese government. *Id.* ¶ 96. The next day, Dai told her that he had reported Luo to the authorities. *Id.* She then told him that she was returning to China. *Id.* Plaintiffs allege Luo ordered Huang to arrange for her to travel to New York to collect intelligence on Dai, a known Fox Hunt maneuver. *Id.*

In May 2018, the Enterprise brought a lawsuit in China to remove Khan Funds Beijing as general partner of the Partnership. *Id.* ¶ 97. Nations Investment alleged that they could not locate or reach Dai, resulting in a default judgment against Khan Funds Beijing in February 2019 without ever serving Dai or notifying him of the lawsuit. *Id.* Dai first learned about the default judgment, over two years later, in June 2021. *Id.* Also, on October 16, 2019, Nations Investment, through the lawsuit in China, formally removed Dai from his position as director of the Partnership. *Id.* ¶ 106.

Although the United States Attorney's Office declined to bring a case against the Enterprise, on October 18, 2018, one year after Dai had first approached law enforcement, the Department of Justice filed a superseding indictment as to Chen, Shih, and others in the U.S. District Court for the Central District of California for conspiracy to violate IEEPA, Export Administration Regulations, and other forms of economic espionage. *Id.* ¶ 98.

On December 6, 2018, several weeks after the indictment, Plaintiffs allege that Nations, Nations USA, Luo, and Sun, directly or through agents retaliated against Plaintiffs by ordering a cyberattack against Khan Funds' computers and networks in New York to steal confidential documents, including correspondence with legal counsel.  *Id.* ¶¶ 100, 163.  On October 27, 2020, Nations Investment commenced a litigation against Dai and other Khan Funds associates for embezzlement in Singapore (the "Singapore Action"), relying, in part, on the documents stolen from Khan Funds' computers on December 6, 2018.  *Id.*[7]  Plaintiffs allege that Sun had a lead role in coordinating the Singapore Action.  *Id.* ¶ 121(ii).  Between November 2020 and September 2021, as part of the Singapore Action, Nations Investment hired three process service entities—who Plaintiffs allege were actually investigators employed as part of the Fox Hunt—to surveil Dai's property in New York, purportedly to serve Dai a subpoena in connection with the litigation.  *Id.* ¶¶ 107–09.  Dai was eventually served by email—i.e., not based on the surveillance.  *Id.* ¶ 107.

On December 25, 2018, Nations announced that the Shenzhen People's Procuratorate[8] had approved the arrest of Dai and his colleagues as fugitives suspected of embezzlement, as a result of which Dai cannot travel to any country honoring China's extradition requests, and his assets in China were frozen.  *Id.* ¶ 101.  Nations allegedly used its connections with the Chinese government and false testimony to obtain the arrest warrants.  *Id.*

---

[7] Plaintiffs allege that they first became aware in June 2021, after reviewing the initiating documents provided by Dai's Singaporean counsel, that Defendants had stolen confidential documents in the cyberattack and filed them in Singapore Action.  Doc. 35 ¶ 97, 164.

[8] Plaintiffs allege that the "Procuratorate is a local branch of the highest State [prosecuting] authority in China—an agency under direct supervision of the National People's Congress and its Standing Committee, the highest organ of the [Chinese Communist Party]."  Doc. 35 ¶ 101.

In addition, the Enterprise's Fox Hunt efforts were also an attempt to obstruct the proceedings against Yi-Chi Shih, Ishiang Shih,[9] and Chen and the FBI's investigation into the Enterprise's broader activities. *Id.* ¶¶ 12, 14, 91–92, 96, 98, 100, 133, 163.

In August 2019, the FBI interviewed Dai about Jay Liang, Nations USA's director. *Id.* ¶ 105. And in October and November 2019, the FBI sought Dai's assistance with an investigation into the Fox Hunt, and Plaintiffs allege that the FBI investigation was meant to target Sun. *Id.*

### B. Procedural History

On April 6, 2022, Plaintiffs brought suit against Nations, Nations USA, Luo, Yu, Sun, Huang, and Does 1-20 in New York state court for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), RICO conspiracy, fraud, defamation, prima facie tort, and civil conspiracy. Doc. 1-1. On June 16, 2022, those Defendants removed the case to this Court. Doc. 1.

On December 19, 2022, Plaintiffs amended their complaint, adding Nations Investment, Chen, HuaXia GPT, OST, and Keyi Li as defendants. Doc. 35. The amended complaint asserts four claims: (1) RICO violations against all Defendants, (2) conspiracy to violate RICO against all Defendants, (3) common law fraud against Nations, Nations USA, Nations Investment, Luo, Yu, and Huang,[10] and (4) violation of the Computer Fraud and Abuse Act ("CFAA") against Nations, Nations USA, Luo, and Sun. *Id.* As to the RICO claims, Plaintiffs allege predicate acts of:

- wire fraud (based on Defendants' international communications related to the Partnership and inducing Plaintiffs to invest in OST);
- witness tampering, retaliation, and obstruction of justice (based on the Fox Hunt, including the negative press campaign, revocation of Khan Funds' financial license, inducing Dai's younger sister to investigate him, burglary of

---

[9] Ishiang Shih was indicted on economic espionage charges and other crimes related to the Enterprise in the Central District of California on October 18, 2018. *See United States v. Yi-Chi Shih, et al.*, No. 18-cr-00050 (C.D. Cal.2018).

[10] In in their memorandum of law in opposition to the motion to dismiss, Plaintiffs withdrew their common law fraud claim as to Nations USA. Doc. 64 at 57 n.24.

> Khan Funds' Singapore office, the cyberattack, the fraudulent lawsuits in China and Singapore, inducing the arrest warrant in China against Dai, pervasive surveillance, attempted kidnapping, and the Twitter threats);

- extortion (based on threats against Dai, his family, and his associates); and

- kidnapping (based on the Fox Hunt's ultimate goal of seeking to repatriate Dai to China).

*Id.* ¶¶ 129–37.[11]

On February 17, 2023, the Nations Defendants jointly moved to dismiss the amended complaint for lack of personal jurisdiction, insufficient service of process, and failure to state a claim as to the claims brought against each of them.  Doc. 46.

On September 19, 2023, the Court denied the Nations Defendants' motion to dismiss without prejudice as premature as to Federal Rule of Civil Procedure 12(b)(5). Doc. 74.  As to Nations, the Court explained that "it is premature for Nations to move to dismiss the complaint for failure to serve in compliance with the Hague Convention when Plaintiffs are currently in the process of doing exactly that."  *Id.* at 16.  As to Nations USA, the Court used its discretion to quash prior service and directed Plaintiffs to serve Nations USA properly in compliance with Federal Rule of Civil Procedure 4.  *Id.* at 18. The Court further noted that dismissal was not warranted because proper service remains possible.  *Id.*

On November 3, 2023, at a telephonic conference, Norton Rose Fulbright US LLP, who represents the Nations Defendants, informed the Court that they would accept service of the complaint on behalf of Nations USA.  Doc. 84; *see* Doc. 90.  On December 8, 2023, Norton Rose Fulbright US LLP informed the Court that they would accept service of the complaint on behalf of Nations.  Doc. 90.

---

[11] Plaintiffs also allege (1) economic espionage, (2) theft of trade secrets, (3) transportation in foreign commerce of technology converted or taken by fraud, and (4) money laundering.  Doc. 35 ¶ 137.  However, Plaintiffs explain that since Defendants solely possess the information regarding the wrongdoing related to these claims, they are not pressing these claims at this stage.  Doc. 64 at 56 n.22.  Plaintiffs note that they reserve the right to seek leave to further amend their pleading with these claims.  *Id.*

On August 5, 2024, Nations and Nations USA asked the Court to deem the motion to dismiss as ripe for review as to lack of personal jurisdiction and failure to state a claim. Doc. 131.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Plaintiffs "opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction ha[ve] the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02-cv-4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). Plaintiffs "must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To meet this burden, Plaintiffs must plead facts sufficient for a prima facie showing of jurisdiction. *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 502, 507 (2d Cir. 1994)). The Court construes all of Plaintiffs' allegations as true and resolves all doubts in Plaintiffs' favor. *Casville Investments, Ltd. v. Kates*, No. 12-cv-6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *see also Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012). "However, [Plaintiffs] may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14-cv-3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citation omitted). The Court may rely on additional materials outside the pleading when ruling on 12(b)(2) motions. *John Hancock Property & Casualty Insurance Co. v. Universale Reinsurance Co.*, No. 91-cv-3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5,

1992); *see also Darby Trading Inc. v. Shell International Trading & Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008) (citations omitted).

## B. Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* However, this "flexible plausibility standard" is not a heightened pleading standard. *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted). And "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F3d 150, 155 (2d Cir. 2006)). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citing

*Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013)).  In considering a Rule 12(b)(6)

motion, a district court may also consider "documents attached to the complaint as

exhibits[] and documents incorporated by reference in the complaint."  *Doe v. New York*

*University*, No. 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021)

(quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.    DISCUSSION

The Nations Defendants move to dismiss the action, in its entirety, for lack of

personal jurisdiction pursuant to Rule 12(b)(2), and failure to state a claim pursuant to

Rule 12(b)(6).  *See* Doc. 46.  When the Court is confronted by a motion raising a

combination of Rule 12(b) defenses, it will first address jurisdictional issues before

considering whether the complaint states a claim.  *Mende v. Milestone Technology, Inc.*,

269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) ("Before addressing Defendants' Rule 12(b)(6)

motion to dismiss, the Court must first address the preliminary questions of service and

personal jurisdiction."); *see also Darby Trading*, 568 F. Supp. 2d at 335.  Accordingly,

the Court will first address whether it has personal jurisdiction over the Nations

Defendants, and if it does, will next address whether Plaintiffs have stated a claim upon

which relief may be granted.

### A.  The Court Has Personal Jurisdiction Over Nations and Nations USA

Courts evaluating personal jurisdiction over out-of-state defendants take a two-

step approach:  first, the Court must determine if jurisdiction exists under the law of the

forum state; second, if so, the Court must then evaluate whether the exercise of personal

jurisdiction comports with due process under the United States Constitution.  *Yih v.*

*Taiwan Semiconductor Manufacturing Co.*, 815 F. App'x 571, 573 (2d Cir. 2020) (citing

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)).

"There are two categories of personal jurisdiction:  general and specific personal

jurisdiction.  General, all-purpose jurisdiction permits a court to hear any and all claims

against an entity.  Specific jurisdiction, on the other hand, permits adjudicatory authority

only over issues that arise out of or relate to the entity's contacts with the forum." *Thackurdeen v. Duke University*, 130 F. Supp. 3d 792, 798 (S.D.N.Y. 2015) (alterations adopted) (quoting *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014)). The parties do not dispute that the Court does not have general jurisdiction over the Nations Defendants. Ultimately, the Court concludes that it may exercise specific personal jurisdiction over them.

    1. *Specific Jurisdiction*

Under New York law, "[s]pecific jurisdiction is governed by C.P.L.R. § 302(a), which empowers courts to exercise jurisdiction over non-domiciliaries when the causes of action in the case arise from specific kinds of contact within New York." *Thackurdeen*, 130 F. Supp. 3d at 801 (alterations adopted) (internal quotation marks omitted). C.P.L.R. § 302(a) states:

> Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: [(1)] transacts any business within the state or contracts anywhere to supply goods or services in the state; or [(2)] commits a tortious act within the state . . . ; or [(3)] commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or [(4)] owns, uses or possesses any real property situated within the state.

Plaintiffs argue that the Nations Defendants purposefully availed themselves of the forum; thus, the Court has jurisdiction over them under C.P.L.R § 302(a)(1). Doc. 64 at 24–28. Plaintiffs further argue that the Nations Defendants committed tortious conduct while physically located in New York, and outside of New York that caused injury in New York; therefore, the Court has jurisdiction over the Nations Defendants under C.P.L.R § 302(a)(2)–(3). *Id.* at 29–32.

19

    *a.  The Court Has Personal Jurisdiction Over the Nations Defendants under C.P.L.R § 302(a)(3)[12]*

Under § 302(a)(3), a court may exercise personal jurisdiction over any non-domiciliary who, either in person or through an agent:  "commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, *or* derives substantial revenue from goods used or consumed or services rendered, in the state, *or* (ii) expects or should reasonably expect the act to have consequences in the state *and* derives substantial revenue from interstate or international commerce[.]"  C.P.L.R. § 302(a)(3) (emphases added).  A "persistent course of conduct" is not limited to contacts solely related to business.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 126 (2d Cir. 2002).  Pursuant to § 302(a)(3), courts apply a "situs-of-injury test, which asks them to locate the 'original event which caused the injury.'"  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999) (quoting *Hermann v. Sharon Hospital, Inc.*, 135 A.D.2d 682, 683 (2d Dep't 1987)).

The Court will address the application of New York's long-arm statute to each Defendant in turn.

    *i.  Nations*

Nations allegedly committed many tortious acts outside of New York through its agents, including RICO predicate acts, fraud, and a violation of the CFAA, among other things.  *See, e.g.*, Doc. 35 ¶¶ 68, 71, 97, 101, 162–65; *see also Koam Produce, Inc. v. DiMare Homestead, Inc.*, 213 F. Supp. 2d 314, 325–26 (S.D.N.Y. 2002), *aff'd*, 329 F.3d 123 (2d Cir. 2003) ("Corporations can only act through their officers and employees, and . . . the acts and knowledge of the employee are imputed to the corporation.").  These

---

[12] Plaintiffs assert personal jurisdiction over the Nations Defendants pursuant to three provisions of C.P.L.R. § 302(a).  The Court does not need to address the alternate bases alleged for personal jurisdiction because the Court ultimately finds jurisdiction for the Nations Defendants pursuant to C.P.L.R. § 302(a)(3).  *See Pearson Education, Inc. v. ABC Books, LLC*, No. 19-cv-7642 (RA), 2020 WL 3547217, at *6 (S.D.N.Y. June 30, 2020) ("Because the Court concludes that personal jurisdiction is proper under § 302(a)(1), it need not determine whether it would also be proper under § 302(a)(3).").

tortious acts caused injury in New York because the acts injured both Dai, a New York resident at the time, and Khan Funds, a New York corporation. *Id.* ¶¶ 19–20. The acts also allegedly damaged Plaintiffs' reputation and ruined their business, causing both financial and emotional harm. *Id.* ¶¶ 140–46.

The Court also finds that both subsections of § 302(a)(3) are satisfied, though only one is required for jurisdiction purposes. *See* C.P.L.R § 302(a)(3).[13] Section 302(a)(3)(i) is satisfied because Nations, through its agents, engaged in a persistent course of conduct over several years. *See, e.g.*, Doc. 35 ¶¶ 5, 51, 75, 78, 156, A-7. This conduct included communications with Dai, a New York resident at the time, to acquire New York-based entities, including OST. *Id.*

Section 302(a)(3)(ii) is also satisfied because Plaintiffs allege that Nations should have expected their acts to have an impact in New York because both Plaintiffs were located New York during the relevant time. *Id.* ¶¶ 19–20, 37. In addition, Nations, through its agents, encouraged Plaintiffs to invest in New York-based companies in furtherance of the Partnership. *Id.* ¶¶ 73–75. Nations repeatedly contacted Plaintiffs in New York to facilitate the Enterprise's goals and, and through its agents, met with Dai multiple times in New York. *Id.* ¶ 68–69, 74, 78–87.

Section 302(a)(3)(ii) also requires that a defendant derive substantial revenue from interstate or international commerce. Although Plaintiffs acknowledge that they have not demonstrated that Nations derives substantial revenue from interstate or international commerce, the Court finds that at this stage—as it did in the March 2025 Opinion—it is not necessary for Plaintiffs to demonstrate Nations derives substantial revenue from interstate or international commerce. *See Manufacturing Technology, Inc.*

---

[13] Nations submitted declaration of Yantao Ye, Nations' Vice General Manager and Secretary to the Board, who stated that Nations (1) "is not registered to do business in New York," (2) "does not transact business in New York or contract anywhere to supply good or services to New York," and (3) "does not regularly do or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in New York." Doc. 49 at 2. However, at this procedural juncture, the Court must construe Plaintiffs' allegations such that any conflicts are resolved in their favor.

*v. Kroger Co.*, No. 06-cv-3010 (JSR), 2006 WL 3714445, at *3 (S.D.N.Y. Dec. 13, 2006); *see also Dental Recycling North America, Inc. v. Stoma Ventures*, *LLC*, No. 21-cv-9147 (KPF), 2023 WL 373143, at *7 (S.D.N.Y. Jan. 24, 2023).  Accordingly, the Court finds that personal jurisdiction over Nations is proper under § 302(a)(3).

> ii.  *Nations USA*[14]

Nations USA allegedly committed tortious acts outside of New York through its agents, specifically predicate RICO acts and a violation of the CFAA.  *See, e.g.*, Doc. 35 ¶¶ 121(ii), 121(iv), 133, 135, 162–65; *see also Koam Produce*, 213 F. Supp. 2d at 325–26.  These tortious acts caused injury in New York because these acts injured both Dai, a New York resident at the time, and Khan Funds, a New York corporation.  *Id.* ¶¶ 19–20.  The acts also allegedly damaged Plaintiffs' reputation and ruined their business, causing both financial and emotional harm.  *Id.* ¶¶ 140–46.

The Court also finds that subsection of § 302(a)(3)(ii) is satisfied.  *See* C.P.L.R § 302(a)(3).[15]  Section 302(a)(3)(ii) is satisfied because Plaintiffs allege that Nations USA should have expected their acts to have an impact in New York because both Plaintiffs were located New York during the relevant time.  *Id.* ¶¶ 19–20, 37.

Section 302(a)(3)(ii) also requires that a defendant derive substantial revenue from interstate or international commerce.  Although Plaintiffs acknowledge that they have not demonstrated that Nations USA derives substantial revenue from interstate or

---

[14] Plaintiffs primarily argue that Luo and Yu, on behalf of Nations USA, committed various acts to justify jurisdiction under §302(a)(1) and §302(a)(2).  Although the complaint alleges that Luo and Yu are or were executives of Nations, the complaint does not allege that Luo and Yu are or were executives of Nations USA.  In addition, although only raised in reply, the Nations Defendants note that Luo and Yu have no legal relationship with Nations USA.  Doc. 69 at 9.  However, there is no dispute that Sun is Nations USA's CEO.  *See* Docs. 48-2, 65-1.

[15] Nations USA submitted declaration of Yulun Kan, a director at Nations USA, who stated that Nations USA "(1) "is not registered to do business in New York," (2) "does not transact business in New York or contract anywhere to supply good or services to New York," and (3) "does not regularly do or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in New York."  Doc. 48 at 2.  However, at this procedural juncture, the Court must construe Plaintiffs' allegations such that any conflicts are resolved in their favor.

international commerce, the Court finds that at this stage, as previously discussed, it is not necessary for Plaintiffs to demonstrate Nations USA derives substantial revenue from interstate or international commerce.  *See Manufacturing Technology*, 2006 WL 3714445, at *3; *see also Dental Recycling North America*, 2023 WL 373143, at *7.  Accordingly, the Court finds that personal jurisdiction over Nations is proper under § 302(a)(3).

 2.  *Due Process*

Having found that Plaintiffs have sufficiently established personal jurisdiction over the Nations Defendants pursuant to § 302(a)(3), the Court turns to whether the exercise of personal jurisdiction in this case comports with due process.

The due process inquiry requires analyzing whether the defendant has sufficient minimum contacts with the forum state to establish personal jurisdiction and whether exercising personal jurisdiction would be reasonable given the circumstances of this case. *See Chloe*, 616 F.3d at 164.  As with New York's long-arm statute, these minimum contacts must be related to Plaintiffs' claims.  *Id.* at 166 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) ("When a controversy is related to or arises out of a defendant's contacts with the forum, the Court has said that a relationship among the defendant, the forum, and the litigation is the essential foundation of in personam jurisdiction.") (internal quotation marks and citation omitted)). Reasonableness is then assessed using five factors:  (1) the burden that the exercise of jurisdiction will impose on the defendant, (2) the interests of the forum state in adjudicating the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and (5) the shared interest of the states in furthering substantive social policies.  *Id.* at 164–65 (citing *Asahi Metal Industries Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987)).

Here, the Nations Defendants[16] have sufficient minimum contacts with New York to satisfy due process.  Nations allegedly committed many tortious acts outside of New York through its agents, which caused injury in New York, including RICO predicate acts, fraud, and a violation of the CFAA.  *See, e.g.*, Doc. 35 ¶¶ 68, 71, 97, 101, 162–65. Nations USA allegedly committed tortious acts outside of New York through its agents, which caused injury in New York, including predicate RICO acts and a violation of the CFAA.  *See e.g., id.* ¶¶ 121(ii), 121(iv), 133, 135, 162–65.

Once minimum contacts are shown, "the exercise of jurisdiction is favored" unless defendants present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Smart Study Co., Ltd. v. A Pleasant Trip Store*, No. 20-cv-1733 (MKV), 2020 WL 2227016, at *4 (S.D.N.Y. May 7, 2020) (citing *Metro Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)).

On balance, the Court finds that its assertion of personal jurisdiction over the Nations Defendants amply comports with due process for the same reasons discussed in the March 2025 Opinion.  In addition, the constitutional requirements of personal jurisdiction are also satisfied because application of § 302(a) meets due process requirements.  *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) (citing *United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir. 1966)).

Because the exercise of personal jurisdiction over the Nations Defendants complies with New York's long-arm statute and comports with due process, the Nations Defendants' motion to dismiss the complaint for lack of personal jurisdiction is denied.

---

[16] The parties primarily dispute whether the exercise of jurisdiction comports with due process by analyzing the Nations Defendants as a group.

**B. Plaintiffs Plausibly Plead That the Nations Defendants Violated Civil RICO (Count 1)**

To state a claim for civil RICO, a plaintiff must plausibly allege:  (1) a violation of the RICO statute, 18 U.S.C. § 1962, (2) an injury to business or property, and (3) that the injury was caused by the violation of the RICO statute.  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (citing *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013)). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The elements of a § 1962(c) violation thus are (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Kim*, 884 F.3d at 103 (citing *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)).

1. *Plaintiffs Sufficiently Allege that the Nations Defendants Conducted or Participated in the Enterprise's Affairs*

The mere existence of an enterprise is not enough:  "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'"  *First Capital Asset Management*, 385 F.3d at 175–76 (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994)).  Thus, "[p]laintiffs must also allege that the defendants conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," meaning that the defendant "must have had some part in directing the enterprise's affairs."  *Id.* (internal quotation marks and brackets omitted) (citing 18 U.S.C. § 1962(c); *Reves v. Ernst & Young*, 507 U.S. 170, 177–79 (1993)).  "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage."  *Id.* at 176 (internal citations omitted); *see also D'Addario v. D'Addario*, 901 F.3d 80, 103 (2d Cir. 2018).

Here, Plaintiffs allege that the Nations Defendants played an important role in the management of the Enterprise, satisfying the "operation and management test." *See Reves*, 507 U.S. at 179; *see also Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995) (explaining that the operation and management test was satisfied by alleging that the defendants were "lower-rung participants" who "provided substantial assistance" to "upper management" of the RICO enterprise). Specifically, Plaintiffs allege that Nations, including through Luo as its agent, served as a "core part" of the scheme, and directed wire fraud transactions and acts of retaliation, among other things. Doc. 35 ¶¶ 11–15, 121, 127–28, 130, 133. Plaintiffs allege that Nations USA, including through Sun as an agent, served as an American base of the Enterprise. *Id.* ¶¶ 121(ii), 121(iv). Plaintiffs allege that, among other things, the Nations Defendants (1) coordinated with OST in furthering the wire fraud scheme, (2) directed a cyberattack at Khan Funds' computers in New York, and (3) coordinated the Fox Hunt efforts targeting Dai. *Id.* ¶¶ 51–54, 100, 105, 121(ix-x), 161–165. Thus, Plaintiffs sufficiently allege that the Nations Defendants conducted or participated in the affairs of the Enterprise.

### 2. *Plaintiffs Sufficiently Allege That the Nations Defendants Engaged in Predicate Acts*

A "pattern of racketeering activity" requires that Plaintiffs plausibly allege *each defendant*—not merely the Enterprise as a whole—engaged in at least two predicate acts. *Buhannic v. American Arbitration Association*, No. 18-cv-2430 (ER), 2019 WL 4735005, at *5 (S.D.N.Y. Sep. 27, 2019) (citing *Palatkevich v. Choupak*, 152 F. Supp. 3d 201, 214 (S.D.N.Y. 2016)). "[C]ivil RICO claims are generally subject to the notice pleading requirements of Federal Rule of Civil Procedure 8(a); the heightened pleading requirements of Rule 9(b) apply only to the alleged predicate acts involving fraud." *Secure Source Claims Co., LLC v. Miller*, No. 22-cv-9764 (JGLC) (OTW), 2024 WL 1342804, at *3 (S.D.N.Y. Mar. 29, 2024) (citations omitted).

*a. Wire Fraud*

Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1343 relating to wire fraud. 18 U.S.C. § 1961(1)(B). To allege wire fraud, a plaintiff must allege the following with particularity: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). A scheme to defraud is defined as "a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal quotation marks omitted) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)). Allegations of wire fraud "should state the contents of the communications, who was involved, and where and when they took place, and should explain why they were fraudulent." *Spool v. World Child International Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (alterations adopted) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)). "However, courts in the Second Circuit have applied a different standard in cases where a plaintiff claims … wires were simply used in furtherance of a master plan to defraud, but does not allege that the communications themselves contained false or misleading information." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (alterations adopted) (quoting *In re Sumitomo Copper Litigation*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998)). "In such cases, including complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity." *Id.* at 146 (internal quotation marks omitted). Instead, "Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Id.*

As discussed in the March 2025 Opinion, Plaintiffs allege both (1) a scheme to defraud, and (2) money or property as the object of the scheme. *See* Doc. 35 ¶¶ 66, 156. Plaintiffs also allege the requisite communications in furtherance of the scheme by Nations' agents, Luo and Yu, with specificity. *See Mills*, 12 F.3d at 1175. For example, in October and November 2015, in phone calls between Yu and Dai, in China and New York respectively, Yu indicated, among other things, that he would work with Dai's associates to finalize the Partnership agreement. Doc. 35 ¶ 156(i). Yu omitted that Nations Investment was negotiating in bad faith and intended to use the Partnership for espionage purposes. *Id.* Subsequently, in reliance on Yu's omissions, Dai entered the Partnership with Nations Investment. *Id.* In March 2016, in a phone call between Luo and Dai, in China and New York respectively, Luo requested that Dai open a bank account for Luo in New York and omitted that he intended to use the account to launder money for the Enterprise in furtherance of its espionage activities. *Id.* ¶ 156(iv). Subsequently, based on Luo's omission, Dai opened the bank account and continued to spend money in furtherance of the Partnership. *Id.* In June 2016, in a phone call between Yu and Dai, in China and New York respectively, Dai shared his suspicions that Luo did not seriously intend to invest in the biomedical industry, but Yu reassured him that his fears were unfounded and told him to proceed as planned. *Id.* ¶¶ 71, 156(vi). Yu misled Dai because Nations wanted to "facilitate an additional capital contribution and bring more money to the United States to further the Enterprise's aims." *Id.* ¶ 156 (vi). Subsequently, Dai relied on Yu's misrepresentation to go forward with Nations' 200 million Chinese renminbi (approximately $29 million) capital contribution. *Id.* Although Plaintiffs allege specific wire communications by Nations' agents, they do not allege any specific wire communication by Nations USA's agents. Accordingly, Plaintiffs sufficiently allege wire fraud as to Nations, but not Nations USA.

b. *Witness Tampering, Witness Retaliation, and Obstruction of Justice*[17]

Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under the witness tampering statute, the witness retaliation statute, or the obstruction of justice statute. *See* 18 U.S.C. §§ 1512, 1513, 1503. A plaintiff plausibly establishes witness tampering by alleging that a defendant "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a [f]ederal offense." 18 U.S.C. § 1512(b)(3). A plaintiff plausibly establishes witness retaliation by alleging that a defendant "knowingly engages in any conduct and thereby . . . damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for . . . any information relating to the commission or possible commission of a [f]ederal offense," 18 U.S.C. § 1512(b)(2), or "knowingly with the intent to retaliate, takes any action harmful to any person . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any [f]ederal offense," 18 U.S.C. § 1512(e). To allege obstruction of justice, a plaintiff must allege that "(1) that there is a pending judicial . . . proceeding . . . , (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the . . . proceeding, whether or not the defendant is successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Sampson*, 898 F.3d 287, 299 (2d Cir. 2018) (quoting *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006)); *see* 18 U.S.C. § 1503(a); *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 593 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016).

---

[17] The parties appear to refer to witness tampering and witness retaliation collectively as witness intimidation.

"There must be a nexus in time, causation, or logic between the conduct and its effect on the proceeding:  A defendant must know that his corrupt actions are likely to affect the proceeding."  *United States v. Jahedi*, 681 F. Supp. 2d 430, 434 (S.D.N.Y. 2009) (alterations adopted) (citing *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).

The Nations Defendants argue that Plaintiffs fail to allege that "any specific persons or entities, let alone [the Nations Defendants], were aware of Dai's discussions with federal investigators, but asserts that the 'Enterprise' 'assumed' that 'Dai had reported their activities to the authorities' after 'federal authorities arrested [alleged co-conspirator] Yi-Chi Shih [on] violations of the International Emergency Economic Powers Act' in or around December 2017."  Doc. 50 at 47–48.  Here, Plaintiffs allege that Defendants believed Dai was cooperating with U.S. law enforcement when Yi-Chi Shih was arrested on January 18, 2018 on charges of economic espionage, and reacted to Dai's cooperation with the FBI by committing various retaliatory acts in violation of the witness tampering, witness retaliation, and obstruction of justice statutes.  Doc. 64 at 50; *see* Doc. 35 ¶¶ 10, 12, 95, 121 (ii).

Specifically, in late 2017, Nations allegedly began a negative press campaign to destroy Dai's reputation, "tarring [him] as a fraudster."  Doc. 35 ¶ 93.  The negative press campaign "involved countless articles and announcements with false claims that Dai and his associates had embezzled funds…[and] also included an extensive so-called 'documentary' on Dai's purported wrongdoing."  *Id.*  On December 25, 2018, Nations allegedly "announced that Dai and his colleagues were approved for arrest by the Shenzhen People's Procuratorate as fugitives suspected of embezzlement."  *Id.* ¶ 101.  Nations allegedly "used false testimony and utilized its connections with the [Chinese] government to secure [the] arrest warrant."  *Id.*  Weeks after the indictment of Chen and Yi-Chi Shih on economic espionage charges, Nations and Nations USA allegedly, through agents, ordered a cyberattack on Khan Funds' computer systems to steal confidential documents, and these documents were used in the Singapore Action against

Dai. *Id.* ¶¶ 14, 98, 100, 163.  In directing these various acts, the Nations Defendants attempted to obstruct the proceedings against Yi-Chi Shih, Ishiang Shih, and Chen and the FBI's investigation into the Enterprise's broader activities.  Accordingly, the Court finds that Plaintiffs adequately allege witness tampering, witness retaliation, and obstruction of justice as a predicate act as to the Nations Defendants.

   *c.  Extortion*

   Section 1961(1) of RICO provides that "racketeering activity" includes any violation of 18 U.S.C. § 1951 or "any act or threat involving . . . extortion" that is "chargeable under State law."  18 U.S.C. § 1961(1).  Extortion requires that a defendant obtain property from another, with consent, induced by wrongful use of actual or threatened force, violence, or fear.  18 U.S.C. § 1951(b)(2).

   Here, Plaintiffs adequately allege extortion as to Nations because (1) Nations with others executed a scheme in attempt to extort Plaintiffs, and (2) Nations carried out an extortionate act in the form of a threat.  Doc. 35 ¶¶ 72–73, 83, 85–87, 121, 134.  Plaintiffs specifically allege that Nations attempted to extort from Plaintiffs, among other things, 300 million Chinese renminbi (approximately $42 million) in cash, 10 million Chinese renminbi (approximately $1.5 million) in capital contributions to Zhongxinanxin, and control of the Partnership.  *See id.* ¶¶ 83, 85–87, 134.  Nations' goal was to obtain Plaintiffs' money, which is sufficient to establish extortion as a predicate act.  *See Advance Relocation & Storage Co. v. Local 814, International Brotherhood of Teamsters, AFL-CIO*, No. 03-cv-4475 (DGT) (JM), 2005 WL 665119, at *7 n.8 (E.D.N.Y. Mar. 22, 2005).  ("[S]ince an attempt to extort constitutes a predicate act, a defendant need not complete an act of extortion in order for it to be considered part of a 'pattern of racketeering.'").  As to the specific extortionate acts, Luo, as Nations' agent, allegedly repeatedly threatened Dai and his family and threatened to leverage the Chinese government and judiciary to harass, investigate, and arrest him Dai.  *Id.* ¶¶ 83, 85–87, 134.  Nations, on information and belief, "used false testimony and utilized its

connections with the PRC government to secure [the] arrest warrant" for Dai and his colleagues as fugitives suspected of embezzlement. *Id.* ¶ 101. In addition, in December 2018, Nations announced the arrest warrant. *Id.* As previously discussed in the March 2025 Opinion, although malicious or frivolous litigation cannot constitute extortion, other threats that are alleged do constitute extortion. *See FindTheBest.com, Inc. v. Lumen View Technology LLC*, 20 F. Supp. 3d 451, 457 (S.D.N.Y. 2014) (explaining that "the filing of [a] meritless litigation is not a RICO predicate act."). Although Plaintiffs allege specific extortionate acts by Nations, they do not allege any specific extortionate act by Nations USA. Thus, the Court finds that Plaintiffs sufficiently plead extortion as to Nations, but not Nations USA.

   *d. Kidnapping*

   Section 1961(1) of RICO provides that "racketeering activity" includes "any act or threat involving . . . kidnapping" that is "chargeable under State law." 18 U.S.C. § 1961(1). "A person is guilty of kidnapping in the second degree when he abducts another person." N.Y. Penal Law § 135.20. To "'abduct' means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force." N.Y. Penal Law § 135.00(2); *People v. Denson*, 42 N.E.3d 676, 682 (N.Y. 2015). To "restrain" means "restrict[ing] a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful." N.Y. Penal Law § 135.00(1); *Denson*, 42 N.E.3d at 684–85. A person is "restrained" "without consent" when the defendant accomplishes this by, *inter alia*, "physical force, intimidation or deception." N.Y. Penal Law § 135.00(1)*; Carter v. Herbert,* No. 9-cv-1821 (NAM) (GLS), 2002 WL 975309, at *4 (N.D.N.Y. Jan. 8, 2002). "Deadly physical force" is defined as "physical force which, under the circumstances in

which it is used, is readily capable of causing death or other serious physical injury."
N.Y. Penal Law § 10.00(11); *Cardona v. Goord*, 811 F. Supp. 2d 655, 665 (E.D.N.Y.
2011).

The Nations Defendants did not challenge Plaintiffs' allegations of kidnapping, so
the Nations Defendants has waived its right to do so. *See Cruz v. Zucker*, 116 F. Supp. 3d
334, 349 n.10 (S.D.N.Y. 2015) (explaining that arguments not raised in an opening brief
are waived). Regardless, the Court finds that Plaintiffs sufficiently allege kidnapping as
to the Nations Defendants. Plaintiffs allege that Defendants "attempt[ed] to repatriate
Dai to [China] through a coordinated Fox Hunt campaign in violation of New York Penal
Law § 135.20 (Kidnapping in the Second Degree)." Doc. 35 ¶ 135. The Nations
Defendants, through Luo and Sun, are alleged to have been involved in the attempt. *See
id.* ¶¶ 121(ii), 135. Specifically, Luo, acting as Nations' agent, took a leadership role in
the Fox Hunt kidnapping plot and used Dai's sister to pressure and investigate him. *Id.*
Sun, acting as Nations and Nations USA's agent, also took a leadership role in the Fox
Hunt kidnapping plot. *Id.* The Defendants also filed a false report leading to the issuance
of an arrest warrant for Dai in China, conducted pervasive surveillance activities in the
United States, and issued death threats to Dai on social media. *Id.* These acts, among
others, were executed to attempt to move Dai to China and prevent his escape by threat of
deadly force. Thus, the Court finds that Plaintiffs sufficiently allege kidnapping as to the
Nations Defendants.

Because Plaintiffs allege at least two RICO predicate acts as to each Defendant,
the Courts finds that Plaintiffs plausibly allege that the Nations Defendants violated civil
RICO.

### C.  Plaintiffs Plausibly Allege That the Nations Defendants Participated in a RICO Conspiracy (Count 2)

To establish a RICO conspiracy, the "plaintiff must prove "(1) that there existed a
conspiracy to commit acts that, if successful, would constitute a substantive civil RICO

violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner." *City of New York v. Chavez*, 944 F. Supp. 2d 260, 268–69 (S.D.N.Y. 2013); *see also Loop Production v. Capital Connections LLC*, 797 F. Supp. 2d 338, 350 (S.D.N.Y. 2011) ("A defendant can commit a RICO conspiracy where he 'know[s] the general nature of the conspiracy and that the conspiracy extends beyond [his] individual role[ ].'" (quoting *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000))). "An agreement can be shown directly, by assent to commit predicate acts of racketeering, or indirectly, by circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." *City of New York v. Chavez*, 2012 WL 1022283, at *7 (S.D.N.Y. Mar. 26, 2012) (internal quotation marks omitted) (quoting *Fuji Photo Film, U.S.A., Inc. v. McNulty*, 640 F.Supp.2d 300, 312 (S.D.N.Y. 2009)). For a RICO conspiracy claim, the Court must limit its focus to "whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise." *Zichettello*, 208 F.3d at 99 (internal quotation marks and citation omitted).

Plaintiffs sufficiently allege that the Nations Defendants agreed to join the RICO conspiracy under the liberal pleading standard for conspiracy. *See* Doc. 35 ¶¶ 121(i)–(vii), 152, 153, 154; *see* Doc. 64 at 56–57. Plaintiffs allege that the Nations Defendants were "aware of the general scope and nature of the conspiracy," which is sufficient to show agreement to join conspiracy. *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 321 (S.D.N.Y. July 17, 2009); *see* Doc. 35 ¶¶ 151–54. Specifically, Plaintiffs allege that (1) the Nations Defendants were aware that the conspiracy extended beyond their individual roles; (2) the Nations Defendants were "knowing, willing, and active participant[s] in the Enterprise and its affairs"; (3) the Enterprise's members shared goals of stealing U.S. semiconductor technology for the benefit of the Chinese military, and intimidating and retaliating against Plaintiffs for refusing to participate in the scheme

and reporting it to U.S. law enforcement authorities; and (4) "the Enterprise could not have operated as it did" in the absence of an agreement.  Doc. 35 ¶¶ 151–54; *see also JPMorgan Chase Bank, N.A. v. Nowak*, No. 23-cv-6834 (JPO), 2024 WL 1329410, at *6 (S.D.N.Y. Mar. 28, 2024) ("[A] defendant's agreement to join a [RICO] conspiracy . . . can be inferred from circumstantial evidence of the defendant[s'] status in the enterprise or knowledge of wrongdoing") (quoting *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 154 (S.D.N.Y. 2014)).  Lastly, as discussed, Plaintiffs also adequately allege civil RICO as to the Nations Defendants, including that each committed at least two predicate acts.  *See Palazzolo*, 346 F. Supp. 3d at 462 ("Because the court holds that Plaintiff has properly alleged a RICO claim, the court denies the motion to dismiss the conspiracy claim.") (quoting *SKS Constructors, Inc. v. Drinkwine*, 458 F.Supp.2d 68, 81 (E.D.N.Y. 2006)).  Accordingly, the Court finds that Plaintiffs allege a RICO conspiracy as to the Nations Defendants.

### D.  Plaintiffs Sufficiently Allege That Nations Engaged in Fraud (Count 3)[18]

To state a claim of common law fraud under New York law, a plaintiff must allege that the defendant made "(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Financial Guaranty Insurance Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015).  "A claim for common law fraud is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)," *id.* at 402–03, which requires that the complaint "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Specifically, to meet this requirement, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."

---

[18] In their memorandum of law in opposition to the motion to dismiss, Plaintiffs withdrew their common law fraud claim as to Nations USA.  Doc. 64 at 57 n.24.

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). While a fraud claim may plead scienter generally, the plaintiff "must still allege facts that give rise to a strong inference of fraudulent intent." *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 585 (S.D.N.Y. 2021) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 472 (S.D.N.Y. 2020)). This inference may be established by (1) "alleging facts to show that defendants had both motive and opportunity to commit fraud," or (2) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting *Duran v. Henkel of America, Inc.*, 450 F. Supp. 3d 337, 353 (S.D.N.Y. 2020)).

The Court finds that Plaintiffs' allegations meet the heighted pleading standard under Rule 9(b). First, Plaintiffs allege fraudulent statements and omissions made by Luo and Yu, on behalf of Nations, with particularity. Doc. 35 ¶ 5, 43, 44, 66, 68, 90, 156; *see also Koam Produce*, 213 F. Supp. 2d at 325–26. Luo's fraudulent statements and omissions include requesting Dai to open a bank account for him and asking Dai to create a semiconductor focused fund. Doc. 35 ¶¶ 5, 43, 68, 156. The complaint alleges that Luo's intention was for the Enterprise to use the account and the fund to launder money in furtherance of its espionage activities. *Id.* Yu's fraudulent statements and omissions include allegedly falsely reassuring Dai that his fears that Luo did not intend to invest in biomedical industry were unfounded and encouraging him to proceed as planned. *Id.* ¶¶ 5, 44, 90, 156. Luo and Yu, as executives of Nations, made these statements and omissions "in furtherance of Nations' goals to advance the Partnership with Plaintiffs, trick Plaintiffs into investing into the Partnership, and use that leverage to force Plaintiffs to serve as a money laundering front for the larger Enterprise and help them acquire semiconductor companies." Doc. 64 at 58; *see id.* ¶¶ 5, 43, 44, 66, 68, 90. Plaintiffs also allege facts that plausibly demonstrate Nations' fraudulent intent in making the fraudulent statements and omissions. *See Bayshore Cap. Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667 F. Supp. 3d 83, 147 (S.D.N.Y. 2023) ("In . . . common law fraud

context[], courts have imputed to the corporate defendant intent based on the intent of officers and directors acting within the scope of their employment."). Thus, the Court finds that Plaintiffs' fraud allegations as to Nations satisfy Rule 9(b).

The Nations Defendants argue that "false statements or omissions by [Nations] concerning how they would perform under the Partnership Agreement to plead fraud against [Nations] … are not actionable." Doc. 50 at 58. The Nations Defendants argue that "intentionally misleading statements by a defendant falsely indicating an intent to perform under a contract and/or concealing a breach of the contract do not give rise to an action for fraud." *Id.* (citing *IKEA North American Services, Inc. v. Northeast Graphics, Inc.*, 56 F. Supp. 2d 340, 342 (S.D.N.Y. 1999)). However, as Plaintiffs note, "a valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced the plaintiff to enter the contract." Doc. 64 at 60 (citing *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)); *see, e.g.*, *Astroworks, Inc. v. Astroex*hibit, Inc., 257 F. Supp. 2d 609, 617 (S.D.N.Y. Mar. 11, 2003). Here, Plaintiffs allege that the fraud claim is premised on misrepresentations that were made before the formation of the Partnership and that induced Plaintiffs to enter the Partnership. Accordingly, the Court finds that Plaintiffs sufficiently plead fraud as to Nations.

### E. Plaintiffs Sufficiently Plead That the Nations Defendants Violated the CFAA

The CFAA created a civil right of action for any person who suffered "damages or loss" as a result of individuals who intentionally accessed a protected computer without authorization or in a way that exceeded their authorized access. 18 U.S.C. §§ 1030(a)(2)(C), 1030(g). Under the CFAA, damage refers to "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. §§ 1030(e)(8). Loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue

lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. §§ 1030(e)(11). Any alleged loss is limited to "economic damages" of at least $5,000. 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g). This Court has long held that "costs not related to computer impairment or computer damages are not compensable under the CFAA." *Civic Center Motors, Ltd. v. Mason Street Import Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005); *see also Deutsch v. Human Resource Management, Inc.*, No. 19-cv-5305, 2020 WL 1877671, at *5 (S.D.N.Y. Apr. 15, 2020).

The Nations Defendants argue that Plaintiffs fail to allege that the they "accessed a protected computer without authorization." Doc. 50 at 62. Plaintiffs counter that the they "directly link [] [the] [Nations] Defendants with the hack by alleging that such a hack of internal documents is one of the *only* ways that Defendants could end up in possession of [the confidential] documents," including "copies of certain contracts and certain correspondence with legal counsel." Doc. 64 at 63. Here, the allegations that the Nations Defendants "possessed information … available only through [Plaintiff's] computer or email, are sufficient for the Court to draw the reasonable inference" of access at the motion to dismiss stage. *Sachdev v. Singh*, No. 15-cv-7114 (AJP), 2016 WL 768861, at *10 (S.D.N.Y. Feb. 26, 2016) (at the motion to dismiss stage, the Court held that the plaintiff's "allegations that [the defendant] possessed information known only to a limited number of individuals, and other available only through his computer or email, are sufficient for the Court to draw the reasonable inference that [the defendant] accessed [the plaintiff's] computer."); *see also* Doc. 35 ¶¶ 100, 164. Thus, the Court finds that Plaintiffs sufficiently plead that the Nations Defendants violated the CFAA.

Because Plaintiffs sufficiently allege each claim brought against the Nations Defendants, the Nations Defendants' motion to dismiss for failure to state a claim is denied.

## IV.   CONCLUSION

For the foregoing reasons, the Nations Defendants' motion to dismiss is DENIED.

It is SO ORDERED.

Dated:    April 30, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.