UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KHAN FUNDS MANAGEMENT
AMERICA, INC. *and* XUEFENG DAI,

                  Plaintiffs,

        – *against* –

NATIONS TECHNOLOGIES, INC.,
NATIONS TECHNOLOGIES (USA)
INC., SHENZHEN QIANHAI NATIONS
INVESTMENT MANAGEMENT CO.
LTD., ZHAOXUE LUO, YINGTONG
SUN, BAOXIN HUANG, JUNEE YU,
YAPING CHEN, HUAXIA GENERAL
PROCESSOR TECHNOLOGIES INC.,
OPTIMUM SEMICONDUCTOR
TECHNOLOGIES INC. D/B/A
GENERAL PROCESSOR
TECHNOLOGIES, KEYI LI, *and* DOES 1-
20,

                Defendants.

NATIONS TECHNOLOGIES INC.,
SHENZHEN QIANHAI NATIONS
INVESTMENT MANAGEMENT CO.
LTD., *and* SHENZHEN
GUOTAIQIXING INDUSTRY
INVESTMENT FUND CENTRE
(LIMITED PARTNERSHIP),

          Counterclaim-Plaintiffs,

        – *against* –

KHAN FUNDS MANAGEMENT
AMERICA, INC., XUEFENG DAI,
BEIJING KHAN PHARMACEUTICAL
HOLDINGS CO., LTD., *and* SHENZHEN
QIANHAI GENGHIS KHAN FUND
MANAGEMENT CO., LTD.,

        Counterclaim-Defendants.

**OPINION & ORDER**

22-cv-05055 (ER)

ZHAOXUE LUO,

          Counterclaim-Plaintiff,

– *against* –

XUEFENG DAI,

          Counterclaim-Defendant.

RAMOS, D.J.:

In this action, Nations Technologies Inc. ("Nations"), Shenzhen Qianhai Nations Investment Management Co. Ltd. ("Nations Investment"), and Shenzhen Guotaiqixing Industry Investment Fund Centre (the "Partnership") (collectively, the "Counterclaim Plaintiffs") assert seven counterclaims against Xuefeng Dai, Khan Funds Management America, Inc. ("Khan Funds"), Beijing Khan Pharmaceutical Holdings Co., Ltd. ("Beijing Khan"), and Shenzhen Qianhai Khan Fund Management Co., Ltd. ("China Khan") (collectively, the "Counterclaim Defendants").[1] Zhaoxue Luo also asserts a counterclaim for defamation against Dai. Before the Court is Dai and Khan Funds's motion to dismiss the counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I.    FACTUAL BACKGROUND[2]

### A. The Parties

Nations is publicly-traded technology company organized under Chinese law; its principal place of business is Shenzen, China. Doc. 167 ¶¶ 1, 17, 27. Nations Investment

---

[1] Because the Counterclaim Plaintiffs and Counterclaim Defendants differ from the plaintiffs and defendants in the original action, to avoid any confusion, the Court uses "Plaintiffs" and "Defendants" to refer solely to the parties in the operative complaint. *See* Doc. 35.

[2] The Court draws the factual background from the allegations in the Counterclaim Plaintiffs' complaint, which, for the purposes of this motion, the Court accepts as true. *Shake Shack Enterprises, LLC v. Brand Design Co., Inc.*, 708 F. Supp. 3d 515, 521 n.1 (S.D.N.Y. 2023). The Court also notes—without opining on

is Nations's wholly-owned subsidiary, *id.* ¶ 18, and the Partnership is wholly owned by Nations Investment, *id.* ¶ 19. Shenzen is also the principal place of business for the Partnership and Nations Investments. *Id.* ¶¶ 18, 19.

From January 2014 to May 2018, Luo was the Chairman of Nations's board of directors. *Id.* ¶ 42. In September 2019, he left the company. *Id.*

Dai conducts business by and through a number of entities, for which he is the effective and beneficial owner (the "Khan Entities"). *Id.* ¶ 24. Many of these entities contain the name "Khan." *Id.* ¶ 24. Khan Funds, for example, is a New York corporation that is wholly owned by Dai. *Id.* ¶ 21. It was established to serve as the global headquarters for all of Dai's affiliated entities. *Id.* Beijing Khan is a Chinese company with a business address in Beijing. *Id.* ¶ 23. China Khan is a holding company for the Khan Entities, including Khan Funds and Beijing Khan. *Id.* ¶ 22. China Khan is a corporation that is organized under Chinese law; its principal place of business is in Shenzen. *Id.*

### B. The Factual Allegations

#### 1. *The Initial Investment & Formation of the Partnership*

In 2014, Nations was exploring various investment opportunities as part of its regular investment strategy. *Id.* ¶ 43. After Dai learned of Nations's interest in investing its funds, he began to solicit Nations for business opportunities. *Id.* ¶ 44. Dai promoted himself as an investment advisor, consultant, and expert in pharmaceutical investments, information technology, and financial blue chips in China and abroad. *Id.* ¶ 45. After Dai was introduced to Nations's chief executive officer, Luo, the two men began to discuss a potential collaboration in which Dai would invest Nations's funds in investment products

---

the merits—that the Plaintiffs vigorously contest the allegations in the countercomplaint and set forth a very different version of events in their complaint. A summary of the Plaintiffs' allegations may be found in the Court's previous decisions. *See Khan Funds Management America, Inc. v. Nations Technologies Inc.*, No. 22-cv-5055 (ER), 2023 WL 6124801 (S.D.N.Y. Sept. 19, 2023); *Khan Funds Management America, Inc. v. Nations Technologies Inc.*, No. 22-cv-05055 (ER), 2025 WL 1266626 (S.D.N.Y. Apr. 30, 2025).

3

that Dai controlled that were primarily focused on the biomedical industry. *Id.* ¶ 48.  Dai represented that the investments would be lucrative. *Id.*

Encouraged by Dai's representations, Nations invested approximately $28 million in a fund operated by China Khan in November 2014. *Id.* ¶ 49.  Dai made representations to Nations regarding the returns on this investment throughout 2015 and 2016. *Id.* ¶ 50. Sometime after the initial investment, Dai also offered to form a partnership with Nations in which Nations would entrust him and his company with funds and, through his company, Dai would oversee the investment. *Id.* ¶ 51.  Nations agreed to the arrangement because of Dai's representations regarding his experience, potential investment opportunities outside of China, the returns Nations would receive and had received from the initial investment, and his performance as a fiduciary for Nations's funds. *Id.* ¶ 52.  Dai also agreed to guarantee the security of the principal funds invested during the potential partnership.

In preparation for this joint venture, Dai formed Beijing Khan and Nations formed Nations Investment in August 2015. *Id.* ¶¶ 53–54.  Nations Investment and Beijing Khan then signed a limited partnership agreement (the "Partnership Agreement") on November 23, 2015, which created the Partnership. *Id.* ¶ 56.  The Partnership Agreement also named Nations Investment as a limited partner and Beijing Khan as a general and "Executive Partner" with substantial control over the Partnership and the Partnership funds. *Id.* ¶ 57.

The Partnership Agreement stated that the purpose of the Partnership was to share in the returns of the rapidly developing merger and acquisitions market by combining capital advantage and the advantages of professional investment and management. *Id.* ¶ 58.  The Partnership was intended to extend for twenty years. *Id.*  And the Partnership Agreement called for a total capital raise of nearly $279 million to be invested over a three-year period, with initial capital contributions of $70,000 and $42 million by Beijing Khan and Nations Investment, respectively. *Id.* ¶ 59.  As Executive Partner, Beijing Khan

was empowered to, *inter alia*, execute the Partnership's affairs, act on its behalf, hire Dai as an investment manager, and pay Dai a management fee. *Id.* ¶ 61. Beijing Khan was bound by fiduciary duties until the end of the investment period. *Id.* ¶ 62.

Nations Investment, by contrast, was not permitted to participate in the Partnership's day-to-day affairs. *Id.* Nations would also refrain from participating in the Partnership or investment decisions. *Id.* Nations Investment did, however, have certain rights under the Partnership Agreement; these included the right to review and audit the Partnership's books and records, be regularly informed about the Partnership's affairs, receive distributions whenever there were net profits, attend regular meetings, and provide advice and suggestions to Beijing Khan. *Id.* ¶ 63.

Nations Investment and China Khan also entered into a Supplementary Agreement for the Establishment of the Partnership (the "First Supplemental Agreement") on November 27, 2015. *Id.* ¶ 64. Pursuant to that agreement, China Khan guaranteed the security of Nations Investment's investment capital in the Partnership during the Partnership and a fixed annual income of 5% of Nations Investment's investment from the date of payment. *Id.* If the Partnership was not able to achieve that income, China Khan agreed to make up the deficit on an annual basis. *Id.*

After Dai continued to represent that Nations's investments were going well and progressing steadily in accordance with defined targets, *id.* ¶ 65, Nations announced to its shareholders that it had voted to make a second capital contribution to the Partnership of approximately $28 million on February 29, 2016. *Id.* ¶ 66. In accordance with that announcement, Nations Investment and Beijing Khan executed an amendment to the Partnership Agreement (the "Additional Investment Agreement") wherein Nations Investment agreed to invest that additional sum on March 25, 2016. *Id.* ¶ 68. Around that same time, Nations Investment and China Khan also entered into a supplemental agreement to the Additional Investment Agreement (the "Second Supplemental

Agreement") which mirrored the terms of the First Supplemental Agreement set forth above. *Id.* ¶ 69.

    2. *The "Dividend," Audit, and Resulting Fallout*

Several months later, in December 2016, Dai and Beijing Khan paid Nations Investment an approximately $6.97 million "dividend." *Id.* ¶ 71. Although the "dividend" gave Nations Investment the impression that the funds were being managed professionally and successfully,[3] *id.*, a few weeks later, Nations and Nations Investment received an audit of the Partnership that "revealed" several "issues"—namely that: (1) only $16.5 million had actually been invested by the Partnership, (2) China Khan owed $27 million to the Partnership, and (3) the Partnership owed a "shockingly high" management fee of $11.5 million to China Khan. *Id.* ¶¶ 7, 74–75, 78. Upon receipt of the audit, Nations and Nations Investment sought clarification from Dai and Beijing Khan about the audit findings. *Id.* ¶ 78. Dai and Beijing Khan were unable, however, to explain or account for the issues revealed by audit. *Id.* And rather than providing Nations Investment with access to the Partnership's books or records or explaining the "revelations" in the audit, *id.* ¶ 76, Dai repeatedly "fobbed off or avoided" the clarification requests by representing that the investment management was going well, *id.* ¶ 78. "As a result, even after the [a]udit, Nations Investment was unaware of the scope of Dai's diversions," "mismanagement[,] and theft." *Id.* ¶¶ 76, 78.

In approximately mid-2017, Nations Investment proposed a change to the structure of the Partnership to ensure better governance of its investment. *Id.* ¶ 79. To conceal his misconduct and forestall further action, Dai pretended to agree to the proposal, and told Nations Investment and Nations that he would return to China in November 2017 to further discuss the changes and that he was calculating the payment of

---

[3] The counterclaims allege that, at some point, subsequent investigations revealed that this payment was not tethered to any real investment gains and thus did not constitute a true investment dividend. Doc. 167 ¶ 72.

6

a forthcoming dividend.  *Id.* ¶ 80–81.  Dai's associate and agent also proposed a call with a representative of Nations Investment to discuss an upcoming audit on November 5, 2017.  *Id.* ¶ 82.  But when the Nations Investment representative called Dai's associate, her phone was turned off, and she did not call back.  *Id.*  On November 11, 2017, Dai also announced that he was shutting down a chat group that was used to communicate with investors and potential investors.  *Id.* ¶ 83.

Nations Investment attempted to contact Dai and his known associates without success.  *Id.*  And when Nations Investment sent a representative to the Partnership's Shenzen office in late November 2017, it discovered that the office had been abandoned earlier that year.  *Id.* ¶ 86.  Representatives of Nations Investment also visited Beijing Khan's office in Beijing and similarly found that it had been occupied by a new tenant.  *Id.* ¶ 87.  The building's management informed Nations Investment that the offices were vacated in June 2017.  *Id.*  Nations Investment discovered in January 2018 that the office of the Partnership's wholly-owned subsidiary in Singapore, Guotaiqixing Biomedical International (Singapore) Pte. Ltd. ("GTQX"), had also been abandoned.  *Id.* ¶ 88.

Nations and Nations Investment filed a report with the Shenzen Municipal Public Security Bureau (the "Shenzen PSB") on November 29, 2017, alleging that Dai and Beijing Khan had defrauded them.  *Id.* ¶¶ 96–97.  That same day, Nations's board also disclosed to its shareholders that the relevant personnel of Beijing Khan could not be reached and that it had made a report to the relevant authorities.  *Id.* ¶ 91.  At Nations's request, the Shenzen Stock Exchange briefly halted trading of Nations's stock; when the halt was lifted, Nations's shares were trading at a lower price.  *Id.* ¶¶ 92–93.

In response to Nations and Nations Investment's report, the Shenzen PSB began an investigation that culminated in the issuance of an approval for the arrest of Dai and two of his associates on suspicion of embezzlement on December 25, 2018.  *Id.* ¶¶ 98–99.  The approval for the arrest remains outstanding.  *Id.*

3. *Nations Investment Removes Beijing Khan and Dai from the Partnership and Gains Access to the Partnership's Bank Statements*

Nations Investment issued a written notice to Beijing Khan, through its registered legal representative, requesting Beijing Khan's removal from the Partnership on December 20, 2017. *Id.* ¶¶ 100–01. After Beijing Khan failed to respond, Nations Investment filed a civil complaint against Beijing Khan in the Shenzhen Qianhai Cooperation Zone People's Court (the "PRC Civil Court"). *Id.* ¶ 101. The PRC Civil Court eventually deemed Beijing Khan served by public announcement, and, after neither Dai nor Beijing Khan appeared, entered a default judgment ordering Beijing Khan's removal from the Partnership. *Id.* ¶¶ 102–04. In its February 18, 2019, written decision, which was based on its review of the evidence, the PRC Civil Court determined that Beijing Khan had not only "failed to report regularly to [Nations Investment] regarding the implementation of partnership-related matters and the operation and financial condition of the partnership," but "also disappeared and been unavailable for contact," and that this conduct "constitutes severe negligence of its operational responsibilities, meeting the mandatory condition for the striking off of a partner." *Id.* ¶ 104–05.[4]

Nations Investment assumed the role of liquidator of the Partnership in August 2019. *Id.* ¶ 109. In that role, Nations Investment was empowered to remove Dai as director of the Partnership, which it did on October 16, 2019. *Id.* ¶ 110. Nations Investment also gained access to the Partnership's bank statements, *id.* ¶ 146, which revealed that, in 2016 and 2017, Dai had transferred at least $47 million from the Partnership (the "China Funds") to China Khan, an entity that owns 100% of Beijing Khan and is controlled by Dai. *Id.* ¶ 148–49. The statements also revealed that, in labeling these transfers, Dai used "false and vague justifications." *Id.* ¶ 150. Finally, the bank statements revealed that Dai transferred approximately $4.4 million to Shenzen

_____

[4] While Dai, through Beijing Khan, appealed the default judgment nearly three years later on January 26, 2022, Doc. 167 ¶ 111, the Shenzen Intermediate People's Court rejected his challenge, concluding that the judgment was factually and legally supported, and the appeal itself was untimely, *id.* ¶ 112.

Weiyunnan Trading Co, which, on information and belief, is a Dai-controlled entity. *Id.* ¶ 154.

Nations Investment sent demand letters to Dai and Beijing Khan requesting the return of the China Funds on November 9, 2020, and again, three years later, on October 25, 2023. *Id.* ¶ 155. To date, none of the Counterclaim Defendants have returned the requested funds. *Id.* ¶ 159.

### 4. GTQX Sues Dai in Singapore

After the disappearance of Dai and Beijing Khan, GTQX's board resolved to conduct a full audit of its business, operations, and financials in approximately December 2017. *Id.* ¶ 113. GTQX's investigation revealed that Dai had caused the Partnership to transfer approximately $32 million to GTQX on December 23, 2015, before causing GTQX to transfer approximately $34 million (the "Singapore Funds") to other entities that he controlled.[5] *Id.* ¶¶ 116–19. The reasons that Dai provided for the transfers were "bogus." *Id.* ¶¶ 120–22. The investigation also revealed that Dai and his agents had forged the signature of GTQX's director on documents "in the course of concealing their diversions." *Id.* ¶ 123.

In light of these findings, GTQX filed a civil action for breach of fiduciary duty against Dai and two of his associates in Singapore on October 27, 2020. *Id.* ¶ 124. Dai initially appeared and participated in the action through counsel. *Id.* ¶¶ 125–26. In an affidavit that Dai filed with the court, he conceded that he "transferr[ed] the monies from the Plaintiff to the various Khan entities" and that the monies "belong" to the Partnership and GTQX. *Id.* ¶ 127. Dai also argued that he had diverted the funds to prevent "the commission of an illegal act and/or purpose," and cited the initial complaint that he filed in this case before it was removed to federal court. *Id.* ¶ 128. Dai further explained that "[a]s the illicit activities of Mr. Luo and [current Nations board chairman and general

---

[5] The $34 million was comprised of the $32 million transfer from the Partnership and other GTQX funds. *Id.* ¶ 119 n.11.

manager] Mr. [Yingtong] Sun were reported to law enforcement agencies in the US, [he] was concerned that monies in [the Partnership] may be viewed by the US authorities as proceeds of an illegal enterprise and if so, the monies in [the Partnership] and [GTQX] might be part of a freezing order by the US authorities." *Id.* ¶¶ 42, 129.

Based on these admissions, the Singapore Court found that Nations Investment was entitled to the equivalent of a temporary restraining order and enjoined Dai from disposing of, dealing with, or diminishing the value of his assets up to the value of GTQX's claims in the action. *Id.* ¶ 130. After GTQX later discovered that Dai had sold two properties in New York, GTQX again sought temporary injunctive relief from the Singapore court. *Id.* ¶¶ 131–32. The court granted the equivalent of a temporary restraining order and enjoined Dai from disposing of, dealing with, or diminishing the value of his assets, including the relevant real properties, up the value of GTQX's claims in the action. *Id.* ¶ 133. In its ruling, the court noted that GTQX had provided evidence that Dai owned the relevant properties and was trying to dissipate his assets pending the adjudication of GTQX's claims. *Id.*

After Dai stopped participating in the proceedings on approximately December 30, 2022, the Singapore court issued an interim injunction on January 12, 2023, prohibiting Dai from disposing of his assets pending resolution of the litigation. *Id.* ¶¶ 136–39. Based on Dai's withdrawal from the proceedings, the court issued a final judgment against Dai on June 27, 2023, ordering him to pay GTQX the full amount of the funds that GTQX alleged that he diverted. *Id.* ¶ 142. The Court also extended and made permanent its previous order prohibiting Dai from dissipating and disposing of assets. *Id.* ¶ 143.

5.  *Dai Reports Nations, Nations Investment, Luo, and Sun to Law Enforcement*

After Nations began to search for the funds that Dai allegedly diverted, Dai began to file reports to Chinese regulatory authorities against Nations. *Id.* ¶ 161. In 2021, for example, an anonymous source filed complaints against Nations with the China Securities

Regulatory Commission ("CSRC") alleging that Nations's public disclosures misled shareholders, and that Nations manipulated its share price. *Id.* ¶ 162. These complaints included details that implicitly identified Dai as the anonymous source. *Id.* The complaints also included allegations that:

- Nations, Luo, and Sun were being investigated by the FBI and "wanted by the federal government of the U.S.," and that Nations "was aware" of those facts in February 2021 but failed to disclose that information. *Id.* ¶ 163.

- Nations "chose to manipulate its stock price and issue low-price private placement and equity incentive[s] to the management and the current chairman by the high stock price, so as to carry out the final crazy crime." *Id.* ¶ 164.

- Dai had hired a lawyer in China to contact the Shenzen procuratorate or Shenzen PSB to report Nations's violations, along with those of its current and former chairmen. *Id.* ¶ 165.

- Nations "used the Singapore lawsuit to bid up the stock price and get profit from investors" by falsely claiming that Dai and his co-defendants had been validly served. *Id.* ¶ 166.

These allegations were all false. *Id.* ¶¶ 161–66.

Dai also made several false reports to U.S. law enforcement officials. For example, on December 24, 2022, Dai emailed six officials from the U.S. Department of Justice ("DOJ") alleging that the Singapore office of Khan Funds was "broken into" by the "[C]hinese military." *Id.* ¶ 188. A few weeks later, on January 12, 2023, Dai separately emailed six DOJ officials, along with individuals at the Wall Street Journal and Blooomberg Newsroom, alleging that Nations is a "Chinese military company" that is "spying in America," and that "Dai's social security number was sold to" Nations.[6]

6. *Dai Files Lawsuits in the United States*

In November 2019, Dai also began to file lawsuits in the United States "in an attempt to recast the narrative known in China and Singapore—that [he] is a thief and fraudster." *Id.* ¶ 177. The first of these actions were filed against foreign media

---

[6] Because the counterclaims allege that these statements were made about "Nations," it is not clear whether they are alleging that these the statements were directed toward Nations, Nations Investment, or both.

companies for defamation allegedly stemming from their reporting of Dai's theft from Nations and Nations Investment. *Id.* ¶¶ 178–79. In one case in particular, Dai filed a *pro se* complaint that alleged, among other things,[7] that the defendants, which included Chinese media companies, executives, and their attorneys, were "secret members of the Chinese military" and provided "assistance to the Chinese military's efforts to commit crimes of espionage in New York." *Id.* ¶ 180. A district court in the Eastern District of New York dismissed the complaint *sua sponte* with prejudice, holding that the allegations in the complaint were frivolous, "fantastic," and "nothing more than [the] Plaintiff's delusions." *Id.* ¶ 181 (quoting *Dai v. Alibaba Cloud US LLC*, No. 19-cv-6140 (JS) (GRB), 2020 WL 122945, at *2 (E.D.N.Y. Jan. 9, 2020)). A New York state court later relied on this dismissal to dismiss a similar action. *Id.* ¶ 182. Dai eventually withdrew his other cases. *Id.* ¶ 183.

The Plaintiffs also filed this case in New York Supreme Court on April 7, 2022; their initial complaint included allegations that "were reminiscent of allegations" that the Eastern District of New York had concluded were frivolous. *Id.* ¶ 184. The amended complaint also included false allegations, including that the Defendants used the Plaintiffs "to help . . . launder funds and facilitate the acquisitions required to steal high technology for the ultimate benefit of the PRC military" and seek to "intimidate and retaliate against Plaintiffs for reporting the technology theft to law enforcement." *Id.* ¶ 186. And "during the course of this litigation, Dai was profiled in an article in The Wire China called 'Patriot Games,' in which he is quoted saying many of the same talking points in the Complaint and providing nothing resembling support for them." *Id.* ¶ 191. When Wire China asked Dai for details of the alleged scheme, Dai responded that "the enemy will

---

[7] Dai's *pro se* complaint was "comprised of 208 pages and 722 numbered paragraphs," and alleged that the forty defendants conspired and participated in the Chinese military's plot to murder him. *Dai v. Alibaba Cloud US LLC*, No. 19-cv-6140 (JS) (GRB), 2020 WL 122945, at *1 (E.D.N.Y. Jan. 9, 2020); *see TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726, 730 n.1 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 82 (2d Cir. 2012) (courts may take judicial notice of prior court rulings that are incorporated by reference into the complaint and matters of public record).

kill you if you know more." *Id.* ¶ 191. In using the term "the enemy," Dai was "presumably" referring to Nations and its affiliates. *Id.* This statement is false. *Id.*

## II.    PROCEDURAL HISTORY

On April 7, 2022, Dai and Khan Funds filed suit against Nations, Nations Technologies (USA) Inc. ("Nations USA"), Luo, Junjie Yu, Yingtong Sun, Baoxin Huang, and Does 1-20 in New York state court for violations of RICO, RICO conspiracy, fraud, defamation, prima facie tort, and civil conspiracy. Doc. 1-1. On June 16, 2022, those defendants removed the case to this Court. Doc. 1. On December 19, 2022, the Plaintiffs amended their complaint, adding Nations Investment, Yaping Chen, HuaXia General Processor Technologies Inc. ("HuaXia GPT"), Optimum Semiconductor Technologies Inc. ("OST"), and Keyi Li as defendants. Doc. 35.

The Court assumes familiarity with the facts alleged in the amended complaint, which are set forth in the Court's previous opinions, *Khan Funds Management America, Inc. v. Nations Technologies Inc.*, No. 22-CV-05055 (ER), 2025 WL 1003964 (S.D.N.Y. Mar. 31, 2025); *Khan Funds Management America, Inc. v. Nations Technologies Inc.*, No. 22-CV-05055 (ER), 2025 WL 1266626 (S.D.N.Y. Apr. 30, 2025). The amended complaint asserts four claims: (1) RICO violations against all Defendants, (2) conspiracy to violate RICO against all Defendants, (3) common law fraud against Nations, Nations USA, Nations Investment, Luo, Yu, and Huang,[8] and (4) a violation of the Computer Fraud and Abuse Act ("CFAA") against Nations, Nations USA, Luo, and Sun. Doc. 35. The Plaintiffs allege the following RICO predicate acts:

- wire fraud (based on the Defendants' international communications related to the Partnership and inducing the Plaintiffs to invest in OST);

- witness tampering, retaliation, and obstruction of justice (based on the Fox Hunt, including the negative press campaign, revocation of Khan Funds's financial license, inducing Dai's younger sister to investigate him, burglary of Khan Funds's Singapore office, the cyberattack, the fraudulent lawsuits in

---

[8] In their memorandum of law in opposition to the motion to dismiss, the Plaintiffs withdrew their common law fraud claim as to Nations USA. Doc. 64 at 57 n.24.

13

China and Singapore, inducing the arrest warrant in China against Dai, pervasive surveillance, attempted kidnapping, and the Twitter threats);

- extortion (based on threats against Dai, his family, and his associates); and

- kidnapping (based on the Fox Hunt's ultimate goal of seeking to repatriate Dai to China).

On February 17, 2023, Nations and Nations USA jointly moved to dismiss the amended complaint for lack of personal jurisdiction, insufficient service of process, and failure to state a claim. Doc. 46. OST also moved to dismiss the two RICO claims (the only claims brought against it) pursuant to Federal Rule of Civil Procedure 12(b)(6) on February 24, 2023. Doc. 53. On September 19, 2023, the Court denied Nations and Nations USA's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) without prejudice as premature and granted OST's motion to dismiss. Doc. 74. As to Nations, the Court explained that "it is premature for Nations to move to dismiss the complaint for failure to serve in compliance with the Hague Convention when Plaintiffs are currently in the process of doing exactly that." *Id.* at 16. As to Nations USA, the Court used its discretion to quash prior service and directed Plaintiffs to serve Nations USA properly in compliance with Federal Rule of Civil Procedure 4. *Id.* at 18. The Court further noted that dismissal was not warranted because proper service remained possible. *Id.* On August 5, 2024, Nations and Nations USA asked the Court to deem the motion to dismiss as ripe for review. Doc. 131. The Court denied the motion on April 30, 2025. Doc. 152.

Luo, Yu, Sun, and Huang jointly moved to dismiss the claims against them for lack of personal jurisdiction and failure to state a claim on May 13, 2024. Docs. 109, 114. On July 26, 2024, Nations Investment moved to dismiss the complaint on the same grounds. Docs. 126–28. The Court denied both motions in an opinion and order issued on March 31, 2025. Doc. 146.

Nations, Nations USA, and Nations Investment filed an answer to the amended complaint on June 17, 2025. Doc. 167. In addition, Nations, Nations Investment, and a

new party, the Partnership, asserted seven counterclaims against Dai, Khan Funds, and two new parties, China Khan and Beijing Khan. *Id.* at 22. The counterclaims allege: (1) breach of contract (against Beijing Khan, China Khan, and Dai), *id.* ¶¶ 193–206; (2) fraud (against all the Counterclaim Defendants), *id.* ¶¶ 207–19; (3) breach of fiduciary duty (against Dai and Beijing Khan), *id.* ¶¶ 220–29; (4) unjust enrichment (against all the Counterclaim Defendants), *id.* ¶¶ 230–34; (5) conversion (against Dai, Beijing Khan, and China Khan), *id.* ¶¶ 235–42; (6) tortious interference with contract (against Dai), *id.* ¶¶ 243–52; and (7) defamation (against Dai), *id.* ¶¶ 253–264. Luo also filed a counterclaim against Dai for defamation, which is substantively identical to the defamation claim brought by Nations, Nations Investment, and the Partnership. Doc. 175.

Dai and Khan Funds moved to dismiss the counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6) on August 7, 2025. Doc. 188. The Counterclaim Plaintiffs filed a motion for alternative service of the counterclaims on China Khan and Beijing Khan on September 8, 2025. Doc. 195.

## III.    STANDARD

"For the purposes of considering a motion to dismiss under Rule 12(b)(6), the same standard applies to complaints as well as counterclaims." *Roberts v. Sugar Hill Records Ltd.*, No. 15 Civ. 2675 (LAP), 2017 WL 11712287, at *2 (S.D.N.Y. Mar. 16, 2017). To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* However, this "flexible plausibility standard" is

not a heightened pleading standard.  *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted).  And "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).  Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

## IV.    DISCUSSION

Dai and Khan Funds assert that the counterclaims should be dismissed because they are:  (1) time-barred, (2) duplicative, and (3) fail to state a claim.  The Court begins its discussion with timeliness.

### A.  Timeliness

#### 1.  Legal Standard

"Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998).  To determine whether the counterclaims are timely, the Court thus looks to the law of New York.

In New York, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either:  (1) New York; or (2) the state where the cause of action accrued."  *Id.* (citing N.Y. C.P.L.R. § 202).  "This means that the shorter statute of limitations governs."  *Gibbons v. Fronton*, 661 F. Supp. 2d 429, 432 (S.D.N.Y. 2009).  Under this regime, a cause of action accrues "where the injury is sustained."  *Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 278 (S.D.N.Y. 2011) (quoting *Gordon & Co. v. Ross*, 63 F.Supp.2d 405, 408 (S.D.N.Y. 1999)).   And "[i]n cases involving economic harm," the injury is "normally" sustained in the "state of the plaintiff's residence."  *Id.* (quoting *Gorlin v. Bond Richman & Co.*, 706 F. Supp. 236, 240 (S.D.N.Y.1989)).

While the "burden of proving that a particular statute of limitation has expired falls on the defendant," the "plaintiff bears the burden of proving that a particular statute of limitation has been tolled."  *Id.* (quoting *Cuccolo v. Lipsky, Goodkin & Co.*, 826 F. Supp. 763, 767 n.2 (S.D.N.Y. 1993)).  Here, the Counterclaim Plaintiffs invoke two bases for the tolling the relevant statutes of limitations:  N.Y. C.P.L.R. § 203(d) ("Section 203(d)") and New York Executive Order No. 8.202.8.[9]  Doc. 206 at 23–24, 26 n.12.

Section 203(d) provides that a

> defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed, except that if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.

N.Y. C.P.L.R. § 203(d).

Thus, if a counterclaim was timely when the action was commenced, then Section 203(d) tolls the statute of limitations from that point onward—regardless of the

---

[9]  The Counterclaim Plaintiffs invoke the executive order only as to their fraud, breach of fiduciary duty, breach of contract, conversion, and unjust enrichment claims.  Doc. 206 at 26 n.12.

relationship between the claims and the counterclaims.  1 Weinstein, Korn & Miller, New York Civil Practice:  CPLR ¶ 203.24 (David L. Ferstendig ed. 2025) ("Thus, a defense or counterclaim, whether or not related to the plaintiff's claim, relates back to the time when the claims asserted in the complaint were interposed and it is maintainable if not then time-barred . . . .").  But if a counterclaim was not timely when the action was commenced, then Section 203(d) only "allow[s] a defendant to assert [the] otherwise untimely claim" if the claim "arose out of the same transactions alleged in the complaint" and "only as a shield for recoupment purposes."  *Carlson v. Zimmerman*, 63 A.D.3d 772, 774 (N.Y. App. Div. 2009) (quoting *DeMille v. DeMille*, 5 A.D.3d 428, 429 (N.Y. App. Div. 2004)).  "It is incumbent upon a party seeking to have claims exempted from the statute of limitations under [Section 203(d)] to demonstrate that the counterclaims fall within the purview of the rule."  *Falk v. FFF Industries, Inc.*, 731 F. Supp. 134, 139 (S.D.N.Y. 1990) (citing *Rochester Health Network, Inc. v. Rochester Hospital Service Corp.*, 123 A.D.2d 509, 510 (N.Y. App. Div. 1986)).

New York Executive Order No. 8.202.8 was issued on March 20, 2020.  It provided, in relevant part, that:

> In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis, any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020.

9 N.Y. C.R.R. § 8.202.8.  "Subsequent executive orders extended the tolling period through November 3, 2020."  *U.S. Bank National Association as Trustee to Bank of America, N.A. v. KeyBank, National Association*, No. 20-CV-3577 (PKC), 2023 WL

18

2745210, at *12 (S.D.N.Y. Mar. 31, 2023) (citing 9 N.Y. C.R.R. 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.67, 8.202.72).

    2. *Analysis*

Dai and Khan Funds contend that the counterclaims are all time-barred. Doc. 188 at 7–11. The Counterclaim Plaintiffs respond that the claims are timely, and that, even if they were not, Section 203(d) would nonetheless revive the claims.[10] Doc. 206 at 23–28. Because the applicability of Section 203(d) would obviate the need to conduct a particularized statute of limitations analysis, the Court begins its analysis there.

    a. *Section 203(d) Revival*

The Counterclaim Plaintiffs contend that "even if the limitations periods had expired" by the time the Plaintiffs had filed their complaint on April 7, 2022, Section 203(d) revives "all of the [c]ounterclaims" because they "arose from the same investment relationship with Dai, which gives rise to [the] Plaintiffs' claims." Doc. 206 at 24. In support of this argument, the Counterclaim Plaintiffs do not attempt to analyze the caselaw under Section 203(d) or apply it to the allegations supporting each of their counterclaims. *Id.* Rather, they dedicate two sentences of their brief to characterizing the allegations in the 57- and 71-page complaint and countercomplaint at a high level and cite a quotation from a single case. *Id.*

In so staking their claim to Section 203(d) revival, moreover, the Counterclaim Plaintiffs do not cite to any authority that holds that Section 203(d) applies whenever claims and counterclaims "arose from the same investment relationship." *Id.* This fact is significant because at least one court has observed that "[t]he mere fact of an ongoing business relationship . . . is insufficient to establish" the applicability of Section 203(d).

---

[10] The Counterclaim Plaintiffs also argue that dismissal on statute of limitations grounds would be premature because "there are factual determinations intertwined with assessing the statute of limitations defense for each and every claim." Doc. 206 at 28. But the Counterclaim Plaintiffs do not identify any factual determinations that are necessarily implicated by the statute of limitations inquiry; nor is it apparent to the Court that there are any. Thus, the Court does not agree that dismissal on timeliness grounds would be premature.

*First Fiduciary Bank N.A. New Jersey v. Companhia de Navegacao Maritima Netumar*, 637 F. Supp. 1182, 1185 (S.D.N.Y. 1986).  And to the extent that the investment relationship here was governed by the Partnership Agreement, courts have also made clear that, for Section 203(d) purposes, it is not sufficient that a counterclaim and claim both implicate the same contract.  *Goldberg Cohen, LLP v. Luv N' Care, Ltd.*, No. 16 Civ. 6576 (NRB), 2018 WL 4538927, at *7 (S.D.N.Y. Sept. 20, 2018); *SCM Corp. v. Fisher Park Lane Co.*, 358 N.E.2d 1024, 1027 (N.Y. 1976).

In analyzing whether Section 203(d) applies, New York courts have instead engaged in a more searching inquiry, under which the counterclaim must be "in the nature of recoupment, the equitable doctrine in which the statutory provision is grounded." *SCM Corp.*, 358 N.E.2d at 1027.  Pursuant to the recoupment doctrine, it is not enough that a claim and counterclaim are related in a "general sense." *Id.*; *cf. Messinger v. Mount Sinai Medical Center*, 279 A.D.2d 344, 345 (N.Y. App. Div. 2001) ("The two actions are related, but there is no common thread tying the two together to warrant revival of the . . . counterclaim under CPLR 203(d)."). Rather, a "party wishing to bring a counterclaim within the protection of [Section 203(d)] must show that the counterclaim 'seek[s] *a recovery-back* predicated on some act or fact growing out of the matter constituting the cause or ground of the action brought,'" rather than "a monetary set-off based on separate and distinct claims." *Falk*, 731 F. Supp. at 139 (S.D.N.Y. 1990) (emphasis added) (quoting *SCM Corp.*, 358 N.E.2d at 1026); *see also Rochester Health Network*, 123 A.D.2d at 510 ("Recoupment does not allow one transaction to be offset against another.").  In applying these principles, New York courts "have 'generally required a tight nexus between claim and counterclaim before section 203(d) will save a counterclaim from an otherwise-applicable statute of limitations.'" *Estate of Mantle v. Rothgeb*, 537 F. Supp. 2d 533, 544 (S.D.N.Y. 2008) (quoting *Macaluso v. U.S. Life Ins. Co.,* No. 03-cv-2337, 2004 WL 1497606, at *7 (S.D.N.Y. July 2, 2004)).

Here, the Counterclaim Plaintiffs make no effort to show that there is a "tight nexus" between the claims and counterclaims, *Rothgeb*, 537 F. Supp. 2d at 544, such that the counterclaims constitute "a shield for recoupment purposes" rather than distinct claims seeking "affirmative relief," *Goldberg Cohen*, 2018 WL 4538927, at *7. Indeed, when Dai and Khan Funds argued in their motion that Section 203(d) does not apply for that reason, the Counterclaim Plaintiffs did not dispute that their claims are "affirmative in nature." Doc. 206 at 23.[11] Instead, they argued that Section 203(d) should apply notwithstanding the counterclaims' affirmative nature, because Section 203(d) revives counterclaims regardless of their relationship to the plaintiff's claims. But the authorities that the Counterclaim Plaintiffs cite simply do not support that proposition. Rather, they make clear that, for Section 203(d) to revive untimely counterclaims, they must be "interposed as an effort at recoupment." *Falk*, 731 F. Supp. at 139; *see also Picture Patriots, LLC v. Aeropostale, Inc.*, 788 F. Supp. 2d 127, 140 (S.D.N.Y. 2011) (noting that "Section 203(d) functions 'only as a shield for recoupment purposes, and does not permit the defendant to obtain affirmative relief'" (quoting *DeMille v. DeMille*, 5 A.D.3d 428, 429 (N.Y. App. Div. 2004))).[12]

---

[11] To be sure, a counterclaim that properly seeks recoupment may also seek affirmative relief insofar as the counterclaim exceeds "the extent of the demand in the complaint." N.Y. C.P.L.R. § 203(d); *Jenkins v. Astorino*, 155 A.D.3d 733, 736 (N.Y. App. Div. 2017). Thus, New York courts have used Section 203(d) to revive counterclaims "to the extent that [they] seek[] to offset" the plaintiff's award as a means of recoupment, but "not to the extent that [they] seek[] affirmative relief." *Balanoff v. Doscher*, 140 A.D.3d 995, 996 (N.Y. App. Div. 2016); *see also Getzel Schiff & Pesce, LLP v. Shtayner*, 233 A.D.3d 758, 760 (N.Y. App. Div. 2024). But here, the Counterclaim Plaintiffs do not argue that the counterclaims in any way constitute an effort at recoupment—rather, they concede that the counterclaims are "affirmative in nature." Doc. 206 at 23.

[12] The Counterclaim Plaintiffs also emphasize that a New York treatise states that "a defense or counterclaim, *whether or not related to the plaintiff's claim*, relates back to the time when the claims asserted in the complaint were interposed and it is maintainable if not then time-barred." Doc. 206 at 23 (quoting Weinstein, Korn & Miller, New York Civil Practice: CPLR ¶ 203.24) (emphasis supplied by the Counterclaim Plaintiffs). But that statement merely reiterates the general rule that a counterclaim that is timely when an action was commenced remains timely even if the counterclaim would have been time-barred if brought in an independent suit. Thus, nothing in the treatise supports the Counterclaim Plaintiffs' apparent contention that Section 203(d) revives all untimely counterclaims, regardless of their relationship to the plaintiff's claims.

21

In support of their contention that Section 203(d) nonetheless revives their claims because they "arose from the same investment relationship," the Counterclaim Plaintiffs do cite to a single case, *Bloomfield v. Bloomfield*, 764 N.E.2d 950, 952 (N.Y. 2001); *see* Doc. 206 at 24. In a parenthetical to that citation, the Counterclaim Plaintiffs highlight the Court of Appeals' observation that "[i]t is axiomatic that claims and defenses that arise out of the same transaction as a claim asserted in the complaint are not barred by the Statute of Limitations." *Bloomfield*, 764 N.E.2d at 952; *see* Doc. 206 at 24.

In *Bloomfield*, the Court of Appeals did hold that Section 203(d) revived an otherwise time-barred defense. But, in doing so, the court emphasized that the relationship between the plaintiff's claim and defense was "direct[]": the defendant challenged the validity of an agreement that the plaintiff was seeking to enforce. *Id.* at 192–93. Thus, the defense operated as a "a shield for recoupment purposes" against the plaintiff's attempt to enforce specific provisions of the contract. *DeMille*, 5 A.D.3d at 774. Subsequent cases have held that the same principle applies to counterclaims, subject to the requirement that the claim and counterclaim share a tight nexus. *See e.g.*, *Balanoff v. Doscher*, 140 A.D.3d 995, 996 (N.Y. App. Div. 2016) ("The defendant's counterclaim alleging legal malpractice relates to the plaintiff's performance under the same retainer agreement pursuant to which the plaintiff would recover, and therefore this counterclaim falls within the permissive ambit of CPLR 203(d)."); *Getzel Schiff & Pesce, LLP v. Shtayner*, 233 A.D.3d 758, 760 (N.Y. App. Div. 2024) ("This counterclaim alleging professional malpractice relates to GSP's performance of accounting services pursuant to which GSP would recover, and, thus, the counterclaim falls within the scope of CPLR 203(d) . . . .").

Here, the relationship between the counterclaims and claims is far more attenuated. Unlike in *Bloomfield*, the plaintiffs are not seeking recover on any contract. Thus, the counterclaims—which *are* premised on the breach of the Partnership Agreement—do not "seek a recovery-back" in the sense described by the *Bloomfield* line

of cases. *SCM Corp.*, 358 N.E.2d at 1027.   And while the counterclaims and claims may be related in the "most general sense" that they arose out of the parties' investment relationship—which itself was governed by the Partnership Agreement—for the purposes of Section 203(d) revival, relatedness in that sense is not sufficient. *Id.; Rothgeb*, 537 F. Supp. 2d at 545–46.  Nor do the Counterclaim Plaintiffs cite to any cases applying Section 203(d) in analogous circumstances.  Thus, the Court concludes that Section 203(d) is inapplicable.

To the extent that any of the counterclaims were untimely as of the filing of the complaint on April 7, 2022, they therefore must be dismissed.  The Court proceeds by addressing each claim, mindful that the shorter statute of limitations applies, whether imposed by New York or Chinese law.  *See Gibbons v. Fronton*, 661 F. Supp. 2d 429, 432 (S.D.N.Y. 2009).

### b.  Breach of Contract

"In New York, the statute of limitations for breach of contract claims is six years, and the claim accrues when the breach occurs, not upon discovery of it." *DM Manager LLC v. Fidelity National Information Services, Inc.*, No. 23-CV-00617 (ER), 2024 WL 1347724, at *15 (S.D.N.Y. Mar. 29, 2024), *aff'd*, No. 24-1217, 2025 WL 863338 (2d Cir. Mar. 19, 2025).  In general, "the statute of limitations accrues when the contract is first breached." *Id.*  A "narrow exception" to that rule applies, however, "for claims 'premised on a continuing wrong' when the contract 'imposes a continuing duty that is repeatedly breached.'" *Id.* (quoting *Fioranelli v. CBS Broadcasting Inc.*, 551 F. Supp. 3d 199, 256 (S.D.N.Y. 2021)).

Dai and Khan Funds argue that the first alleged breach—Dai's diversion of the funds—occurred on December 29, 2015.  Doc. 188 at 9 (citing Doc. 167 ¶¶ 149, 196).  Because the Plaintiffs commenced this action approximately six years and three months later, on April 7, 2022, Dai and Khan Funds contend that the breach of contract counterclaim is untimely under New York law.

23

The Counterclaim Plaintiffs respond by invoking New York's continuing violation doctrine. They assert that certain "breaches of contract are ongoing" because the "Supplemental Agreements require China Khan to make annual payments to Nations Investment through 2035," and thus that the statute of limitations with respect to those breaches has not yet run. Doc. 206 at 27. They also contend that, in general, the contract claim is based on "breaches spanning a number of years" that "continu[e] to be concealed to the present day." *Id.* at 26–27.

The Court need not decide whether the contract claim is timely under New York law, because it is time-barred under the shorter Chinese statute of limitations. *See Stuart*, 158 F.3d at 627 ("[A]n action by a nonresident on a foreign cause of action is untimely if it is barred under the law of either New York or the state where the injury occurred."). The parties agree that, under Chinese law, all of the counterclaims—including the contract claim—are subject to a three-year statute of limitations, and that the clock begins to run "when a potential plaintiff knew or should have known that its civil law rights have been infringed" and the identity of the infringer. Doc. 206 at 25; Doc. 188 at 9; *see Nanjing CIC International Co. v. Schwartz*, No. 6:20-CV-07031 (EAW), 2022 WL 170606, at *5 (W.D.N.Y. Jan. 19, 2022).

Dai and Khan Funds contend that the Counterclaim Plaintiffs knew or should have known about the breach in "early 2017," because that is when they allegedly "learned through a routine audit conducted on the Partnership that only about $16.5 million had been invested in the Partnership." Doc. 167 ¶ 7; Doc. 188 at 9. By contrast, the Counterclaim Plaintiffs assert that the contract claim only accrued "on or around November 29, 2017[,] at the earliest" because that is when they "discovered that Dai and his entities had deserted their [Chinese] offices and reported Dai to the Public Security Bureau." Doc. 206 at 25 (citing Doc. 167 ¶¶ 86, 96–97). They further contend that, under Chinese law, the three-year statute of limitations "reset" on November 9, 2020, and October 25, 2023, when Nations Investment and the Partnership sent demand letters to

Dai and Beijing Khan alleging "significant breaches of the respective agreements by diverting funds."[13]  *Id.*

Dai and Khan Funds have the better argument.  As the Counterclaim Plaintiffs concede, the Chinese statute of limitations begins to run when the plaintiff knew or *should have known* that his rights had been infringed and by whom.  Here, the Counterclaim Plaintiffs allege that "[i]n early 2017, Nations Investment learned through a routine audit conducted on the Partnership that only about $16.5 million had been invested by the Partnership," "an entity controlled by Dai named China Khan was indebted to the Partnership for $27 million[,] and the Partnership owed a shockingly high management fee of $11.5 million to China Khan."  Doc. 167 ¶ 7; *see also* Doc. 175 ¶¶ 36–37.  They further allege that "discovering these facts" led "Nations Investment and [Nations] [to] . . . s[eek] explanations from Dai," *id.*, but that "Dai and Beijing Khan were unable to explain or account for the issues revealed by the 2016 Audit" even though "Nations Investment and [Nations] sought clarification from [them] about these issues throughout early 2017," *id.* ¶ 78.  And, as a result, Nations Investment allegedly took steps to "more closely monitor Dai's activities."  *Id.* ¶ 7.

Taken together, these allegations show that the Counterclaim Plaintiffs at very least *should have known* that their civil law rights had been infringed when they received the results of the audit in early 2017.  Indeed, that Nations Investment and Nations took

---

[13]  The Counterclaim Plaintiffs base this contention on a declaration from Jacques DeLisle, the Stephen A. Cozen Professor of Law, Professor of Political Science, Director of the Center for the Study of Contemporary China, and Co-Director of the Center for Asian Law at the University of Pennsylvania, which states that:

> Where actions by a plaintiff are sufficient to "interrupt" [*zhongduan*] the running of the three-year limitations period under subsections (1) (concerning request/demand letters) or (3) (concerning commencement of litigation or arbitration), or (4) (other circumstances similar to (3)) [of the relevant statutory provision], the prospective plaintiffs gets a "fresh clock" under Chinese law. That is, the limitation period is "counted anew" [*chongxin jisuan*] and plaintiff gets a new three-year limitations period running from the date of the "interrupting" event (that is, the request/demand letter or initiation of litigation or arbitration or similar moves).

Doc. 208 at 26–27 ¶ 56.

25

steps to investigate the audit findings and monitor Dai's activities suggests that the Counterclaim Plaintiffs actually knew of the alleged breach at that time. So too does the allegation that Nations and Nations Investment sought explanations from Dai and Beijing Khan regarding the audit's "revelations," but failed to receive satisfactory responses. Doc. 167 ¶¶ 76, 78. In that regard, the Court considers it significant that the Counterclaim Plaintiffs do not allege that they were unaware of Dai's alleged diversion, mismanagement, and theft in early 2017, but rather that, because of Dai's unsatisfactory explanations regarding the audit, they were "kept in the dark about the true *scope*" of these alleged misdeeds. *Id.* ¶¶ 78, 76 (emphasis added).[14] Thus, based on their own allegations, the Counterclaim Plaintiffs at least should have known about the alleged breach in early 2017.

Because the contract counterclaim accrued in early 2017, the statute of limitations expired by early 2020. Thus, no "reset" could have been triggered by the November 9, 2020, and October 25, 2023, demand letters under Chinese law, because the statute of limitations had already run. Doc. 208 at 26–27 ¶ 56 (stating that a reset "interrupt[s]" a running statute of limitations). Because the breach of contract claim is time-barred under Chinese law, the claim is therefore dismissed.

> c. *Fraud, Breach of Fiduciary Duty, Conversion, and Unjust Enrichment*

The fraud, breach of fiduciary duty, conversion, and unjust enrichment claims are untimely for similar reasons.

---

[14] Although Luo alleges that Nations Investment was generally "unaware of Dai's diversions" because Beijing Khan "did not provide Nations Investment with access to the Partnership's books or records or provide information about its finances," Luo does not allege that Nations Investment remained unaware after it received the audit results. Doc. 175 ¶ 39. In any event, any such allegation would be implausible given the information revealed by the audit and Luo's allegation that Nations Investment and Nations were "[t]roubled by the issues revealed" by the audit, "sought clarification from Dai and Beijing Khan about these issues throughout early 2017," and "did not receive satisfactory answers or explanations as to what had become of the[] monies." *Id.* ¶ 40. Moreover, and as the Court has explained, these allegations at very least suggest that by early 2017, the Counterclaim Plaintiffs should have known about their contract claim, which is sufficient for accrual under Chinese law.

26

"Under New York law, the statute of limitations for fraud is the greater of six years from the time of accrual or two years from the time the plaintiff discovered the fraud or could with reasonable diligence have discovered it." *Soward*, 814 F. Supp. at 279 (citing N.Y. C.P.L.R. § 213(8)).  When a plaintiff's breach of fiduciary duty or conversion is based on fraud, the same statute of limitations applies.  *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 272 (N.Y. 2009) (breach of fiduciary duty); *Star Auto Sales of Queens, LLC v. Filardo*, 203 A.D.3d 865, 867 (N.Y. App. Div. 2022) (conversion).  Unjust enrichment claims based on the breach of a fiduciary duty are similarly subject to a six-year statute of limitations.  *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001).

Applying these principles, Dai and Khan Funds contend that, under New York law, the statute of limitations would have run on December 29, 2021, at the latest, because that is six years after the first allegedly fraudulent transfer of funds.  Doc. 188 at 10 (citing Doc. 167 ¶¶ 149, 196); Doc. 217 at 4.  The Counterclaim Plaintiffs do not clearly identify when they believe these claims accrued or when the statute of limitations would run.[15]  Rather, they emphasize that the fraud, fiduciary duty, conversion, and unjust enrichment claims are all premised on "diversions, coverups, and breaches . . . [that] continu[e] to be concealed to the present day."  Doc. 206 at 26–27.[16]  They also contend

---

[15]  The only potential exception to this is the Counterclaim Plaintiffs' discussion of the conversion claim. That claim, the Counterclaim Plaintiffs contend, "may not even have accrued until November 9, 2020," Doc. 206 at 27, because "where possession is originally lawful, a conversion does not occur until the owner makes a demand for the return of the property and the person in possession of the property refuses to return it," *Siegler v. Lippe*, 189 A.D.3d 903 (N.Y. App. Div. 2020).  The Court need not address this argument, however, because the claim would be time-barred under the shorter Chinese statute of limitations.

[16]  Although the Counterclaim Plaintiffs argue that the continuing violation doctrine tolls the statute of limitations "with respect to [certain] breaches of contract"—and cite a case in support of that contention— they do not explicitly invoke the continuing violation doctrine as to their fraud, fiduciary duty, conversion, or unjust enrichment claims.  Doc. 206 at 27.  To the extent that they mean to do so by referencing the Counterclaim Defendants' "continu[ed] . . . conceal[ment]" of the alleged violations, the Court considers this argument waived, because the Counterclaim Plaintiffs do not cite any cases that would support the application of the doctrine outside of the breach of contract context or otherwise explain why it should apply to their fraud, fiduciary duty, conversion, or unjust enrichment claims.  *See King v. Federal National Mortgage Association*, No. 24-CV-1153 (GRB) (ST), 2025 WL 1707193, at *5 (E.D.N.Y. Mar. 10,

that these claims are subject to 228 days of tolling under Executive Order 8.208.8. *Id.* at 26 n.12.

Whatever the merits of these arguments, the Court need not address them because the three-year Chinese statute of limitations would bar the fraud, breach of fiduciary duty, conversion, and unjust enrichment claims. At bottom, these claims are based on the Counterclaim Plaintiffs' allegations of diversion. Thus, for the reasons set forth above, the Counterclaim Plaintiffs either knew or should have known about the alleged fraud and breach of fiduciary duty when they received the results of the audit in early 2017. The statute of limitations for the fraud-based claims and the fiduciary duty claim therefore ran in early 2020, well before the initial complaint was filed. Those claims are thus dismissed.[17]

### d. Tortious Interference with Contract

"New York provides for a three-year statute of limitations for tortious interference claims." *Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG*, 96 F.4th 327, 344 (2d Cir. 2024). "[A]ccrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint." *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993). "Since damage is an essential element of the tort, the claim is not enforceable until damages are sustained." *Id.* Thus, tortious interference claims accrue on the date that the plaintiff was "first injured." *Red Mountain Medical Holdings, Inc. v. Brill*, No. 23-433, 2024 WL 1005561, at *1 (2d Cir. Mar. 8, 2024); *see also Spinap Corp. v. Cafagno*, 302 A.D.2d 588 (N.Y. App. Div. 2d Dep't 2003) (explaining that "tortious interference with contract is not a continuous tort"). The date that a plaintiff discovered that he was injured is not relevant. *Brill*, 2024 WL 1005561, at

---

2025) ("To the extent Defendants have cited no applicable case law and have failed to clearly identify the grounds for this argument, the Court deems it perfunctory and thus waived.").

[17] Because the Court concludes that these claims are time-barred, it need not address the Counterclaim Defendants' argument that they are duplicative. Doc. 188 at 11–15.

*1 n.1 (citing *Andrew Greenberg, Inc. v. Svane, Inc.*, 36 A.D.3d 1094, 1099 (N.Y. App. Div. 2007)).

Dai and Khan Funds argue that the tortious interference claim accrued when the funds were first allegedly diverted in December 2015. Doc. 188 at 11; Doc. 167 ¶ 149. The Counterclaim Plaintiffs recognize that the relevant inquiry under New York law centers around the date of injury. Doc. 206 at 27. But they argue, somewhat paradoxically, that their tortious interference claim did not accrue until "August 2019, when they received the Partnership's bank statements." *Id.* (citing Doc. 167 ¶ 251).

The Court concludes that the tortious interference claim is untimely. As an initial matter, the Court notes that the claim would be untimely under Chinese law for the reasons already explained. That is, the Counterclaim Plaintiffs should have known about Dai's alleged tortious interference when they received the audit results in early 2017; as a result, the Chinese statute of limitations ran in early 2020.

In addition, New York law provides a shorter statute of limitations than Chinese law that would render the tortious interference claim untimely. That is so because the Counterclaim Plaintiffs allege that Dai is liable for tortious interference based on his "procure[ment of] Beijing Khan's breach of the Partnership Agreement by diverting funds." Doc. 167 ¶ 248. It thus follows that the Counterclaim Plaintiffs were first injured by Dai's interference when the funds were first allegedly diverted in December 2015. *Id.* ¶ 149; *see also id.* ¶ 250 (alleging that the damages that resulted from the tortious inference included "the amount of the funds diverted"). And because a plaintiff's "discovery of the injury" does not trigger accrual, *Kronos*, 612 N.E.2d at 292, the Counterclaim Plaintiffs' argument that the clock began to run "when they received the Partnership's bank statements" is without merit, Doc. 206 at 27. Thus, under New York law, the statute of limitations ran in December 2018, and the claim was untimely as of the filing of the complaint.

*e. Defamation*

In New York, the statute of limitations for defamation claims is one year. N.Y. C.P.L.R. § 215(3). "Such a cause of action accrues at the time the alleged statements are originally uttered." *Melious v. Besignano*, 125 A.D.3d 727, 728 (N.Y. App. Div. 2015). The counterclaims allege that Dai made defamatory statements between November 2018 and January 2023. Doc. 167 ¶¶ 177, 254–59. Under New York's one-year statute of limitations, however, any defamation claims based on statements made prior to April 7, 2021, are time-barred. Thus, to the extent that the defamation claims are premised on statements made prior to April 7, 2021, those aspects of the claims are dismissed.[18]

In sum, the Court holds that the breach of contract, fraud, breach of fiduciary duty, unjust enrichment, conversion, and tortious interference with contract counterclaims are time-barred. Those claims are therefore dismissed as to all of the Counterclaim Defendants. *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 6 (2d Cir.1990) (explaining that *sua sponte* dismissal is appropriate where issues concerning the defendant are essentially the same as those issues faced by the defendants whose motions to dismiss were granted); *Wachtler v. County of Herkimer,* 35 F.3d 77, 82 (2d Cir. 1994) (noting that a district court may dismiss a complaint *sua sponte* if it fails to state a claim against non-moving defendants). The defamation claims, however, are only untimely as to statements allegedly made prior to April 7, 2021.

**B. Failure to State a Claim**

Given the Court's timeliness ruling, only the defamation counterclaims discussed below remain. The Court thus turns to Dai's argument that these claims nonetheless fail to state a claim pursuant to Rule 12(b)(6).

---

[18] In arguing that the defamation counterclaim is timely, the Counterclaim Plaintiffs also assert—without further explanation or reference to particular factual allegations—that "[o]ther[] [statements] are properly asserted to offset Dai's claims." Doc. 206 at 28. To the extent that they mean to raise a distinct ground for Section 203(d) revival based on this single conclusory sentence, the Court considers the argument waived. *See Abdou v. Walker*, No. 19 Civ. 1824 (PAE), 2022 WL 3334700, at *3 (S.D.N.Y. Aug. 12, 2022).

"To state a claim for defamation under New York law, the plaintiff must allege (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on the part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 699 (S.D.N.Y. 2018) (quoting *Thai v. Cayre Group, Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010)).

Dai's allegedly defamatory statements fall into three broad categories: (1) statements to law enforcement, Doc. 167 ¶¶ 254–56; Doc. 175 ¶¶ 117–19; (2) statements made in this lawsuit, Doc. 167 ¶¶ 258–59; Doc. 175 ¶¶ 121–22; and (3) statements made in a January 2023 Wire China article, Doc. 167 ¶ 257; Doc. 175 ¶¶ 114–15, 120. The Court addresses each set of statements in turn.

### 1. Statements to Law Enforcement

The defamation counterclaims allege that between July 20, 2021, and January 12, 2023, Dai made various false statements to Chinese regulatory authorities and DOJ officials. Doc. 167 ¶¶ 254–256; Doc. 175 ¶¶ 117–119. They allege, in particular, that:

- Between July 20, 2021, and August 13, 2021, "Dai made false statements about [Nations] to Chinese regulatory authorities," which included the claims that "[Nations], Luo, and Sun were under investigation by the FBI," "that Luo and Sun 'were wanted by the federal government of the U.S.,'" and "that [Nations] 'manipulated' its share price." Doc. 167 ¶ 254; Doc. 176 ¶ 117.

- On December 24, 2022, Dai emailed six DOJ officials with "false accusations about [Nations]," including the accusation that "'[N]ations' is part of the '[C]hinese military' and is trying to kill him." Doc. 167 ¶ 255; Doc. 175 ¶ 118.

- On January 12, 2023, Dai emailed six DOJ officials—and copied numerous individuals, including email addresses associated with the Wall Street Journal and Bloomberg Newsroom—accusing Nations of being a "Chinese military company," "spying in America," and having bought his social security number. Doc. 167 ¶¶ 189, 256; Doc. 175 ¶ 119.

Dai contends that these statements cannot support a defamation claim because they are privileged. Doc. 188 at 21. In New York, courts recognize a qualified privilege

for communications to law enforcement.[19]  Thus, when "a person reports a suspected crime to law enforcement," her statements regarding the suspected crime are subject to a "qualified law enforcement privilege." *Brandenburg v. Greek Orthodox Archdiocese of North America*, No. 20-CV-3809 (JMF), 2021 WL 2206486, at *9 (S.D.N.Y. June 1, 2021).   "A plaintiff can overcome a defendant's qualified privilege if she can show that the defendant made the relevant statements with malice—either common-law malice, meaning 'spite or ill will,' or constitutional malice, meaning '[a] high degree of awareness of [the statement's] probable falsity.'" *Id.* at *10 (quoting *Liberman v. Gelstein*, 605 N.E.2d 344, 349–50 (N.Y. 1992)).

The Counterclaim Plaintiffs do not dispute that these statements fall within the qualified privilege, but rather argue that dismissal is not warranted because the counterclaims sufficiently allege malice.  Doc. 206 at 22–23.  In general, "issues of intent and motive are typically factual inquiries that should not be decided on a motion to dismiss 'unless the nonmovant has failed to [allege] any evidence . . . that the defendants acted with scienter.'" *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 517 (S.D.N.Y. 2014) (quoting *In re JWP Inc. Securities Litigation*, 928 F. Supp. 1239, 1256 (S.D.N.Y. 1996)).  Here, the counterclaims allege that Dai made the statements to "continue to conceal his misappropriation of funds from [Nations], Nations Investment[,] and GTQX," Doc. 167 ¶ 190, and "create a false narrative that he was a victim rather than a fraudster," *id.* ¶144, and that his "false reports about [Nations] began only after [Nations] began taking action to pursue the funds Dai diverted," *id.* ¶ 161; *see Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 634 (E.D.N.Y. 2018) (holding that an allegation that a statement was made "to deflect blame . . . onto plaintiffs because they were political opponents" sufficiently alleged malice).  The Counterclaim

---

[19]  Because the Counterclaim Plaintiffs do not argue that the analysis differs under Chinese law—or develop any argument as to why, under Chinese law, the claims would survive—the Court focuses its analysis on New York law.  *See* Doc. 206 at 21–23.

Plaintiffs also allege that "Dai made such claims even though his prior lawsuits based on the same made-up facts went nowhere, and one was deemed frivolous." Doc. 167 ¶ 260. Because the Court cannot say that the Counterclaim Plaintiffs "ha[ve] failed to [allege] any evidence . . . that [Dai] acted with scienter," dismissal at this stage would be premature. *LBBW Luxemburg S.A.*, 10 F. Supp. 3d at 517. The defamation counterclaim may therefore proceed on the basis of the statements made to law enforcement.

2. *Statements Made in this Lawsuit*

The counterclaims also allege that Dai defamed Nations and Luo in the initial and amended complaints in this action. Doc. 167 ¶ 258; Doc. 175 ¶ 121. They allege that the complaint "makes unending false statements about [Nations] and Nations Investment," including the allegations that they were "active participants and central persons in the . . . orchestration, perpetration, and execution of the Enterprise's scheme to illicitly procure protected technologies and commodities for end use in China" and helped "launder funds and facilitate[] the acquisitions required to steal high technology for the ultimate benefit of the military." Doc. 167 ¶ 259; Doc. 175 ¶ 122. The Counterclaim Plaintiffs allege that these allegations were "utter fabrications" that were "intended solely to harm the reputation of [Nations] to help blunt any efforts by [Nations] to either enforce the Singapore Judgment against Dai in the United States or assert claims against Dai for misappropriation of the China Funds." Doc. 167 ¶ 258; Doc. 175 ¶ 121. And they highlight that Dai "made such claims even though his prior lawsuits based on the same made-up facts went nowhere, and one was deemed frivolous" by a judge in the Eastern District of New York. Doc. 167 ¶ 260; Doc. 175 ¶ 123 (citing *Dai v. Alibaba Cloud US LLC*, No. 19-cv-6140, 2020 WL 122945, at *2 (E.D.N.Y. Jan. 9, 2020)).

Dai contends that these statements cannot support a defamation claim because they are absolutely privileged. Doc. 188 at 21–22. In New York, "absolute immunity from liability for defamation exists for oral or written statements made by attorneys in connection with a proceeding before a court when such words and writings are material

and pertinent to the questions involved." *Gottwald v. Sebert*, 220 N.E.3d 621, 628–29 (N.Y. 2023) (citation modified) (quoting *Front, Inc. v. Khalil*, 28 N.E.3d 15, 18 (N.Y. 2015)).

The Counterclaim Plaintiffs do not dispute that the statements in the complaints are covered by the absolute privilege. Rather, they contend that because the statements were made maliciously and solely to harm Nations's reputation, a "sham" exception to the litigation privilege applies. Doc. 206 at 22–23. But as Dai notes, Doc. 217 at 12, "[t]he litigation privilege, being absolute, 'confers immunity from liability regardless of motive.'" *Gottwald*, 220 N.E.3d at 629 (quoting *Park Knoll Associates v. Schmidt*, 451 N.E.2d 182, 184 (N.Y. 1983)). Indeed, the Court of Appeals recently clarified that, insofar as some lower courts had previously recognized a "sham exception" to the litigation privilege, these rulings were "inconsistent with the absolute privilege . . . [that applies to] statements made in connection with judicial proceedings." *Id.* Thus, the Counterclaim Plaintiffs' invocation of the so-called "sham exception" lacks merit. Therefore, the defamation counterclaim cannot proceed based on these statements.

### 3. *Statements Made in the Wire China Article*

The Counterclaim Plaintiffs finally allege that Dai made false statements about Nations in a January 2023 article published in Wire China. Doc. 167 ¶ 257; Doc. 175 ¶¶ 114–15, 120. They highlight, in particular, Dai's alleged statements that he was a "victim of a 'plot [by Nations and the Chinese government] to steal U.S. chip technology for China's military'" and that "he could not provide evidence of his claims because 'the enemy . . . will kill you if you know more.'" Doc. 167 ¶ 257. The Counterclaim Plaintiffs allege that, in using the phrase "the enemy," Dai was referring to Nations and its affiliates. *Id.*

Dai and Khan Funds argue that these statements cannot support a defamation claim because they are also covered by the absolute litigation privilege. In support of this contention, they rely, in particular, on New York cases holding that "[s]tatements by

34

parties to legal proceedings are absolutely privileged if those statements are in any way pertinent to the litigation." *Black v. Green Harbour Homeowners' Association, Inc.*, 19 A.D.3d 962, 963 (N.Y. App. Div. 2005); *see* Doc. 188 at 23. Dai and Khan Funds contend that these statements fall within the scope of this privilege because Dai allegedly made them "during the course of this litigation" and, in doing so, relied on "many of the same talking points [from] the Complaint." Doc. 188 at 23 (quoting Doc. 167 ¶ 191; Doc. 175 ¶ 114).

Here, again, the Counterclaim Plaintiffs do not argue that the statements are not covered by the absolute litigation privilege on pertinency or any other ground; they argue only that the sham exception exempts these statements from the privilege. But, for the reasons just explained, the Court concludes that that argument lacks merit. Thus, to the extent that the defamation counterclaim is based on the Wire China statements, the claim is dismissed. [20]

## V. CONCLUSION

In sum, the counterclaims against all of the Counterclaim Defendants, except for the defamation counterclaims against Dai, are DISMISSED. The defamation counterclaims may proceed only as to Dai's alleged statements to law enforcement. Because the counterclaims against Beijing Khan and China Khan are time-barred, the motion for alternative service, Doc. 192, is also denied as moot. The Clerk of the Court is respectfully requested to terminate the motions, Docs. 187, 192.

---

[20] Luo's defamation claim is substantively identical to the Counterclaim Plaintiffs' defamation claim, Doc. 175 ¶¶ 116–27, and rather than raising any independent grounds for dismissal, he joins in the Counterclaim Plaintiffs' arguments. Doc. 211. The Court's analysis therefore applies equally to his counterclaim.

It is SO ORDERED.

Dated:    March 24, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

36